## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

Our Alchemy, LLC, *et al.*,[1]

                Debtors.

Chapter 7

Case No. 16-11596 (KG)
(Jointly Administered)

**Bidding Procedures Hearing Date:**
**July 25, 2018 at 11:00 a.m.**

**Bidding Procedures Objection Date:**
**July 18, 2018 at 4:00 p.m.**

**Sale Hearing Date:**
**T.B.D.**

**Sale Objection Date:**
**T.B.D.**

**TRUSTEE'S MOTION FOR (A) AN ORDER (I) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS; (II) APPROVING BREAK-UP FEE; (III) APPROVING FORM AND MANNER OF SALE NOTICE; AND (IV) SCHEDULING AN AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF THE SALE; (B) AN ORDER (I) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS AND INTERESTS; AND (C) CERTAIN RELATED RELIEF**

George L. Miller, in his capacity as Chapter 7 Trustee (the "Trustee") for the estates of

the above-captioned debtors (the "Estates" of the "Debtors"), respectfully submits this motion

(the "Sale Motion") for an order substantially in the form attached hereto as Exhibit A (the

"Bidding Procedures Order"): (a) approving the bidding procedures (the "Bidding Procedures"),

a copy of which is attached to the Bidding Procedures Order, in connection with the sale (the

"Sale") of the Debtors' assets identified as "Acquired Assets" in the Asset Purchase Agreement

dated as of July 3, 2018, by and among the Trustee as seller, and OA Acquisitions LLC (the

"Stalking Horse Purchaser") as purchaser, which is attached hereto as Exhibit "B" (including

all exhibits, schedules, and ancillary agreements related thereto, and as amended and in effect,

---

[1] The Debtors are: Our Alchemy, LLC, Case No. 16-11596, and Anderson Digital, LLC, Case No. 16-11597.

the "Stalking Horse Agreement" or "APA"), (b) approving the Break-Up Fee and Transaction Expenses payable to the Stalking Horse Purchaser, (c) approving the form and manner of the sale notice, (d) scheduling an auction (the "Auction") and sale hearing (the "Sale Hearing"), and (e) granting certain related relief.

By this Sale Motion, the Trustee also requests entry of an order substantially in the form attached hereto as Exhibit C (the "Sale Order"): (a) approving and authorizing the Sale to the Stalking Horse Purchaser or other Prevailing Bidder[2] of the Acquired Assets free and clear of liens, claims, interests and encumbrances (other than as described in the Stalking Horse Agreement), (b) authorizing and approving the Stalking Horse Agreement or Alternative Asset Purchase Agreement (as defined below), and (c) granting certain related relief.  In support of this Sale Motion, the Trustee respectfully states:

**Jurisdiction, Core Nature, and Venue**

1.      The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).  Venue is proper in this Bankruptcy Court under 28 U.S.C. §§1408 and 1409.

**Background**

A.      **The Debtors' prepetition business and debt structure**

2.      On July 1, 2016 (the "Petition Date"), the Debtors commenced the above-captioned bankruptcy cases (the "Bankruptcy Cases") by each filing voluntary petitions for relief under chapter 7 of the Bankruptcy Code in the Bankruptcy Court.

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings provided for such terms in the Bidding Procedures or the Stalking Horse Agreement, as applicable.

3.      Prior to the Petition Date, the Debtors operated as a film and media distributor. The Debtors' business included acquiring and distributing feature films, television series, and other programming via multiple platforms, including online, electronic, and hard copy distribution channels.  The Debtors were among the largest independent distributors of film and television content across multiple platforms and windows in North America.  The Debtors were also full-service acquisition and distribution companies providing one-stop destinations for sales, marketing and releasing services across all major media channels.  The Debtors served as independent distributors that provided direct access to theatrical exhibitors, and certain major physical retailers (including Wal-Mart, Target and Best Buy), and also served as a leading independent supplier to digital platforms, cable, satellite and television (including Netflix, Comcast, DIRECTV, Amazon and Hulu).  The Debtors currently own interests in a diverse library of film and television titles in North America and select international markets.

4.      The Acquired Assets consist primarily of the Estates' rights with respect to their library of film and television titles and other intellectual property, including distribution or other exploitation rights, as well as certain physical property related to their library, as set out in detail in the Stalking Horse Agreement.

5.      On or shortly after the Petition Date, the Office of the United States Trustee appointed the Trustee.  The Debtors have ceased all operations, and the Trustee is in the process of liquidating all of their assets.

6.      As of the Petition Date, the Debtors were indebted to SunTrust Bank, as administrative agent ("SunTrust") for itself and for certain other secured lenders (collectively, and including SunTrust in its capacity as a lender, the "Secured Lenders") in an amount of at least $46,306,475, (the "Secured Obligations"), and this indebtedness was secured with an

3

asserted first priority security interest in substantially all of the Debtors' assets, including cash and other proceeds of the Debtors' accounts receivable and inventory.

7.       Shortly after the Petition Date, the Trustee commenced negotiations with the Secured Lenders, and eventually on or about September 1, 2016 the Trustee and SunTrust entered into a certain sharing agreement (the "Sharing Agreement") under which (i) the Trustee obtained authority to use SunTrust's cash collateral to enable him to market and attempt Asset Sales (as defined in the Sharing Agreement), as well as certain carve-outs from the Secured Lenders' liens, and (ii) the Trustee will retain a certain portion of the proceeds of the sale of the Debtors' assets for the benefit of the Estates, in each case as provided in the Sharing Agreement. On October 25, 2016, the Court entered an order approving the Sharing Agreement [Docket No. 302] (the "Sharing and Reimbursement Order").

8.       In addition, the Trustee has entered into a stipulation (the "Guilds Stipulation") with the Directors Guild of America, Inc., the Screen Actors Guild – American Federation of Television and Radio Artists, and the Writers Guild of America West, Inc. (collectively, the "Guilds") and SunTrust, under which, *inter alia*, the Guilds will share in the proceeds from the sale of certain assets of the Estates.  On March 1, 2018, the Bankruptcy Court entered an order approving the Guilds Stipulation.

**B.       The Trustee's goal of selling the Acquired Assets and marketing efforts**

9.       The Trustee's primary goal in these Bankruptcy Cases is to liquidate certain of the Debtors' assets identified as Acquired Assets in the Stalking Horse Agreement by a sale through a competitive sale process pursuant to 11 U.S.C. §363 designed to maximize the value received from the sale.

LEGAL\33319041\10 00601.0823.000/390810.000
07/03/2018

10.     Since shortly after the Petition Date, the Trustee has been working diligently to market the Debtors' assets.  In an effort to maximize value for the Estates, the Trustee undertook a number of steps to ensure that the Sale process will be competitive.  Specifically, the Trustee: (i) retained Focus Advisory Services LLC, a consultant in the entertainment industry, to assist with the Sale process; (ii) activated an electronic dataroom containing "due diligence" materials related to the Debtors' assets and arranged for interested parties to have access; and (iii) contacted and solicited, through Focus Advisory Services (among others), a number of potential purchasers who have expressed an interest in the Acquired Assets and/or operate in the same sector as the Debtors.

11.     As a result of these efforts, the Trustee has received expressions of interest from numerous parties, including numerous parties who executed confidentiality agreements in connection with their review of the due diligence material.  The Trustee eventually received multiple offers for the Acquired Assets, the best of which, in the Trustee's business judgment, was submitted by the Stalking Horse Purchaser.

12.     After arm's length negotiations, and after consultation with SunTrust, the Trustee, reached an agreement with the Stalking Horse Purchaser under which the Stalking Horse Purchaser has agreed to pay $1.2 million for the Acquired Assets, pursuant to the terms of the Stalking Horse Agreement, subject to Bankruptcy Court approval and to higher and better bids.

**C.      Terms of Stalking Horse Agreement**

13.     The principal terms of the Stalking Horse Agreement are summarized as follows:[3]

---

[3] This summary of the Stalking Horse Agreement is provided solely for the convenience of the parties in interest. To the extent there is any inconsistency between this summary and the Stalking Horse Agreement, the latter governs in all respects.  Capitalized terms used but not defined in this chart have the meanings ascribed in the Stalking Horse Agreement.

5

| Agreement Provision | Summary Description |
|---|---|
| Seller | George L. Miller, as chapter 7 trustee for the bankruptcy estates of the Debtors. |
| Stalking Horse Purchaser | OA Acquisitions LLC. |
| Purchase Price | Cash in the amount of $1.2 million, to be delivered at Closing, plus the Stalking Horse Purchaser's assumption of the Assumed Liabilities and Permitted Liens (as defined in the Stalking Horse Agreement).<br><br>(*See* APA at §§3.1-3.2) |
| Deposit | An amount equal to 10% of the Purchase Price, payable to the Trustee upon execution of the APA, to be held by the Trustee in escrow until Closing (the Stalking Horse Purchaser's "<u>Deposit</u>").<br><br>(*See* APA at §11.16, Def'n of "Deposit") |
| Acquired Assets | All of the Estates' right, title, and interest in and to the following but in all cases excluding the Excluded Assets:<br><br>(a) all Contract Rights whether or not summarized in Schedule I of the APA with respect to each Picture listed therein, including but not limited to: (i) all right, title and interest of the Estates to distribute, exhibit or otherwise exploit any Picture; and (ii) the benefit of any unrecouped and outstanding amounts, if any, including any Minimum Guarantee paid by the Debtors or the Estates;<br><br>(b) all negatives, prints and all other physical or other materials (including digital materials) and personal property owned or controlled by the Estates, together with the Estates' rights to access to any negatives, prints, other physical or other materials constituting or used in connection with each applicable Picture, including those elements which are stored by the Estates at a laboratory or other facility;<br><br>(c) the right to receive and retain all sums payable from the Exploitation of the Pictures pursuant to the Designated Contracts or otherwise pursuant to the APA in respect of the Pictures for all accounting periods on or after the Closing Date, other than the license fees payable by Netflix, Inc. under the existing Sublicense Agreement with Netflix, Inc. and/or as otherwise set forth under the Netflix Stipulation; and<br><br>(d) any right to receive any sums payable on or after the date hereof by a licensor (together with its successors and assigns) in connection with any claim, action, demand, suit, lawsuit, arbitration, proceeding or litigation, whether arising prior to, on, or after the date hereof, to collect or recover any unrecouped and outstanding amounts of any advance, license fee, guaranteed payment, or similar amount paid by any of the Debtors, or with respect to expenses or other amounts incurred by any of the Debtors, pursuant to the terms of the Designated Contracts or otherwise pursuant to the APA. |

| Agreement Provision | Summary Description |
|---|---|
| | (*See* APA at §11.6, Def'n of "Acquired Assets") |
| Excluded Assets | In no event shall the Trustee be deemed to sell, transfer, assign, convey, and the Estates shall retain all right, title, and interests to, in and under the assets, properties, interests, and rights of the Estates not included in the above description of Acquired Assets or set forth below (the "Excluded Assets"): <br><br> (a) All sums paid, accrued or otherwise payable (but not paid as of the Closing Date) to the Estates from the Exploitation of the Pictures pursuant to the Designated Contracts in respect of the Pictures for all accounting periods prior to the Closing Date; <br><br> (b) All inventory of any kind or nature, merchandise and goods maintained, held or stored by or for the Trustee on the Closing Date, excluding those Acquired Assets set forth in clause (b) of the definition of Acquired Assets; <br><br> (c) All sums and fees payable by Netflix, Inc. under the Estates' existing Sublicense Agreement with Netflix, Inc.; <br><br> (d) All cash and cash equivalents and certificates of deposit of the Estate as of the Closing Date; <br><br> (e) All deposits, advances and prepaid expenses of the Estates in respect of utilities, taxes, and insurance policies; <br><br> (f) All tax refunds and prepaid taxes of the Estates; <br><br> (g) All avoidance claims and causes of action under the Bankruptcy Code or applicable state law, including avoidance claims and causes of action of the Debtors arising under chapter 5 of the Bankruptcy Code; <br><br> (h) All claims or causes of action of the Debtors accrued as of the Closing Date including but not limited to claims and causes of action against the Debtors' current or former directors and officers; <br><br> (i) All insurance policies, including any directors and officers and errors and omissions insurance policies and claims arising thereunder; and <br><br> (j) All documents (whether copies or original), to the extent that they (i) relate to the Excluded Assets or which the Trustee or the Debtors are required by law to retain and, in each case, which the Seller or the Debtors are prohibited by law from providing a copy of or to the Purchaser, or (ii) are covered by the attorney-client or work product privilege or similar privileges. |

LEGAL\33319041\10 00601.0823.000/390810.000
07/03/2018

| Agreement Provision | Summary Description |
|---|---|
| | (*See* APA at §11.6, Def'n of "Excluded Assets") |
| Assumed Liabilities | Any and all of the following (and none others): |

Any and all of the following (and none others):

(a) any and all Liabilities of the Debtors or the Estates under each Designated Contract with respect to which Contract Rights are included as part of the Acquired Assets relating solely to the Exploitation of the Pictures by the Purchaser to the extent they both accrue and become due and payable after the Closing Date and relate to an accounting period commencing on or after such date, but, in each case, only to the extent that any Minimum Guarantee (if any) and/or other amount required to trigger payment of such Liabilities provided for in such Designated Contract is fully recouped pursuant to the terms thereof. For purposes of clarification, the Assumed Liabilities do not include any Minimum Guarantees or indemnity obligations owed by the Debtors or the Estates under any Designated Contract arising from a breach of a representation or warranty of the Debtors or the Estates or any other indemnity claim that arises from any act or omission of the Debtors or the Estates under the Designated Contracts or otherwise that relate to a period on or prior to the Closing Date;

(b) any and all Residuals relating to the Exploitation of the Guild Secured Pictures only to the extent they become due and payable based on sums received by the Purchaser after the Closing Date and relate to an accounting period commencing on or after such date; and

(c) any and all ongoing license rights to Pictures licensed by Netflix, Inc. pursuant to the Stipulation by and between the Trustee and Netflix, Inc. Regarding License Agreement for Internet Transmission (the "Netflix Stipulation") and order of the Bankruptcy Court approving the Netflix Stipulation.

For the avoidance of doubt, Assumed Liabilities shall specifically exclude any obligation to defend, indemnify, hold harmless or discharge any Liability of the Debtors or the Estates or any of their Affiliates, and any other Liabilities except as specifically set forth above in (a)-(c) including without limitation the following: (i) any and all Liabilities arising under the Acquired Assets for any period prior to the Closing Date (ii) any and all Liabilities arising under the Sublicense Agreements regardless of whether such Liabilities relate to a period before or after the Closing Date (other than Liabilities under the Netflix Stipulation), except where a licensee or sublicensee elects to retain its rights under the applicable Sublicense Agreement pursuant to section 365(n) of the Bankruptcy Code within the time period set forth in the Bidding Procedures Order; (iii) any and all Residuals related to any Guild Secured Pictures for any period prior to the Closing Date (including any payment obligations that were due and payable prior to such time regardless of whether such payment obligations relate to a period before or after the Closing Date); (iv) any and all obligation to report

LEGAL\33319041\10 00601.0823.000/390810.000
07/03/2018

| Agreement Provision | Summary Description |
|---|---|
| | or pay to a licensor or any other 3rd party any revenue related to any sums paid, accrued or otherwise payable (whether or not paid as of the Closing Date) to the Estates from the Exploitation of the Pictures pursuant for all accounting periods prior to the Closing Date and (v) any Damages arising from the rejection of the Designated Contracts and subject to allowance or disallowance as provided in section 502(g) of the Bankruptcy Code. <br><br> (*See* APA at §11.6, Def'n of "Assumed Liabilities"): |
| Representations, Warranties and Covenants | The APA includes customary representations, warranties and covenants for transactions of this nature, including without limitation representations and warranties regarding due authorization, compliance with law, brokerage, and other representations and warranties consistent with a sale under chapter 7 of the Bankruptcy Code. <br><br> (*See* APA at Articles 5 and 6) |
| Break-Up Fee | If the APA is terminated pursuant to sections 10(f) or 10(g) of the APA by virtue of the Trustee consummating an Alternative Transaction and/or by virtue of the Stalking Horse Purchaser failing to become the Prevailing Bidder or Second-Highest Bidder following the Sale Hearing, the Stalking Horse Purchaser shall be entitled to the payment of a fee equal to $60,000 (the "<u>Break-Up Fee</u>"), and the Trustee shall pay to the Stalking Horse Purchaser such amount by wire transfer of immediately available funds within four (4) business days following the date of Closing of the Alternative Transaction. <br><br> In addition, if the APA is terminated either by reason of the circumstances described in the preceding sentence or pursuant to sections 10.1(d) or (e) of the APA, the Stalking Horse Purchaser shall be entitled to a payment equal to the reasonable, actual, and documented out-of-pocket costs and expenses incurred by the Stalking Horse Purchaser in connection with the Sale Transaction, up to a maximum of $100,000 (the "<u>Transaction Expenses</u>"). <br><br> (*See* APA at §§10.3 and 11.6, Def'ns of "Break-Up Fee" and "Transaction Expenses") |
| Bidding Procedures Order | The APA requires entry of the Sale Order and Bidding Procedures Order. <br> (*See* APA at §§7.2, 7.4, and 9.1(a)) |
| Closing Conditions | The Closing is conditioned upon the satisfaction of the conditions set forth in Article 9 of the APA or the waiver thereof by the party entitled to waive the applicable condition. <br> (*See* APA at §§9.1-9.3) |
| Termination Events | The APA may be terminated by the Seller and/or Stalking Horse Purchaser, as applicable, upon the occurrence of the events described in section 10.1 of the APA, including without limitation upon consummation of an Alternative |

| Agreement Provision | Summary Description |
|---|---|
| | Transaction. <br> (*See* APA at §10.1) |

14. The Stalking Horse Agreement contains the following terms, conditions and provisions that are to be highlighted pursuant to Local Rule 6004-1(b):

a) **Sale to Insider**. The Stalking Horse Purchaser is not an insider of the Debtors.

b) **Closing and Other Deadlines**. The Stalking Horse Purchaser may terminate the Stalking Horse Agreement if, among other things:

   i. The Auction has not begun by the date that is thirty (30) days following the entry of the Bidding Procedures Order;

   ii. The Bankruptcy Court has not entered the Sale Order by September 17, 2018; or following its entry, the Sale Order shall have been stayed, vacated, modified, or supplemented without the prior written consent of the Stalking Horse Purchaser; or

   iii. The Closing has not occurred by the fifth business day following the satisfaction and/or waiver of all conditions to the Closing set forth in Article IX of the APA, other than conditions that, by their nature, can only be satisfied at the Closing.

(*See* APA at §§4.1(b), 9.1(a), and 10.1(e)).

c) **Deposit**. The Stalking Horse Agreement requires the Stalking Horse Purchaser to post a good faith deposit equal to 10% of the Purchase Price. (*See* APA at §11.16, Def'n of "Deposit").

d) **Use of Proceeds**. The Trustee's use of proceeds shall be subject to the Sharing Agreement, the Sharing and Reimbursement Order, and the Guilds Stipulation.

e) **Record Retention**. At or within thirty (30) days after the Closing, the Trustee shall deliver to the Stalking Horse Purchaser, at the Stalking Horse Purchaser's expense, copies of the Designated Contracts, the Sublicense Agreements, and all documents, books, records, or information of the Estates pertaining to the Acquired Assets that are in Trustee's possession or control. (*See* APA at §8.7).

f) **Sale Free and Clear**. The Trustee shall sell the Acquired Assets to the Stalking Horse Purchaser free and clear of all Liens, other than the Permitted Liens and Assumed Liabilities. (*See* APA at §2.1).

g) **Successor Liability**. The Stalking Horse Purchaser requires that the Sale Order include certain findings that the Acquired Assets are being sold free of successor liability or other similar liability as part of its offer to purchase the Acquired Assets and enter into the APA. In light of the proposed notice of the Sale to

parties in interest, the Trustee believes the inclusion of these findings in the Sale Order is appropriate and reasonable when balanced against the Sale benefits.

h)   **Relief from Bankruptcy Rule 6004(h)**.  By the Sale Motion, the Trustee seeks a waiver of the stay of Bankruptcy Rule 6004(h).  In light of the proposed notice of the Sale to all parties in interest, the Trustee believes that the inclusion of this waiver in the Sale Order is appropriate and reasonable when balanced against the Sale benefits.

## D.    **Bidding Procedures**

15.    The Trustee, in consultation with SunTrust, has devised the Bidding Procedures in order to generate the highest and best value for the Acquired Assets.  The Bidding Procedures are fully set forth as Exhibit "1" to the Bidding Procedures Order, which itself is attached to this Sale Motion at Exhibit "A." The Bidding Procedures include the following terms:[4]

a)   **Provisions Governing Qualification of Bidders**. The Bidding Procedures provide that to participate in the bidding process and to receive access to due diligence materials (the "Diligence Materials"), a party must submit (i) an executed confidentiality agreement to the Trustee, and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Acquired Assets (an "Alternative Transaction"), each in a form reasonably acceptable to the Trustee, as determined by the Trustee and his advisors in consultation with SunTrust.

(*See* Bid. Proc. at pp.2-3).

b)   **Provisions Governing Qualified Bids**. To be eligible to participate in the Auction, each Bid and each Bidder (other than the Stalking Horse Purchaser), must be reasonably determined by the Trustee to satisfy each of the following conditions:

(i) Deposit:  Each Bid must be accompanied by a cash deposit in the amount of not less than 10% of the purchase price set forth in the Alternative Asset Purchase Agreement (as defined below).  Such deposit shall be held in an escrow account to be identified and established by the Trustee (the "Deposit").

(ii) Return of Deposits: The Deposits of all Qualified Bidders (as defined

---

[4] This summary of the Bidding Procedures is provided for the convenience of the parties in interest. To the extent there is any inconsistency between this summary and the Bidding Procedures, the latter governs in all respects. Capitalized terms used but not defined in this summary have the meanings provided in the Bidding Procedures.

below) shall be held in one or more escrow accounts by the Trustee, but shall not become property of the Debtors' Estates absent further order of the Bankruptcy Court or as expressly provided below.  The Deposits of any Qualified Bidder that is neither a Prevailing Bidder nor a Second-Highest Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing.  The Deposit of the Second-Highest Bidder, if any, shall be returned to the Second-Highest Bidder no later than seventy-two (72) hours after the closing of the transaction with the Prevailing Bidder.  If the Prevailing Bidder timely closes on its winning transaction, its Deposit shall be credited towards the purchase price set forth in its Asset Purchase Agreement, and shall be deemed property of the Debtors' Estates.  If a Prevailing Bidder (or Second-Highest Bidder, if applicable) fails to consummate an Alternative Transaction, because of a breach or failure to perform on the part of such Prevailing Bidder (or Second-Highest Bidder, if applicable), the Trustee will not have any obligation to return the Deposit of such Prevailing Bidder (or Second-Highest Bidder, if applicable), and the Deposit shall irrevocably become property of the Debtors' Estates, as liquidated damages.

(iii) <u>Same or Better Terms</u>:  Each Bid must be on terms that the Trustee, in his business judgment and after consulting with SunTrust, determines are the same or better for the Trustee than the terms of the Stalking Horse Agreement.   No Bid may contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Trustee than those set forth in the Stalking Horse Agreement, as determined by the Trustee, in good faith, and after consulting with SunTrust.

(iv) <u>Executed Agreements</u>:  Each Bid must be based on the Stalking Horse Agreement, and must include binding, executed transaction documents, in the form of an asset purchase agreement and related documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (an "<u>Alternative Asset Purchase Agreement</u>").   Each Bid must also include a copy of the Alternative Asset Purchase Agreement (including all exhibits thereto) marked against the Stalking Horse Agreement, to show all changes requested by the Bidder (including those related to purchase price, and to remove any provisions that apply only to the Stalking Horse Purchaser, such as the break-up fee provision contained in the Stalking Horse Agreement, which shall not be in any Alternative Asset Purchase Agreement).

Notwithstanding any other provisions of the Bidding Procedures, a Bidder's Alternative Asset Purchase Agreement: (i) must incorporate, and may not materially alter, subsection (b) of the definition of "Assumed

Liabilities" in the Stalking Horse Agreement, and must provide that the transfer of the Acquired Assets to the purchaser shall be subject to the Assumed Liabilities set out in subsection (b) of the definition of "Assumed Liabilities" in the Stalking Horse Agreement; and (ii) must provide that the transfer of the Acquired Assets to the purchaser shall be subject to the Permitted Liens.    Any Alternative Asset Purchase Agreement submitted by SunTrust shall, to the extent applicable, conform with the *Stipulation Between the Chapter 7 Trustee, SunTrust Bank, as Administrative Agent for Itself, Certain Other Secured Lenders, and the Guilds Regarding the Sharing and Reimbursement Agreement*, dated October 25, 2017 and filed with the Bankruptcy Court at docket No. 543.

(v) <u>Scope of Bid</u>:  Each Bid must be for all or substantially all of the Acquired Assets, unless the Trustee determines, in his discretion, and after consulting with SunTrust, to sell less than all or substantially all of the Acquired Assets.

(vi) <u>Minimum Bid Amount</u>:  Each Bid must be in the minimum amount of $1,385,000 (representing (i) $1,200,000 *plus* (ii) the Break-Up Fee ($60,000) *plus* (iii) the maximum unreimbursed Transaction Expense amount ($100,000) *plus* (iv) $25,000.

(vii) <u>Corporate Authority</u>: Each Bid must include written evidence reasonably acceptable to the Trustee demonstrating appropriate corporate authorization to consummate the proposed Alternative Transaction.  If the Bidder is an entity specially formed for the purpose of effectuating the Alternative Transaction, then the Bidder must (i) disclose the identity/ies of (all of) its equity holder(s) and (ii) furnish written evidence reasonably acceptable to the Trustee, after consulting with SunTrust, of the approval of the Alternative Transaction by such equity holder(s).

(viii) <u>Disclosure of Identity of Bidder</u>:  Each Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets (including any equity holders, in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction), or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  Each Bid must also fully disclose any connections or agreements with the Trustee, the Debtors, the Stalking Horse Purchaser, or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity holder of the Debtors.

(ix) <u>Contact Information and Affiliates</u>:  Each Bid must provide the identity and contact information for the Bidder and full disclosure of any

LEGAL\33319041\10 00601.0823.000/390810.000
07/03/2018

affiliates of the Bidder.

(x) <u>Proof of Financial Ability to Perform</u>:  Each Bid must include written evidence that the Trustee and his advisors may conclude, in consultation with SunTrust, demonstrates that the Bidder has the necessary financial ability to close the Alternative Transaction.   Such information must include, *inter alia*, the following:

(1)    contact names and numbers for verification of any financing sources;

(2)    evidence of the Bidder's internal resources and proof of available cash or unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of irrevocable letters of credit from a recognized banking institution issued in favor of the Trustee in the amount of the Bid, in each case, as are needed to close such Alternative Transaction;

(3)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Trustee;

(4)    a description of the Bidder's pro forma capital structure; and

(5)    any such other form of financial disclosure or credit-quality support information reasonably acceptable to the Trustee, in consultation with SunTrust, demonstrating that such Bidder has the ability to close the Alternative Transaction.

(xi) <u>Regulatory and Third Party Approvals</u>: Each Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternative Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Alternative Asset Purchase Agreement, the actions that the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(xii) <u>No Contingencies</u>:   No Bid may be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of due diligence.

(xiii) <u>Irrevocable</u>:   Subject to section (g) below, each Bid must be irrevocable until five (5) business days after the Sale Hearing; <u>provided</u> that if such Bid is accepted as the Prevailing Bid, such Bid shall continue to remain irrevocable until the closing of the Sale.

(xiv) <u>Compliance with Diligence Requests</u>:  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Trustee to the reasonable satisfaction of the Trustee, after consultation with SunTrust.

(xv) <u>Termination Fees</u>:  The Bid (other than the Bid pursuant to the Stalking Horse Agreement) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code section 503 related in any way to the submission of its Bid or participation in any Auction.

(xvi) <u>Closing Date</u>:  The Bid must include a commitment to close the transactions contemplated by the Alternative Asset Purchase Agreement by no later than September 30, 2018.

(xvii) <u>Parties Entitled to Receive Bid</u>:  For a Bid to be considered timely, the following parties must receive the Bid in writing (in both PDF and Word format), on or before the Bid Deadline:  (i) the Trustee, George L. Miller, Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, PA 19103 (gmiller@mctllp.com); (ii) counsel to the Trustee, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE   19801, Attention: John T. Carroll, III (jcarroll@cozen.com); (iii) counsel to the Stalking Horse Purchaser, Law offices of Vince Ravine, PC, 5120 Gloria Ave., Encino, CA 91436, Attention: Vince Ravine (vince@vravinelaw.com); (iv) counsel to SunTrust Bank, as Administrative Agent, Akin Gump Strauss Hauer & Feld LLP, 1999 Avenue of the Stars, Suite 600, Los Angeles, CA 90067, Attention: David P. Simonds (dsimonds@akingump.com) and Ashby & Geddes, 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attention: Ricardo Palacio (RPalacio@ashbygeddes.com).

(*See* Bid. Proc. at pp.3-7).

Subject to the terms of the Bidding Procedures, a Bid received from a Bidder before the Bid Deadline that meets the above requirements, as reasonably determined by the Trustee, in consultation with SunTrust, shall constitute a "<u>Qualified Bid</u>" and such Bidder shall be a "<u>Qualified Bidder</u>."

c)      **Provisions Governing the Auction**.  The Bidding Procedures provide that if one or more Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) are submitted by the Bid Deadline, the Trustee shall conduct the Auction for the Acquired Assets on [T.B.D.] (prevailing Eastern Time) at the offices of Cozen O'Connor, 1650 Market Street, One Liberty Place, Suite 2800, Philadelphia, PA   19103 or such

15

other place and time as the Trustee shall notify all Qualified Bidders, SunTrust, and each of their respective counsel.

Only the Trustee, the Debtors, SunTrust, the Stalking Horse Purchaser, and any other Qualified Bidders, and the representatives and counsel of each, may attend the Auction (such attendance to be in person, provided however that with the Trustee's consent, participants may attend the Auction remotely via telephone and/or video conference), and only the Stalking Horse Purchaser and Qualified Bidders will be entitled to make any Bids at the Auction

The Trustee and his professionals shall direct and preside over the Auction and the Auction shall be transcribed.  The Auction shall be a voice auction.  Other than as expressly set forth herein, the Trustee (in consultation with SunTrust) may conduct the Auction in the manner he reasonably determines is most likely to maximize the value of the bidding. In addition, Each Qualified Bidder participating in the Auction must confirm that it: (a) has not engaged in any collusion with respect to the bidding or sale of any of the Acquired Assets; and (b) has reviewed, understands, and accepts the Bidding Procedures.

One (1) day prior to the Auction, the Trustee will: (i) notify each Qualified Bidder that its Bid has been deemed a Qualified Bid; and (ii) provide each Qualified Bidder with a copy of the Alternative Asset Purchase Agreements of all Qualified Bidders and an indication as to which Qualified Bid is the highest or otherwise best Qualified Bid, as determined by the Trustee in consultation with SunTrust (such highest or otherwise best Qualified Bid, the "<u>Auction Baseline Bid</u>").

The Trustee shall consult in good faith with SunTrust throughout the Auction to the extent reasonably practicable.  All bids will be made and received in one room, on an open basis and on the record, and all other Qualified Bidders will be entitled to be present for all bidding, with the understanding that the true identity of each Qualified Bidder will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid submitted in response to the Auction Baseline Bid, or to any successive bids made at the Auction, will be fully disclosed to all other Qualified Bidders bidding throughout the Auction, and each Qualified Bidder will be permitted what the Trustee determines to be an appropriate amount of time to respond to the previous bid at the Auction.

All Qualified Bidders, including the Stalking Horse Purchaser, shall have the right to submit additional bids and make additional modifications to the Stalking Horse Agreement or Alternative Asset Purchase Agreement, as applicable, provided that any such modifications to the Stalking Horse Agreement or Alternative Asset Purchase Agreement, on an aggregate

basis and viewed in whole, shall not, in the reasonable business judgment of the Trustee, be less favorable to the Trustee than the terms of the Stalking Horse Agreement, and provided that the modified Stalking Horse Agreement or Alternative Asset Purchase Agreement meets the requirements for being a Qualified Bid described above.  An "Overbid" is any Bid made at the Auction subsequent to the Trustee's announcement of the Auction Baseline Bid.

(*See* Bid. Proc. at pp.8-9).

d)  **Overbidding and Provisions Providing Bid Protections to Stalking Horse Purchaser**.  To submit an Overbid, a Bidder must comply with the following conditions:

(i) Minimum Overbid Amount:  An initial Overbid at the Auction must be in the minimum amount of the Auction Baseline Bid *plus* an additional $25,000 in cash.

(ii) Minimum Subsequent Overbid Increments:  Subsequent Overbids shall be made in increments of not less than $25,000 in cash.

(iii) Stalking Horse Purchaser May Credit Bid Break-Up Fee:  The Stalking Horse Purchaser shall be entitled to submit Overbids including credit bid amounts up to the aggregate amount of the Break-Up Fee.

(iv) Remaining Terms Are the Same as for Qualified Bids:  Overbids must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement and Alternative Asset Purchase Agreement, as the case may be, in connection therewith.  Any Overbid must remain open and binding on the Bidder as provided herein.

(v) Additional Evidence of Ability to Close:  At the Trustee's discretion, after consultation with SunTrust, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality information reasonably acceptable to the Trustee) reasonably demonstrating such Bidder's ability to close the Alternative Transaction proposed by such Overbid.

(vi) Announcement of Overbids:  The Trustee shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in such Overbid, and the basis for calculating such total consideration.

(vii) <u>Consideration of Overbids</u>:  Subject to the deadlines set forth herein, the Trustee reserves the right, in his reasonable business judgment and in consultation with SunTrust, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Trustee and Qualified Bidders; allow Qualified Bidders to consider how they wish to proceed; or give Qualified Bidders the opportunity to provide the Trustee with such additional evidence, as the Trustee in his reasonable business judgment may require, that such Qualified Bidders have sufficient resources, or have received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Alternative Transaction at the prevailing Overbid amount.  When comparing Overbids to the Qualified Bid made by the Stalking Horse Purchaser, the Trustee shall treat any credit bid of the Break-Up Fee made by the Stalking Horse Purchaser, or any credit bid made by SunTrust, as being made in cash or cash equivalents and shall consider the amount of any reimbursement to be paid to the Stalking Horse Purchaser under the Stalking Horse Agreement upon the closing of any Alternative Transaction.

(*See* Bid. Proc. at pp.9-10).

e)      **Additional Procedures**. In his discretion, and after consultation with SunTrust, the Trustee may implement additional rules that may be reasonable under the circumstances for conducting the Auction, which he will announce at the Auction, so long as such rules are not inconsistent in any material respect with the Bidding Procedures Order or the Stalking Horse Agreement.  Any Auction rules adopted by the Trustee will not modify any of the terms of the Stalking Horse Agreement without the consent of the Stalking Horse Purchaser.

(*See* Bid. Proc. at p.10).

f)      **Closing the Auction**.  The Auction shall continue in additional rounds of bidding until the Trustee selects, after consultation with SunTrust, the Bid that is the highest or otherwise best offer for all or substantially all of the Acquired Assets (such bid, a "<u>Prevailing Bid</u>," and the Bidder submitting such Prevailing Bid, the "<u>Prevailing Bidder</u>").  The Prevailing Bidder shall have the rights and responsibilities of the purchaser as set forth in the applicable Stalking Horse Agreement, or Alternative Asset Purchase Agreement.  In selecting the Prevailing Bid, the Trustee and SunTrust shall consider the Bid Assessment Criteria.

The Auction shall close when the Prevailing Bidder submits fully executed sale and transaction documents memorializing the terms of its Prevailing Bid.  Promptly following the Trustee's selection of the Prevailing Bid and

the conclusion of the Auction, the Trustee shall announce the Prevailing Bid and Prevailing Bidder and shall file notice of the Prevailing Bid and Prevailing Bidder with the Bankruptcy Court. The Trustee shall not consider any Bids submitted after the conclusion of the Auction.

(*See* Bid. Proc. at p.11).

g) **Second-Highest Bidder**. The Bidding Procedures provide that, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Trustee, in the exercise of his reasonable business judgment and after consulting with SunTrust, will be designated as the second-highest bidder (the "**Second-Highest Bidder**"); provided, however, that the Stalking Horse Purchaser shall not be designated as the Second-Highest Bidder without the prior written consent of the Stalking Horse Purchaser. The Second-Highest Bidder shall be required to keep its Bid (including, if the Second-Highest Bidder submitted one or more Overbids at the Auction, the Second-Highest Bidder's final Overbid (the "**Second-Highest Bid**"), open and irrevocable until the closing of the relevant transaction with the Prevailing Bidder.

Following the Sale Hearing, if the Prevailing Bidder fails to consummate the Alternative Transaction, the Trustee may deem the Second-Highest Bidder to have the new Prevailing Bid, and the Trustee will be authorized, without further order of the Bankruptcy Court, to consummate the transaction with such Second-Highest Bidder at the price of its last bid. Such Second-Highest Bidder will be deemed to be the Prevailing Bidder and the Trustee will be authorized, but not directed, to effectuate a sale of the Acquired Assets to such Second-Highest Bidder (subject to the terms of the Second-Highest Bid) without further order of the Bankruptcy Court. All Qualified Bids (other than each Prevailing Bid and Second-Highest Bid) shall be deemed rejected by the Trustee on and as of the date of approval of the Prevailing Bid and Second-Highest Bid by the Bankruptcy Court.

(*See* Bid. Proc. at p.11).

h)    **Break-Up Fee:** In the event that the Stalking Horse Purchaser is not the Prevailing Purchaser (or if the Stalking Horse Purchaser is the Second-Highest Purchaser and the Sale to the Prevailing Purchaser is consummated), the Stalking Horse Purchaser is entitled to the Break-Up Fee in the amount of $60,000, plus reimbursement of the reasonable, actual, and documented out-of-pocket costs and expenses incurred by the Stalking Horse Purchaser in connection with the Sale Transaction up to a maximum aggregate amount of $100,000, as in set forth in, and in accordance with the terms of, the Stalking Horse Agreement.

(*See* Bid. Proc. at p.12).

## E.    Proposed Notice Procedures

16.    The Trustee proposes the following notice procedures in connection with the Auction and the Sale of the Acquired Assets (together, the "Notice Procedures").

a)    **Notice of Sale Motion**: The Trustee will serve notice of this Sale Motion on: (1) the Office of the United States Trustee; (2) counsel for the Debtors; (3) counsel to SunTrust; (4) counsel to the Directors Guild of America, Inc., the Screen Actors Guild – American Federation of Television and Radio Artists, and the Writers Guild of America West, Inc.; (5) counsel to the Stalking Horse Purchaser; (6) all entities known by the Trustee to have expressed a *bona fide* interest in purchasing any of the Acquired Assets; (7) all creditors listed on Schedules D and E for each Debtor in the Schedules of Assets and Liabilities filed by the Trustee in the Bankruptcy Cases; (8) non-Debtor parties to the Designated Contracts; (9) the Internal Revenue Service and all other applicable federal, state, county, and municipal taxing authorities; (10) the U.S. Environmental Protection Agency and the California Environmental Protection Agency; (11) the U.S. Attorneys for the Central District of California and the District of Delaware; (12) the state attorneys general and state labor regulatory authorities for California and Delaware; and (13) all persons and entities that have filed a request for service of filings in these Bankruptcy Cases pursuant to Bankruptcy Rule 2002 (the "Notice Parties").

b)    **Sale Notice**: Within two (2) business days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "Mailing Date"), the Trustee (or his agents) shall serve by first-class mail, postage prepaid, the Notice of Sale Free and Clear of Liens, Claims and Interests, Bidding Procedures, Auction Date, and Sale Hearing, substantially in the form attached hereto as Exhibit D (the "Sale Notice"), upon the Notice Parties.

c)  **Sale Objections**: The Trustee further proposes that objections, if any, to the relief sought in the Sale Order (the "Sale Objection(s)") shall be due by [T.B.D.] (prevailing Eastern Time) (the "Sale Objection Deadline"). Any Sale Objections must: (i) be in writing, (ii) state with particularity the grounds for such objections or other statements of position, and (iii) be filed with the Clerk of this Bankruptcy Court (the "Clerk"), 824 Market Street North, Wilmington, Delaware 19801, together with proof of service, and served so as to be actually received by the Sale Objection Deadline by the following parties (together, the "Sale Objection Notice Parties"): (a) the Trustee, George L. Miller, Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, PA 19103 (gmiller@mctllp.com); (b) counsel to the Trustee, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE 19801, Attention: John T. Carroll, III (jcarroll@cozen.com); (c) counsel to the Stalking Horse Purchaser, Law offices of Vince Ravine, PC, 5120 Gloria Ave., Encino, CA 91436, Attention: Vince Ravine (vince@vravinelaw.com); (d) counsel to SunTrust Bank, as Administrative Agent, Akin Gump Strauss Hauer & Feld LLP, 1999 Avenue of the Stars, Suite 600, Los Angeles, CA 90067, Attention: David P. Simonds (dsimonds@akingump.com) and Ashby & Geddes, 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attention: Ricardo Palacio (RPalacio@ashbygeddes.com). However, objections to the conduct of the Auction or selection of the Prevailing Bid or Second-Highest Bid (the "Supplemental Objections") shall be in writing, filed with the Clerk, together with proof of service, and served so as to be received by the Sale Objection Notice Parties on or before 4:00 p.m. (prevailing Eastern Time) on [T.B.D.].

**F.    Schedule of Applicable Timeline for Bidding Procedures**

17.    Based on the foregoing and upon approval of the Bidding Procedures, the following timeline would be established:

a)  **Service of Sale Notice** – within two (2) business days following entry of the Bidding Procedures Order.

b)  **Sale Objection Deadline** – [T.B.D.]

c)  **Deadline to Submit Qualified Bids** – [T.B.D.]

d)  **Auction** – [T.B.D.]

e)  **Supplemental Objection Deadline** – [T.B.D.]

f)  **Proposed Sale Hearing** – [T.B.D.]  .

**Summary of Relief Requested**

18.     *First*, by this Sale Motion, the Trustee seeks entry of an order substantially in the form of the Bidding Procedures Order (Exhibit "<u>A</u>" hereto): (a) approving the Bidding Procedures in connection with the Sale of the Acquired Assets; (b) approving the Break-Up Fee and Transaction Expenses; (c) scheduling an Auction and Sale Hearing; and (d) granting certain related relief.

19.     *Second*, by this Sale Motion, the Trustee also seeks entry of the Sale Order (Exhibit "<u>C</u>" hereto): (a) approving and authorizing the Sale to the Stalking Horse Purchaser or Prevailing Bidder of the Acquired Assets free and clear of liens, claims, interests and encumbrances (other than as provided in the Stalking Horse Agreement or Alternative Asset Purchase Agreement, and in the Sale Order); (b) authorizing and approving the Stalking Horse Agreement or Alternative Asset Purchase Agreement; and (c) granting certain related relief.

**Analysis**

**A.     The Bidding Procedures Order Should be Entered on the Terms Proposed**

   *(i)     The Bidding Procedures are Fair, Appropriate and Should be Approved*

20.     The Bidding Procedures are designed to generate the highest and best bid for the Acquired Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing Qualified Bids.

21.     The Bidding Procedures provide potential bidders with more than the twenty-one (21) days' notice of the Sale Hearing required by Bankruptcy Rule 2002, and provide potential bidders with sufficient opportunity to acquire the information necessary for submission of a timely and informed Qualified Bid.

22.    At the same time, the Bidding Procedures provide the Trustee with adequate opportunity to consider competing bids and to select the highest and best offer for the Sale of the Acquired Assets.  Further, by entering into the Stalking Horse Agreement with the Stalking Horse Purchaser, the Trustee will obtain the highest and best consideration for the Sale by setting the minimum purchase price which will be tested in the marketplace.  As such, the Trustee, the Estates, and the Debtors' creditors can be assured that the consideration obtained will be fair and reasonable.  Accordingly, the Trustee submits that the Bidding Procedures and the form and manner of the notice thereof should be approved as proposed herein by the Bankruptcy Court.

### (ii)    The Break-Up Fee and Transaction Expenses Should be Approved

23.    The United States Court of Appeals for the Third Circuit has identified at least two ways in which bidding incentives may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999).  Second, if the availability of break-up fees and expense reimbursement were to induce a bidder to research the value of the debtor's assets and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  Id.

24.    In O'Brien, the Court of Appeals reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee.  Such factors are:

    a.    the presence of self-dealing or manipulation in negotiating
          the break-up fee;

    b.    whether the fee harms, rather than encourages, bidding;

      c.        the reasonableness of the break-up fee relative to the purchase price;

      d.        whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

      e.        the ability of the request for a break-up fee to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

      f.        the correlation of the fee to a maximization of value of the debtor's estate;

      g.        the support of the principal secured creditors and creditors' committees of the break-up fee;

      h.        the benefits of the safeguards to the debtor's estate; and

      i.        the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

Id. at 536.

25.      The Trustee submits that the foregoing factors are met under the facts and circumstances of these Bankruptcy Cases, as the Stalking Horse Purchaser insisted on including the Break-Up Fee and the Transaction Expenses in the Stalking Horse Agreement.  Accordingly, the Break-Up Fee and the Transaction Expenses were necessary to obtain the Stalking Horse Purchaser's offer.  By agreeing to the Break-Up Fee and the Transaction Expenses, the Trustee hopes to induce additional bids that otherwise may have never been made and without which bidding may have been limited and/or non-existent.  Accordingly, in the Trustee's business judgment, the Break-Up Fee and the Transaction Expenses were necessary to promote a more competitive bidding process, and to maximize the value of the Acquired Assets by setting a minimum initial bid for the Acquired Assets.  Therefore, the Trustee requests that the Bankruptcy Court authorize the payment of the Break-Up Fee and the Transaction Expenses to the Stalking Horse Purchaser.

## II.     The Sale Order Should be Entered on the Terms Proposed

### (i)     The Sale Meets the Standards Applicable Under Section 363(b)(1)

26.     Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  A court should approve a trustee's sale or use of assets outside of the ordinary course of business if the trustee demonstrates a sound business justification for the proposed transaction. See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbott's Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986).  Once the trustee articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("A presumption of reasonableness attaches to a debtor's management decisions").

27.     The Trustee has a sound business justification for selling the Acquired Assets at this time and in the proposed manner.  The fairness and reasonableness of the consideration to be paid for the Acquired Assets, either pursuant to the Stalking Horse Agreement and/or an Alternative Asset Purchaser Agreement, as may be declared at the Sale Hearing, will be conclusively demonstrated by exposure to the marketplace.

28.     At this point, the Trustee has been able to secure the Stalking Horse Purchaser, who has set the minimum value for the Acquired Assets pursuant to the Stalking Horse Agreement.  Moreover, the Sale of the Acquired Assets will be subjected to a competitive bidding process, enhancing the Trustee's ability to receive the highest and best offer for the

Acquired Assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Estates will ultimately be demonstrated by a "market check" through the Auction process, which is the best means for establishing whether the Estates are receiving a fair and reasonable price for the Acquired Assets.

29.    In addition, the Trustee's service of the Sale Motion and the Sale Notice is reasonably calculated to provide timely and adequate notice to the Estates' major creditor constituencies, those parties most interested in the Bankruptcy Cases, those parties potentially interested in bidding on the Acquired Assets, and others whose interests are potentially affected by the proposed Sale.

30.    Further, preservation of the Estates' assets for a lengthy period of time would require the Trustee to continually incur administrative expenses for the Estates.  Consequently, the prudent course for the Trustee is to proceed with a formal sale process as expeditiously as possible.   Particularly in light of these circumstances, the Trustee's proposed Sale process demonstrates sound business judgment, and represents the best path to providing maximum value for the Estates and their creditors.

31.    Accordingly, consummating the Sale expeditiously and in the manner proposed by the Trustee is in the best interests of the Estates and their creditors.

*(ii)    **The Sale Should be Made Free and Clear of Interests Pursuant to 11 U.S.C. § 363(f)***

32.    Section 363(f) of the Bankruptcy Code permits a trustee to sell assets free and clear of all interests (with any such interests attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

33.     Under section 363(f), a trustee may sell all or any part of the debtor's property fee and clear of any and all liens, claims, or interests in such property if: (1) such a sale is permitted under applicable non-bankruptcy law; (2) the party asserting such a lien, claim, or interest consents to such sale; (3) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (4) the interest is the subject of a bona fide dispute; or (5) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

34.     As section 363(f) is written in the disjunctive, a trustee need only meet one of the five conditions of section 363(f).  The Trustee will be able to demonstrate at the Sale Hearing that one or more of these conditions will be satisfied with respect to each party holding a lien on or security interest in any of the Purchased Assets.  At a minimum, the Trustee expect that the second and fifth of these requirements will be satisfied, if not others as well.

35.     Therefore, the Trustee requests that the Sale of the Acquired Assets be approved free and clear of all claims, liens, encumbrances and other interests, except as otherwise provided in the Stalking Horse Agreement or Alternative Asset Purchase Agreement, and in the Sale Order.

*(iii)     The Prevailing Bidder Should Receive the Protections of 11 U.S.C. § 363(m)*

36.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007).

37.     The Trustee submits that the Stalking Horse Purchaser is not an insider of the Debtors, and the Sale of the Acquired Assets to the Stalking Horse Purchaser was negotiated in good faith and is the result of an arm's length transaction.  In response to any objection, in addition to the affidavits filed by the Trustee and the Prevailing Bidder, the Trustee will present facts at the Sale Hearing demonstrating that any Prevailing Bidder for the Acquired Assets has negotiated at arm's length, and that all parties were represented by their own counsel.

38.     Accordingly, the Sale Order includes a provision that the Prevailing Bidder for the Acquired Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Trustee believes that providing any Prevailing Bidder with such protection will ensure that the Estates will receive the maximum possible price for the Acquired Assets.

### III.     Relief from Bankruptcy Rule 6004(h) is Warranted

39.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Trustee requests that the Bankruptcy Court waive this 14-day stay, and that the Sale Order be effective immediately.

40.     The purpose of Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.   See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and waive the 14-day stay, the leading bankruptcy treatise suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY 16th Ed. Rev., ¶ 6004.11 at 6004-20 (2014).  The treatise further suggests that if

28

an objection is filed and overruled, and the objecting party informs the court of its intent to

appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.

41.     The Stalking Horse Purchaser has requested that the parties move expeditiously to

close the Sale, and time is of the essence.  The Trustee needs to move as expeditiously as

possible in order to prevent deterioration in the value of the Estates' assets, and accommodate the

Stalking Horse Purchaser's needs.   Consequently, a waiver of the Bankruptcy Rule 6004(h) stay

is in the Estates' best interest.

## **Notice**

42.     Notice of this Motion is being given to the Notice Parties.  In light of the nature of

the relief requested in this Sale Motion, the Trustee respectfully submits that no further notice is

necessary.

WHEREFORE, the Trustee respectfully requests that the Bankruptcy Court enter the

Bidding Procedures Order substantially in the form attached hereto as Exhibit "A": (a) approving

the Bidding Procedures in connection with the Sale of the Acquired Assets; (b) approving the

Break-Up Fee and the Transaction Expenses; (c) scheduling an Auction and Sale Hearing; and

(d) granting certain related relief; and, after a Sale Hearing, enter the Sale Order substantially in

the form attached hereto as Exhibit "C":  (a) approving and authorizing the Sale to the Stalking

Horse Purchaser or Prevailing Bidder of the Acquired Assets free and clear of liens, claims,

interests and encumbrances (except as provided in the Stalking Horse Agreement or Alternative

Asset Purchase Agreement, and in the Sale Order); (b) authorizing and approving the Stalking

Horse Agreement or Alternative Asset Purchase Agreement; and (c) granting certain related

relief; and granting such other relief as the Bankruptcy Court may deem appropriate.


Date:   July 3, 2018                        COZEN O'CONNOR


                                    By:     */s/ **John T. Carroll, III***
                                            John T. Carroll, III (No. 4060)
                                            Simon E. Fraser (No. 5335)
                                            1201 North Market Street
                                            Suite 1001
                                            Wilmington, DE  19801
                                            302-295-2000
                                            302-295-2013 Fax
                                            jcarroll@cozen.com
                                            sfraser@cozen.com

                                            *Counsel to George L. Miller,*
                                            *Chapter 7 Trustee*

LEGAL\33319041\10 00601.0823.000/390810.000
07/03/2018