# EXHIBIT "A"

[Execution Version]

# ASSET PURCHASE AGREEMENT

## dated as of July 3, 2018

BY AND BETWEEN

## OA ACQUISITIONS LLC

AS PURCHASER

AND

## GEORGE L. MILLER, THE CHAPTER 7 TRUSTEE OF THE ESTATES OF OUR ALCHEMY, LLC AND ANDERSON DIGITAL, LLC

AS SELLER

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................ 1

ARTICLE II PURCHASE AND SALE OF ASSETS ...................................................... 2

Section 2.1    Sale and Transfer of Acquired Assets................................................ 2
Section 2.2    Assumed Liabilities ............................................................................ 2
Section 2.3    Non-Assignment of Contracts............................................................ 2

ARTICLE III CONSIDERATION. ................................................................................... 2

Section 3.1    Purchase Price ..................................................................................... 2
Section 3.2    Payment of the Consideration ............................................................ 2
Section 3.3    Allocation of Purchase Price.............................................................. 2
Section 3.4    Sale Free and Clear ............................................................................ 3

ARTICLE IV CLOSING ................................................................................................... 3

Section 4.1    Closing ................................................................................................ 3
Section 4.2    Deliveries by Seller............................................................................ 4
Section 4.3    Deliveries by Purchaser ..................................................................... 5

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER ..................... 5

Section 5.1    Authorization; Enforceability ............................................................ 5
Section 5.2    Consents and Approvals ..................................................................... 5
Section 5.3    Intentionally Omitted ......................................................................... 6
Section 5.4    Litigation............................................................................................. 6
Section 5.5    Brokers................................................................................................ 6
Section 5.6    Transfer of Acquired Assets Free and Clear of Interests.................... 6

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER......... 7

Section 6.1    Organization........................................................................................ 7
Section 6.2    Authorization; Enforceability ............................................................ 7
Section 6.3    No Conflicts........................................................................................ 7
Section 6.4    Consents and Approvals ..................................................................... 7
Section 6.5    Financial Capability ........................................................................... 8
Section 6.6    Broker's, Finder's or Similar Fees..................................................... 8
Section 6.7    No Other Representations or Warranties ............................................ 8

ARTICLE VII BANKRUPTCY COURT MATTERS..................................................... 8

Section 7.1    Bankruptcy Actions ............................................................................ 8
Section 7.2    Bidding Procedures ............................................................................ 8

i

Section 7.3     Conduct of the Auction .................................................................. 8
Section 7.4     Sale Order ...................................................................................... 9
Section 7.5     Consultation with Purchaser ......................................................... 9

ARTICLE VIII COVENANTS .................................................................................. 9

Section 8.1     Maintaining Acquired Assets Pending Closing ............................. 9
Section 8.2     Access ............................................................................................ 9
Section 8.3     Efforts and Actions to Cause Closing to Occur ........................... 10
Section 8.4     Notification of Certain Matters .................................................... 10
Section 8.5     Subsequent Actions ...................................................................... 10
Section 8.6     Tax Matters ................................................................................... 11
Section 8.7     Books and Records ....................................................................... 11
Section 8.8     Adjustment of Certain Receivables .............................................. 11

ARTICLE IX CONDITIONS ................................................................................... 12

Section 9.1     Conditions Precedent to Performance by Seller and Purchaser ....... 12
Section 9.2     Conditions to Obligations of Purchaser ....................................... 12
Section 9.3     Conditions to Obligations of Seller .............................................. 13

ARTICLE X TERMINATION .................................................................................. 14

Section 10.1    Termination ................................................................................... 14
Section 10.2    Effect of Termination .................................................................... 15
Section 10.3    Expense Reimbursement ............................................................... 15

ARTICLE XI MISCELLANEOUS ........................................................................... 16

Section 11.1    Survival of Covenants, Representations and Warranties .............. 16
Section 11.2    Amendment and Modification ...................................................... 16
Section 11.3    Notices .......................................................................................... 16
Section 11.4    Counterparts .................................................................................. 17
Section 11.5    Mutual Drafting ............................................................................ 17
Section 11.6    Entire Agreement; No Third Party Beneficiaries ......................... 17
Section 11.7    Severability ................................................................................... 18
Section 11.8    Governing Law .............................................................................. 18
Section 11.9    Exclusive Jurisdiction .................................................................. 18
Section 11.10   Remedies ....................................................................................... 18
Section 11.11   Specific Performance .................................................................... 19
Section 11.12   Assignment ................................................................................... 19
Section 11.13   Headings ....................................................................................... 19
Section 11.14   No Consequential or Punitive Damages ....................................... 19
Section 11.15   "As Is" Transaction ...................................................................... 20
Section 11.16   Definitions .................................................................................... 20
Section 11.17   Bulk Transfer Notices ................................................................... 28
Section 11.18   Interpretation ................................................................................ 28
Section 11.19   Guaranty ........................................................................................ 29

LEGAL\36372615\6 00601.0823.000/390810.000
07/03/2018 8:43 PM

## **EXHIBITS**

Exhibit A      Form of Sale Order
Exhibit B      Bidding Procedures Order
Exhibit C      Lab Access Letter
Exhibit D      Release of Security Interest by SunTrust Bank N.A. as administrative agent
Exhibit E      Bill of Sale

## **SCHEDULES**

Schedule I      Pictures and Designated Contracts

Schedule II     Guild Secured Pictures

Schedule III    Litigation

LEGAL\36372615\6 00601.0823.000/390810.000
07/03/2018 8:43 PM

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July 3, 2018 (the "Execution Date"), is made and entered into by and between OA Acquisitions LLC, a New York, LLC ("Purchaser") and George L. Miller, the chapter 7 trustee (the "Trustee" or "Seller") of the chapter 7 estates (collectively, the "Estates") of Our Alchemy, LLC (F/K/A Millennium Entertainment, LLC), a Delaware limited liability company, and its predecessors ("Alchemy"), and Anderson Digital, LLC, a Delaware limited liability company, and its predecessors ("Anderson Digital", together with Alchemy, "Debtors" and each entity individually, a "Debtor").

## RECITALS

WHEREAS, on July 1, 2016, Debtors each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, as amended (the "Bankruptcy Code"), commencing a chapter 7 case (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Purchaser desires to purchase and acquire from Seller, acting on behalf of the Estates, certain assets and rights and assume certain liabilities;

WHEREAS, Seller desires to sell, convey, assign and transfer such assets and rights and such liabilities to Purchaser, in the manner and subject to the terms and conditions set forth herein and as authorized under, among other things, sections 105 and 363 of the Bankruptcy Code;

WHEREAS, Seller's ability to consummate the Transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the Seller has determined that it is advisable and in the Estates' best interests to enter into this Agreement and to consummate the Transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

The terms defined or referenced in Section 11.16, whenever used herein, shall have the meanings set forth therein for all purposes of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1    <u>Sale and Transfer of Acquired Assets</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall Transfer to Purchaser, and Purchaser shall purchase, acquire, assume and accept from the Estates, to the extent permitted by the Bankruptcy Code, free and clear of all Liens and Liabilities (except for any Assumed Liabilities and Permitted Liens), all of the Estates' right, title and interest in and to the Acquired Assets.

(b)    Other than with respect to the Assumed Liabilities, Purchaser shall not be the successor to the Debtors or the Estates or any of their Affiliates, and shall not become liable to pay, perform defend, indemnify, hold harmless or discharge any Liability of the Debtors or the Estates or any of their Affiliates, in each case, arising out of or relating to any of the Acquired Assets.

Section 2.2    <u>Assumed Liabilities</u>.  Purchaser shall assume, and become solely and exclusively liable for, the Assumed Liabilities, and none others.

Section 2.3    <u>Non-Assignment of Contracts</u>.  Notwithstanding anything contained herein to the contrary, the Estates' Transfer to Purchaser, and the purchase, acquisition, assumption and acceptance by Purchaser from Seller, of the right, title and interest in and to the Acquired Assets and the assumption of the Assumed Liabilities shall not constitute an assumption and assignment of any of the underlying Designated Contracts under section 365 of the Bankruptcy Code.

## ARTICLE III

## CONSIDERATION.

Section 3.1    <u>Purchase Price</u>.  The aggregate consideration for the sale and transfer of the Acquired Assets will be (a) One million two hundred thousand dollars ($1,200,000 USD) in cash (the "<u>Purchase Price</u>") plus (b) the assumption by Purchaser of the Assumed Liabilities.

Section 3.2    <u>Payment of the Consideration</u>.  Upon execution of this Agreement the Purchaser shall pay the Deposit (as defined below) to the Seller.  On the Closing Date an amount equal to the Purchase Price less the Deposit shall be paid by Purchaser to Seller by wire transfer of immediately available funds to an account or accounts designated in writing by Seller prior to the Closing Date.

Section 3.3    <u>Allocation of Purchase Price</u>.  Within sixty (60) days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (such statement, the "<u>Allocation Statement</u>"), and the Allocation Statement shall be finalized upon

2

reasonable consultation with Seller, and with Seller's consent, which consent shall not be unreasonably withheld or delayed. The parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position for tax purposes inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, Seller or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation. Seller or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section. Except as otherwise required by Applicable Law or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article II of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this <u>Section 3.3</u>; and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this <u>Section 3.3</u> in any Tax Return, in any refund claim or in any tax litigation. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets by the Trustee for the purpose of his administration of the Bankruptcy Cases by way of liquidation, reorganization or otherwise.

Section 3.4    <u>Sale Free and Clear</u>. Seller acknowledges and agrees and the Sale Order shall be substantially in the form attached hereto as <u>Exhibit A</u>, or, with changes approved by Purchaser, with Purchaser not unreasonably withholding or conditioning such approval and provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Liabilities (other than Liabilities of Purchaser created under this Agreement and the Assumed Liabilities) of, against or created by Seller or its bankruptcy estate, to the fullest extent permitted by section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be Transferred to Purchaser free and clear of all Liabilities, other than the Assumed Liabilities, to the fullest extent permitted by section 363 of the Bankruptcy Code.

## ARTICLE IV

## CLOSING

Section 4.1    <u>Closing</u>.

(a)    Upon the terms and subject to the conditions of this Agreement, the Closing shall take place at the offices of Cozen O'Connor, One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA  19103 at 10:00 a.m. (E.T) as specified below, unless another date, time and/or place is agreed in writing by each of the parties hereto.

(b)    The Closing shall occur on or before the date (the "<u>Closing Date</u>") that is not later than the fifth Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in <u>Article IX</u> (other than conditions which by their nature can be satisfied only at the Closing).

3

Section 4.2   <u>Deliveries by Seller</u>.   At the Closing unless otherwise provided herein, Seller shall deliver or cause to be delivered to Purchaser (unless previously delivered) each of the following:

(a)   the Trustee's certificate referred to in <u>Section 9.2(c)</u>;

(b)   a certified copy of the Sale Order in accordance with <u>Section 9.1(a)</u> and a copy of the docket of the Bankruptcy Court evidencing the entry of the Sale Order (updated through the date and time of the Closing);

(c)   the duly executed Bill of Sale and duly executed counterparts of each Conveyance Document in respect of the Acquired Assets; and

(d)   a certification of non-foreign status for the Estates in a form and manner that complies with the requirements of Section 1445 of the Code and the Treasury regulations promulgated thereunder.

(e)   With respect to the film and video elements related to the Pictures received from counterparties to (or otherwise pursuant to) Designated Contracts which are in the possession and/or control of Seller and to the extent rights in film and video elements are property of or otherwise in control of the Estates ("<u>Film and Video Elements</u>"), Delivery shall mean as applicable, on or before the Closing Date (A) for those Film and Video Elements for the Pictures listed in the attached <u>Schedule I</u>, notice to the lab where such Film and Video Elements are located to transfer such Film and Video Elements in the records of the labs from the Debtor(s) name(s) into the name of Purchaser on the Closing Date and (B) the provision of executed Lab Access Letters for each lab where such Film and Video Elements are housed in substantially the form of <u>Exhibit C</u>.  The transfer of the Estates rights and interests to such Film and Video Elements shall be free and clear of any encumbrances of the labs and SunTrust Bank N.A. as administrative agent of the lender group and at no additional cost to Purchaser.  Purchaser shall be responsible to create its own account or otherwise arrange for payment to the respective lab(s) for all periods subsequent to the Closing Date.

(f)   With respect to the supporting documentation and related materials for each Picture including without limitation those materials related to the Pictures currently stored on the Debtor's or Seller's various computers or servers or otherwise ("<u>Material Delivery Elements</u>"), for any such Material Delivery Elements Delivery shall mean delivery to Purchaser of (A) electronic or other available copies of the Material Delivery Elements on or prior to the Closing Date; and/or (B) hard copies of all such Material Delivery Elements in Seller's possession or control within a reasonable period of time after the Closing Date.

(g)   Other Deliverables.  To the extent the same are not included within the Film and Video Elements and Material Delivery Elements, Delivery shall mean that Seller will deliver (or will cause the delivery of) the following items to Purchaser not later than thirty (30) days following the Closing Date:  (i)  originals (where possible) or copies of all marketing materials and marketing fixed assets currently in the possession of Seller for the Pictures; (ii) all merchandising and licensing materials (i.e., products) for the Pictures in the possession of Seller (no matter where stored); (iii) copies of Residuals reports for the Pictures made by Debtors to unions or guilds and

4

producer reports made by Debtors to conveying rights holders (iv) copies of royalty or overage reports for the Pictures sent to Debtors and in possession or control of Seller, and (v) the Designated Contracts, all of which (i)-(v) shall be delivered electronically (collectively, the "Other Deliverables").

Section 4.3    Deliveries by Purchaser.    At the Closing, Purchaser shall deliver or cause to be delivered to Seller (unless previously delivered) each of the following:

(a)    the Purchase Price by wire transfer of immediately available funds to an account designated by Seller;

(b)    the Secretary's certificate referred to in Section 9.3(d).

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that the statements contained in this Article V are true and correct as of the date of this Agreement, except as otherwise stated in this Article V and except as set forth in the corresponding sections or subsections of the Disclosure Letter delivered by Seller to Purchaser concurrently with the execution and delivery hereof (it being agreed that disclosure of any information in a particular section or subsection of the Disclosure Letter shall be deemed disclosure with respect to any other section or subsection only to the extent that the relevance of such item is readily apparent).

Section 5.1    Authorization; Enforceability.    Subject to the entry of the Sale Order, Seller has all requisite power and authority to enter into, execute and deliver this Agreement and any other document to which Seller, on behalf of the Estates, is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder.    The execution, delivery and performance by Seller of this Agreement and any other document to which Seller, on behalf of the Estates, is or is to be a party as required hereunder, and the consummation by Seller of the Transactions, have been duly authorized by all necessary action on the part of Seller.  This Agreement has been and, when executed and delivered, any other document to which each of them is to be a party, will be, duly and validly executed and delivered by Seller and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each such other document) the valid and binding obligation of Seller, on behalf of the Estates, enforceable against Seller in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 5.2    Consents and Approvals.    No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over the Estates or any of its properties is required for the execution and delivery by Seller of the Agreement and any other document to which Seller, on behalf of the Estates, is a party or is to be a party as required hereunder and performance of and compliance by Seller with all of the provisions hereof and thereof and the consummation of the Transactions, except (a) the entry

5

of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable and (b) such other consents, approvals, authorizations, registrations or qualifications the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.3    Intentionally Omitted.

Section 5.4    Litigation.  Except as may have otherwise been stayed by operation of section 362 of the Bankruptcy Code and/or listed on Schedule III hereof, there are no legal, governmental or regulatory actions, suits, proceedings, arbitrations, investigations or other actions pending to which Seller, on behalf of the Estates, is a party, or to which any property of the Debtors or the Estates, the Assumed Liabilities or Acquired Assets are subject.

Section 5.5    Brokers.  Seller, on behalf of the Estates, is not a party to any contract, agreement or understanding with any Person that would give rise to a valid claim against Purchaser for a brokerage commission, finder's fee or like payment in connection with the Transactions.

Section 5.6    Transfer of Acquired Assets Free and Clear of Interests.

(a)    The Estates, subject to the entry of the Sale Order, at the Closing shall cause to be transferred to Purchaser, good and valid title to the Estates' rights and interests in all of the Acquired Assets, free and clear of any interests in such property, including all Liens, other than Permitted Liens and Assumed Liabilities.

(b)    Subject to section 363(f) of the Bankruptcy Code and as provided for in the Sale Order, the transfer of each of the Acquired Assets to the Purchaser shall be, as of the Closing Date, a legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest the Purchaser with all right, title, and interest of the Estates to the Acquired Assets, free and clear of (i) all Liens (other than Permitted Liens) and (ii) other than the Assumed Liabilities, all debts arising under, relating to, or in connection with any act of the Debtors or the Estates or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including rights with respect to Claims and Liens (a) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Purchaser's interests in the Acquired Assets, or any similar rights, or (b) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership, or any similar rights, (collectively, as defined in this clause (ii), "Claims"), in each case relating to, accruing or arising any time prior to the Closing Date.

6

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES
## OF PURCHASER

Purchaser hereby represents and warrants to Seller that the statements contained in this <u>Article VI</u> are true and correct as of the date of this Agreement.

Section 6.1    <u>Organization</u>.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York.

Section 6.2    <u>Authorization; Enforceability</u>.  Purchaser has all requisite power and authority to enter into this Agreement and any other document to which Purchaser is a party or is to be a party as required hereunder and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Purchaser of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation by Purchaser of the Transactions, have been duly authorized by all necessary action on the part of Purchaser.  This Agreement and, when executed, any other document to which Purchaser is a party as required hereunder, have been duly and validly executed and delivered by Purchaser and, assuming due and valid execution and delivery by Seller, constitute the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 6.3    <u>No Conflicts</u>.  Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and any other document to which Purchaser is a party as required hereunder, and the consummation of the Transactions will not (a) result in a violation of the Organizational Documents of Purchaser or (b) result in a violation of any law, statute, rule or regulation of any Governmental Entity or any applicable order of any court or any rule, regulation or order of any Governmental Entity applicable to Purchaser or by which any property or asset of Purchaser is bound, except for violations that, individually or in the aggregate, has not had and would not reasonably be likely to have a Purchaser Material Adverse Effect.

Section 6.4    <u>Consents and Approvals</u>.  Except as set forth in this Agreement, no consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Purchaser or any of its properties is required for the execution and delivery by Purchaser of the Agreement and any other document to which Purchaser is a party as required hereunder and performance of and compliance by Purchaser with all of the provisions hereof and thereof and the consummation of the Transactions, except (a) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e) and (b) such other consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

Section 6.5    Financial Capability.  Purchaser (a) has as of the date of this Agreement or will have, on the Closing Date, sufficient funds available to pay any portion of the Purchase Price payable in cash and any expenses incurred by Purchaser in connection with the Transactions, and (b) has as of the date of this Agreement and will have on the Closing Date the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

Section 6.6    Broker's, Finder's or Similar Fees.  There are no brokerage commissions, finder's fees or similar fees or commissions payable by Purchaser in connection with the Transactions.

Section 6.7    No Other Representations or Warranties.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V (as modified by the Disclosure Letter), or with respect to any other information provided to the Purchaser in connection with the Transactions, including as to the probable success or profitability of the ownership, use or operation of the Acquired Assets after Closing.  Purchaser further represents that none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person has made any representation or warranty, express or implied as to the accuracy or completeness of any information regarding Seller or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, on behalf of the Estates, the Estates' Affiliates or any other Person will have or be subject to liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives of Purchaser's use of, any such information, including data room information provided to Purchaser or its representatives, in connection with the Transactions.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Acquired Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

ARTICLE VII

BANKRUPTCY COURT MATTERS

Section 7.1    Bankruptcy Actions.  Seller shall use its reasonable best efforts to obtain the entry of the Bidding Procedures Order and the Sale Order within sixty (60) days of full execution hereof.  Purchaser covenants and agrees that it shall cooperate with Seller in connection with furnishing information or documents to Seller to satisfy the requirements for obtaining Bankruptcy Court approval of the Bidding Procedures Order and, to the extent Purchaser is the successful bidder (or Second-Highest Bidder), the Sale Order.

Section 7.2    Bidding Procedures.    The bidding procedures to be employed with respect to the Auction process (the "Bidding Procedures") shall be those reflected in the Bidding Procedures Order in the form of Exhibit B hereto, with only such changes as approved by the Purchaser in its reasonable discretion (the "Bidding Procedures Order").

Section 7.3    Conduct of the Auction.  Purchaser shall be entitled, in accordance with the Bidding Procedures Order, to: (i) allocate the Purchase Price among the

8

Acquired Assets in the discretion of the Purchaser; (ii) reallocate the Purchase Price during the Auction in the discretion of the Purchaser; and (iii) if another person has made a bid that the Seller has been deemed a "higher and better" bid, submit successive bids and make modifications to this Agreement at the Auction in connection with any such successive bid.

Section 7.4    <u>Sale Order</u>.  Seller shall use reasonable best efforts to obtain entry of the Sale Order approving the Transactions.

Section 7.5    <u>Consultation with Purchaser</u>.  Seller shall provide Purchaser, at least three (3) Business Days in advance of filing with the Bankruptcy Court, a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court seeking approval of this Agreement, including the motion to approve the Bidding Procedures Order or the Sale Order.  To the extent practicable, Seller shall reasonably cooperate with Purchaser, and consider in good faith the views of Purchaser, with respect to all such filings.

ARTICLE VIII

COVENANTS

Section 8.1    <u>Maintaining Acquired Assets Pending Closing</u>.  From the Execution Date through the Closing Date, subject to any limitations imposed on Seller as a result of its status as Trustee in the Bankruptcy Case, Seller shall ensure that, and Seller covenants and agrees that, except as expressly provided in this Agreement, required by Applicable Law or as may be agreed in writing by Purchaser:

(a)    Seller shall use reasonable good faith efforts not to modify, amend, reject, waive, release, compromise, settle or assign any material rights or claims (collectively a "<u>Modification</u>") related to any Contract Rights, but in all instances no such Modification shall have a Material Adverse Effect on the Acquired Assets being purchased by Purchaser hereunder; and

(b)    Except as permitted by the Bidding Procedures Order or other order of the Bankruptcy Court, Seller shall not sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of the Acquired Assets, except for abandonment of inventory and obsolete equipment in the ordinary course of administration of the Estates.

Section 8.2    <u>Access</u>.

(a)    From the Execution Date until the earlier of (i) termination of this Agreement and (ii) the Closing, Seller will, (w) upon reasonable notice, give Purchaser and its employees, accountants, financial advisors, counsel and other representatives reasonable access during normal business hours to the books and records of the Debtors or the Estates relating to the Acquired Assets and the Assumed Liabilities; (x) make available to Purchaser such financial and operating data and other information relating to the Acquired Assets and the Assumed Liabilities, as may be reasonably requested; and (y) instruct the counsel, auditors and financial advisors of the Estates to cooperate with Purchaser's employees, accountants, counsel and other representatives; <u>provided, that</u> (A) all activities covered by this <u>Section 8.2(a)</u> shall be, except as specifically set forth herein, at the sole cost and expense of Purchaser and (B) that any such activities pursuant to this provision

9

shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Estates. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information, (i) subject to attorney-client privilege or that conflicts with any confidentiality obligations to which Seller, on behalf of the Estates, is bound, (ii) related to pricing or other matters that are highly competitively sensitive or (iii) that would otherwise in the exercise of Seller's good faith judgment, be inappropriate in light of the Bankruptcy Cases.

(b)     Following the Closing, Seller shall cooperate with Purchaser and make available to Purchaser such documents, books, records or information relating to activities of the Acquired Assets and the Assumed Liabilities prior to the Closing as Purchaser may reasonably require in connection with any Tax determination or contractual obligations to third parties or to defend or prepare for the defense of any claim against the Purchaser or to prosecute or prepare for the prosecution of claims against third parties by Purchaser, relating to the conduct of the Acquired Assets by Seller prior to the Closing or in connection with any governmental investigation involving the Acquired Assets; provided that any such activities pursuant to this provision shall be conducted in such manner as not to interfere unreasonably with the conduct of the administration of the Estates by the Trustee.

(c)     No party shall destroy any documents, books, records or information that are subject to Section 8.2(a) without giving prior written and reasonable notice to the other parties, and within 15 days of receipt of such notice, any such other party may cause to be delivered to it the records intended to be destroyed, at such other party's expense.

Section 8.3     Efforts and Actions to Cause Closing to Occur. At all times prior to the Closing, upon the terms and subject to the conditions of this Agreement, Seller and Purchaser shall use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any Applicable Laws) to cause the Closing Date to occur and consummate the Closing and the other Transactions as promptly as practicable including, the preparation and filing of all forms, registrations and notices required to be filed to cause the Closing Date to occur and consummate the Closing and the other Transactions and the taking of such actions as are necessary to obtain any requisite approvals, authorizations, consents, releases, orders, licenses, Permits, qualifications, exemptions or waivers by any Governmental Entity.

Section 8.4     Notification of Certain Matters. Seller shall give written notice to Purchaser promptly after becoming aware of (i) the occurrence of any event, which would be likely to cause any condition set forth in Article IX to be unsatisfied in any material respect at any time from the date hereof to the Closing Date or (ii) any notice or other communication from (x) any Person alleging that the consent of such Person is or may be required in connection with any of the Transactions or (y) any Governmental Entity in connection with any of the Transactions; provided, however, that the delivery of any notice pursuant to this Section 8.4 shall not limit or otherwise affect the remedies available hereunder to Purchaser or Seller.

Section 8.5     Subsequent Actions. If at any time after the Closing Date, Purchaser or Seller consider or are advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are necessary or desirable to vest, perfect

10

or confirm ownership (of record or otherwise) in Purchaser, its right, title or interest in, to or under any or all of the Acquired Assets or otherwise to carry out this Agreement, including the assumption of the Assumed Liabilities, Purchaser or Seller shall, subject to the authority provided in the Sale Order, at Purchaser's expense, execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances and take and do all such other actions and things as may be requested by the other party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Purchaser or otherwise to carry out this Agreement.

Section 8.6    Tax Matters.

(a)    Purchaser shall be responsible for any Transfer Taxes. Purchaser shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the Transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the Transactions, and file all necessary Tax Returns with respect to all such Transfer Taxes.

(b)    Purchaser and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under Applicable Law.

(c)    Purchaser and Seller agree to furnish, or cause their Affiliates to furnish, to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. Purchaser and Seller shall cooperate, and cause their Affiliates to cooperate, with each other in the conduct of any audit or other proceeding related to Taxes and each shall execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this Section 8.6(c). Purchaser and Seller shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened tax audits, assessments or litigation with respect to the Acquired Assets for any taxable period for which the other party may have liability under this Agreement. Purchaser and Seller shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any taxing authority in connection with any tax audit or information request with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

Section 8.7    Books and Records. At or within 30 days after the Closing, Seller shall deliver to Purchaser, at Purchaser's expense, copies of the Designated Contracts, the Sublicense Agreements and all documents, books, records or information of the Estates pertaining to the Acquired Assets that are in Seller's possession or control.

Section 8.8    Adjustment of Certain Receivables. Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that any revenues or other proceeds or other consideration paid to:

11

(a)     or received by Seller in connection with the Acquired Assets following the Closing Date that, pursuant to the terms of this Agreement, should have been paid to Purchaser, shall be held in trust for Purchaser and shall be delivered, or paid over, by Seller to Purchaser as promptly as practical, but in no event later than thirty (30) days after receipt of the revenues or other proceeds or consideration for amounts received anytime thereafter;

(b)     or received by Purchaser in connection with the Acquired Assets that, pursuant to the terms of this Agreement, should have been paid to Seller shall be held in trust for Seller and shall be delivered, or paid over, by Purchaser to Seller as promptly as practical, but in no event later than thirty (30) days after receipt of the revenues or other proceeds or consideration for amounts received anytime thereafter.

ARTICLE IX

CONDITIONS

Section 9.1     <u>Conditions Precedent to Performance by Seller and Purchaser</u>.  The respective obligations of Seller and Purchaser to consummate the Transactions contemplated by this Agreement are subject to the satisfaction or waiver, on or prior to the Closing Date, of the following conditions:

(a)     <u>Bankruptcy Matters</u>.  By September 17, 2018, the Bankruptcy Court shall have entered the Sale Order.  The Sale Order shall not have been stayed, vacated, modified or supplemented without the prior written consent of Purchaser.

(b)     <u>No Order</u>.  No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Entity that would (i) prevent the consummation of any of the Transactions contemplated by this Agreement or (ii) cause any of the Transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order be in effect. No action shall be pending before any Governmental Entity or before any arbitral body wherein an unfavorable injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of any of the Transactions contemplated by this Agreement or (y) cause any of the Transactions contemplated by this Agreement to be rescinded following consummation.

Section 9.2     <u>Conditions to Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date, each of the following conditions:

(a)     <u>Seller's Representations and Warranties</u>.  The representations and warranties made by Seller in <u>Article V</u> of this Agreement shall be true and correct in all respects as of the Closing, in each case as though made at and as of such time (or, if made as of a specific date, at and as of such date), except to the extent such failures to be true and correct do not individually or in the aggregate constitute a Material Adverse Effect (except for representations and warranties which

12

are qualified by "material" or "Material Adverse Effect", which such representations and warranties shall be true and correct in all respects).

(b)    <u>Seller's Performance of Covenants</u>.  Seller shall not have failed to perform in any material respect any material obligation or to comply in any material respect with any material agreement or material covenant of Seller to be performed or complied with by them under this Agreement.

(c)    <u>Certificate of Trustee</u>.  Purchaser shall have received from the Seller a certificate, dated the Closing Date, duly executed by the Trustee reasonably satisfactory in form to Purchaser, confirming that <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u> have been satisfied.

(d)    <u>Bill of Sale; Conveyance Documents</u>.  Seller shall have duly executed and delivered to Purchaser the documents set forth in <u>Section 4.2</u> that are required to be delivered at the Closing.

(e)    No legal proceeding shall have been commenced against Purchaser or Seller, which would prevent the Closing. No Order shall have been issued by any Governmental Authority, and be in effect, which has the effect of making the Transaction contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of this Transaction or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(f)    Except for Permitted Liens, Seller shall have obtained and delivered to Purchaser a release and discharge from SunTrust Bank, N.A. as administrative agent for the lender group in respect of the UCC Security Interest filed in the State of Delaware and the lender's interest filed in the U.S. Copyright Office in a form reasonably satisfactory to Purchaser, which releases and discharges the Estate and all of the Acquired Assets at the time of Closing.  The form set forth in <u>Exhibit D</u> is hereby approved by Purchaser.

(g)    Seller shall deliver the Lab Access Letter in the form attached hereto as <u>Exhibit C</u>.

(h)    Seller shall have obtained and delivered to Purchaser a release from SunTrust Bank N.A. as administrative agent for lenders of its pledge holder agreements with the labs pertaining to the Film and Video Elements for the Pictures.

The foregoing conditions in this <u>Section 9.2</u> are for the sole benefit of Purchaser and may be waived by Purchaser, in whole or in part, at any time and from time to time in its sole discretion.  The failure by Purchaser prior to Closing to exercise any of the foregoing rights shall be deemed a waiver of any such rights.

Section 9.3    <u>Conditions to Obligations of Seller</u>.  The obligations of Seller to consummate the Closing shall be subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date, of the following conditions:

(a)    <u>Representations and Warranties</u>.  All representations and warranties made by Purchaser in <u>Article VI</u> of this Agreement shall be true and correct in all respects on and as of the Closing Date as if again made by Purchaser on and as of such date (or, if made as of a specific date, at and as of such date) except to the extent such failures to be true and correct do not individually or in the aggregate constitute a Purchaser Material Adverse Effect (except for such

<div align="center">13</div>

representations and warranties which are qualified by "material" or "Purchaser Material Adverse Effect", which such representations and warranties shall be true and correct in all respects).

(b)    <u>Performance of the Obligations of Purchaser</u>.  Purchaser shall have performed in all material respects all material obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate dated as of the Closing Date and signed by an authorized signatory of Purchaser to that effect.

(c)    <u>Purchaser's Deliveries</u>.  Purchaser shall have delivered, and Seller shall have received, all of the items set forth in <u>Section 4.3</u> of this Agreement.

(d)    <u>Secretary's Certificate</u>.  Purchaser shall have delivered to Seller a duly executed certificate by the acting secretary or managing member of Purchaser, certifying as to Purchaser's Organizational Documents and certificate of good standing and other customary matters.

The foregoing conditions in this <u>Section 9.3</u> are for the sole benefit of Seller and may be waived by Seller, in whole or in part, at any time and from time to time in its sole discretion. The failure by Seller prior to Closing to exercise any of the foregoing rights shall be deemed a waiver of any such rights.

ARTICLE X

TERMINATION

Section 10.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing Date as follows:

(a)    By the mutual written consent of Purchaser and Seller;

(b)    By either Purchaser or Seller upon written notice given to the other, if the Bankruptcy Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable best efforts to prevent the entry of and remove) that permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions, and such order, decree, ruling or other action shall have become final and non-appealable;

(c)    By Seller upon written notice given to Purchaser, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in <u>Section 9.3</u> and (ii) cannot be cured within ten (10) Business Days after Seller provides written notice to Purchaser of such breach;

(d)    By Purchaser upon written notice given to Seller:

(i)    if Seller shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained

in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.2 and (ii) cannot be cured within ten (10) Business Days after Purchaser provides written notice to Seller of such breach; or

(ii)     if the Sale Order has been revoked, rescinded, or modified in any material respect and the order revoking, rescinding, or modifying such order(s) shall not be reversed or vacated within ten (10) Business Days after the entry thereof; provided that Purchaser shall have the right to designate any later date for this purpose in its sole discretion;

(e)     By Purchaser or Seller if the Auction has not begun by the date that is thirty (30) days following the entry of the Bidding Procedures Order;

(f)     Subject to Purchaser's rights under Section 7.3 and the Bidding Procedures Order to amend the terms of this Agreement at the Auction, with respect to any Acquired Assets being purchased by Purchaser, by either Purchaser or Seller, if, at the conclusion of the hearing for the sale of Acquired Assets to Purchaser, Purchaser is not determined by the Bankruptcy Court to be the Prevailing Bidder with respect to such Acquired Assets, unless Purchaser is the Second-Highest Bidder; provided, however, that the Purchaser shall have the right to terminate this Agreement pursuant to this Section 10.1(f) on or at any time after the forty-fifth (45th) day following the date of the entry of the Sale Order unless the Purchaser becomes the Prevailing Bidder on or prior to such date; and

(g)     By Purchaser or Seller upon written notice given to the other if Seller consummates an Alternative Transaction.

For the avoidance of doubt, if the Purchaser or Seller terminates this Agreement with respect to any individual or combination of Acquired Assets pursuant to Section 10.1(f), the Agreement, as amended as permitted by Section 7.3 and the Bidding Procedures Order, shall remain in full force and effect for any Acquired Assets for which Purchaser is the Prevailing Bidder. Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to which such termination is made and the effective date of such termination being the date of such notice.

Section 10.2    Effect of Termination.  If this Agreement is terminated by either party in accordance with and pursuant to Section 10.1, then, except as otherwise provided in Section 10.3, all rights and obligations of the parties under this Agreement shall terminate; provided, however, that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination.

Section 10.3    Expense Reimbursement.

(a)     If this Agreement is terminated pursuant to Section 10.1 (d), (e) (f) or (g) then Seller, to the extent provided in the Bidding Procedures Order, shall pay, or cause to be paid, to Purchaser or as Purchaser may direct, by wire transfer in immediately available funds, an aggregate amount equal to any unreimbursed Transaction Expenses.

15

(b)     If this Agreement is terminated pursuant to <u>Section 10.1(f)</u> or <u>(g)</u> then Seller, to the extent provided in the Bidding Procedures Order, shall pay, or cause to be paid, to Purchaser or as Purchaser may direct, by wire transfer in immediately available funds, in addition to the amount payable per Section 10.3(a) above, an amount equal to the Break-Up Fee, with such payments to be made so as to be received not later than four (4) Business Days following the date of Closing on the Alternative Transaction.

(c)     Subject to entry of the Bidding Procedures Order, the obligations of Seller to pay any unreimbursed Transaction Expenses and the Break-Up Fee as provided herein shall survive termination of this Agreement and be entitled to administrative expense status pursuant to section 503(b)(1) of the Bankruptcy Code.

(d)     The parties acknowledge that the agreements contained in this <u>Section 10.3</u> are an integral part of the Transactions contemplated by this Agreement and that without these agreements neither Seller nor Purchaser would enter into this Agreement.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1    <u>Survival of Covenants, Representations and Warranties</u>. The representations and warranties set forth in <u>Article</u> V and <u>Article VI</u> shall not survive the Closing Date; <u>provided</u>, <u>however</u>, that all covenants and agreements in this Agreement shall survive the Closing Date and remain in full force and effect indefinitely, unless otherwise specified therein.

Section 11.2    <u>Amendment and Modification</u>.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement; provided, however, any material amendment shall be subject to approval by the Bankruptcy Court.

Section 11.3    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given when mailed, delivered personally, telecopied (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the parties at the following addresses:

If to Seller:          George L. Miller, Trustee
                       1628 John F. Kennedy Blvd., Suite 950
                       Philadelphia, PA 19103-2110
                       Telephone: (215) 561-0950 Ext. 14
                       Facsimile: (215) 561-0330
                       Email:  gmiller@mctllp.com

LEGAL\36372615\6 00601.0823.000/390810.000
07/03/2018 8:43 PM

|                   |                                          |
|-------------------|------------------------------------------|
| with a copy to:   | John T. Carroll, III                     |
|                   | Cozen O'Connor                           |
|                   | 1201 North Market Street, Suite 1001     |
|                   | Wilmington, DE 19801                     |
|                   | Telephone: (302) 295-2028                |
|                   | Facsimile: (302) 295-2013                |
|                   | Email: jcarroll@cozen.com                |
|                   |                                          |
| If to Purchaser:  | OA Acquisitions LLC, a New York LLC      |
|                   | 220 36th Street, 4th Fl.                 |
|                   | Brooklyn, NY 11232                       |
|                   | Telephone:  (718) 369-9090               |
|                   | Attn:  Goetz Grossmann                   |
|                   | Email:  goetz@filmrise.com               |
|                   |                                          |
| with a copy to:   | The Law offices of Vince Ravine          |
|                   | 5120 Gloria Ave                          |
|                   | Encino CA 91436                          |
|                   | Telephone: 310 776 0215                  |
|                   | Attn:  Vince Ravine                      |
|                   | Email:  vince@vravinelaw.com             |

or to such other address as a party may from time to time designate in writing in accordance with this Section 11.3.  Each notice or other communication given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been received (i) on the Business Day it is sent, if sent by personal delivery or telecopy, or (ii) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (iii) upon receipt, if sent by mail (regular, certified or registered); provided, however, that notice of change of address shall be effective only upon receipt.  The parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this Section 11.3, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

Section 11.4   Counterparts.  This Agreement may be executed by facsimile or PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

Section 11.5   Mutual Drafting. This Agreement is the result of the joint efforts of Purchaser and Seller, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

Section 11.6   Entire Agreement; No Third Party Beneficiaries.  This Agreement and other schedules, annexes, and exhibits hereto, any other document required hereunder, the Conveyance Documents and the Sale Order (i) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with

LEGAL\36372615\6 00601.0823.000/390810.000
07/03/2018 8:43 PM

respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the parties, oral and written, with respect to the subject matter hereof, and (ii) are not intended to confer upon any Person other than the parties hereto and thereto any rights, obligations or remedies hereunder; provided further that Affiliates and representatives of each party are express third-party beneficiaries of <u>Section 11.14</u> and this <u>Section 11.6</u>.

Section 11.7    <u>Severability</u>.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 11.8    <u>Governing Law</u>.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 11.9    <u>Exclusive Jurisdiction</u>.  All actions and proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.  If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the District of Delaware, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in <u>Section 11.3</u> (<u>provided</u> that nothing herein shall affect the right to effect service of process in any other manner permitted by Delaware law).

Section 11.10    <u>Remedies</u>.  Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or Purchaser in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

18

Section 11.11  <u>Specific Performance</u>.

(a)  Purchaser acknowledges and agrees that any breach of the terms of this Agreement by Purchaser would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, Seller shall be entitled to enforce the terms of this Agreement, including, for the avoidance of doubt, Purchaser's obligation to fund the Purchase Price, by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

(b)  Purchaser agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity.  In the event Seller seeks an injunction or injunctions to prevent breaches of this Agreement when expressly available pursuant to the terms of this Agreement and to enforce specifically the terms and provisions of this Agreement when expressly available pursuant to the terms of this Agreement, Seller shall not be required to provide any bond or other security in connection with any such order or injunction.

(c)  Nothing in this <u>Section 11.11</u> shall limit the rights of Purchaser to seek or obtain enforcement of the Bidding Procedures Order or the Sale Order after the entry of such orders or of this Agreement.

Section 11.12  <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written content of the other party; provided that no such prior written consent shall be required for (a) an assignment by the Purchaser to any of its Affiliates, so long as the Purchaser remains liable hereunder, (b) an assignment by the Purchaser of its rights and interests hereunder after the Closing.  Subject to the first sentence of this <u>Section 11.12</u>, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

Section 11.13  <u>Headings</u>.  The article, section, paragraph and other headings contained in this Agreement are inserted for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 11.14  <u>No Consequential or Punitive Damages</u>.  WITHOUT LIMITING ANY RIGHTS OF ANY PARTY TO RECEIVE EXPENSE REIMBURSEMENT IN ACCORDANCE WITH <u>Section 10.3</u> OF THIS AGREEMENT, NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

LEGAL\36372615\6 00601.0823.000/390810.000
07/03/2018 8:43 PM

Section 11.15 "As Is" Transaction.    THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE V OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ALL OR ANY PORTION OF THE ACQUIRED ASSETS. ACCORDINGLY, THE PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

Section 11.16 Definitions.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"Acquired Assets" means all of the Estates' right, title and interest in and to the following but in all cases excluding the Excluded Assets:

(a)    all Contract Rights whether or not summarized in Schedule I attached hereto with respect to each Picture listed therein including but not limited to:

(i)    all right, title and interest of the Estates to distribute, exhibit or otherwise exploit any Picture; and

(ii)    the benefit of any unrecouped and outstanding amounts, if any, including any Minimum Guarantee paid by the Debtors or the Estates.

(b)    all negatives, prints and all other physical or other materials (including digital materials) and personal property owned or controlled by the Estates, together with the Estates' rights to access to any negatives, prints, other physical or other materials constituting or used in connection with each applicable Picture, including those elements which are stored by the Estates at a laboratory or other facility;

(c)    the right to receive and retain all sums payable from the Exploitation of the Pictures pursuant to the Designated Contracts or otherwise pursuant to this Agreement in respect of the Pictures for all accounting periods on or after the Closing Date, other than the license fees payable by Netflix, Inc. under the existing Sublicense Agreement with Netflix, Inc. and/or as otherwise set forth under the Netflix Stipulation; and

(d)    any right to receive any sums payable on or after the date hereof by a licensor (together with its successors and assigns) in connection with any claim, action, demand, suit, lawsuit, arbitration, proceeding or litigation, whether arising prior to, on or after the date hereof, to collect or recover any unrecouped and outstanding amounts of any advance, license fee, guaranteed payment or similar amount paid by any of the Debtors, or with respect to expenses or other amounts incurred by any of the Debtors, pursuant to the terms of the Designated Contracts or otherwise pursuant to this Agreement.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common

20

control with such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the Exhibits hereto and the exhibits and schedules thereto and the Disclosure Letter.

"Alchemy" has the meaning set forth in the preamble hereof.

"Allocation Statement" has the meaning set forth in Section 3.3.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction resulting from the Auction, of a material portion of the Estates' Assets, in a transaction or series of transactions with one or more Persons other than Purchaser.

"Anderson Digital" has the meaning set forth in the preamble hereof.

"Applicable Law" means any law, regulation, rule, order, judgment, guideline or decree to which any Acquired Asset is or the Estates are, subject.

"Assumed Liabilities" means any and all of the following (and none others):

(a)      any and all Liabilities of the Debtors or the Estates under each Designated Contract with respect to which Contract Rights are included as part of the Acquired Assets relating solely to the Exploitation of the Pictures by the Purchaser to the extent they both accrue and become due and payable after the Closing Date and relate to an accounting period commencing on or after such date, but, in each case, only to the extent that any Minimum Guarantee (if any) and/or other amount required to trigger payment of such Liabilities provided for in such Designated Contract is fully recouped pursuant to the terms thereof.  For purposes of clarification, the Assumed Liabilities do not include any Minimum Guarantees or indemnity obligations owed by the Debtors or the Estates under any Designated Contract arising from a breach of a representation or warranty of the Debtors or the Estates or any other indemnity claim that arises from any act or omission of the Debtors or the Estates under the Designated Contracts or otherwise that relate to a period on or prior to the Closing Date;

(b)      any and all Residuals relating to the Exploitation of the Guild Secured Pictures only to the extent they become due and payable based on sums received by the Purchaser after the Closing Date and relate to an accounting period commencing on or after such date; and

(c)      any and all ongoing license rights to Pictures licensed by Netflix, Inc. pursuant to the Stipulation by and between the Trustee and Netflix, Inc. Regarding License Agreement for Internet Transmission (the "Netflix Stipulation") and order of the Bankruptcy Court approving the Netflix Stipulation.

For the avoidance of doubt, Assumed Liabilities shall specifically exclude any obligation to defend, indemnify, hold harmless or discharge any Liability of the Debtors or the Estates or any

of their Affiliates, and any other Liabilities except as specifically set forth above in (a)-(c) including without limitation the following: (i) any and all Liabilities arising under the Acquired Assets for any period prior to the Closing Date (ii) any and all Liabilities arising under the Sublicense Agreements regardless of whether such Liabilities relate to a period before or after the Closing Date (other than Liabilities under the Netflix Stipulation), except where a licensee or sublicensee elects to retain its rights under the applicable Sublicense Agreement pursuant to section 365(n) of the Bankruptcy Code within the time period set forth in the Bidding Procedures Order; (iii) any and all Residuals related to any Guild Secured Pictures for any period prior to the Closing Date (including any payment obligations that were due and payable prior to such time regardless of whether such payment obligations relate to a period before or after the Closing Date); (iv) any and all obligation to report or pay to a licensor or any other 3rd party any revenue related to any sums paid, accrued or otherwise payable (whether or not paid as of the Closing Date) to the Estates from the Exploitation of the Pictures pursuant for all accounting periods prior to the Closing Date and (v) any Damages arising from the rejection of the Designated Contracts and subject to allowance or disallowance as provided in section 502(g) of the Bankruptcy Code.

"Auction" has the meaning ascribed to such term in the Bidding Procedures Order.

"Bankruptcy Case" or "Bankruptcy Cases" has the meaning set forth in the recitals hereof.

"Bankruptcy Code" has the meaning set forth in the recitals hereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bidding Procedures" has the meaning set forth in Section 7.2.

"Bidding Procedures Order" has the meaning set forth in Section 7.2.

"Bill of Sale" means the bill of sale substantially in the form attached as Exhibit E hereto.

"Break-Up Fee" means an amount equal to $60,000.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York are authorized or obligated by Applicable Law or executive order to close or are otherwise generally closed.

"Claims" has the meaning set forth in Section 5.6(b).

"Closing" means the consummation of all Transactions contemplated in this Agreement.

"Closing Date" has the meaning set forth in Section 4.1(b).

22

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Contract Rights</u>" means, with respect to a Picture, all rights, remedies, obligations and entitlements (including the benefits and burdens of all representations, warranties, indemnifications and other covenants) under each Designated Contract or otherwise pursuant to this Agreement included as part of the Acquired Assets, including the right to Exploit such Picture.

"<u>Conveyance Documents</u>" means (a) the Bill of Sale; (b) all documents of title and instruments of conveyance necessary to Transfer record and/or beneficial ownership to Purchaser of Acquired Assets from the Estates which require execution, endorsement and/or delivery of a certificate of title or other document in order to vest record or beneficial ownership thereof in Purchaser; and (c) all such other documents of title, customary title insurance affidavits, deeds, endorsements, assignments and other instruments of conveyance or Transfer that are necessary or appropriate to vest in Purchaser good and marketable title to any Acquired Assets.

"<u>Damages</u>" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"<u>Debtor</u>" or "<u>Debtors</u>" has the meaning set forth in the preamble hereof.

"<u>Delivery</u>" has the meaning set forth in Section 4.2.

"<u>Deposit</u>" means 10% of the Purchase Price payable by Purchaser to Seller upon execution of this Agreement.  Deposit will be deemed held in escrow by the Seller until Closing. In the event that Closing occurs with a party other than the Purchaser, Seller will promptly return the Deposit to Purchaser along with the Transaction Expense.

"<u>Designated Contracts</u>" means the contracts listed on <u>Schedule I</u> attached hereto, including all extension, renewal and option rights thereunder.

"<u>Disclosure Letter</u>" means the disclosure letter of even date herewith prepared and signed by Seller and delivered to Purchaser simultaneously with the execution hereof.

"<u>Estates</u>" has the meaning set forth in the preamble hereof.

"<u>Excluded Assets</u>" notwithstanding anything to the contrary in this Agreement, in no event shall the Seller be deemed to sell, transfer, assign, convey, and the Estates shall retain all right, title and interests to, in and under the assets, properties, interests and rights of the Estates not included in (a)-(d) the above description of Acquired Assets or set forth below (the Excluded Assets):

(a)    All sums paid, accrued or otherwise payable (but not paid as of the Closing Date) to the Estates from the Exploitation of the Pictures pursuant to the Designated Contracts in respect of the Pictures for all accounting periods prior to the Closing Date

23

(b)    All inventory of any kind or nature, merchandise and goods maintained, held or stored by or for the Seller on the Closing Date, excluding those Acquired Assets set forth in clause (b) of the definition of Acquired Assets,

(c)    All sums and fees payable by Netflix, Inc. under the existing Sublicense Agreement with Netflix, Inc.,

(d)    All cash and cash equivalents and certificates of deposit of the Estate as of the Closing Date,

(e)    All deposits, advances and prepaid expenses of the Estates in respect of utilities, taxes, and insurance policies,

(f)    All tax refunds and prepaid taxes of the Estate,

(g)    All avoidance claims and causes of action under the Bankruptcy Code or applicable state law, including avoidance claims and causes of action of the Debtors arising under Chapter 5 of the Bankruptcy Code;

(h)    All claims or causes of action of the Debtors accrued as of the Closing Date including but not limited to claims and causes of action against the Debtors' current or former directors and officers.

(i)    All insurance policies, including any directors and officers and errors and omissions insurance policies and claims arising thereunder; and

(j)    All documents (whether copies or original), to the extent that they (i) relate to the Excluded Assets or which the Seller or the Debtors are required by law to retain and, in each case, which the Seller or the Debtors are prohibited by law from providing a copy of or to the Purchaser, or (ii) are covered by the attorney-client or work product privilege or similar privileges.

"Execution Date" has the meaning set forth in the preamble hereof.

"Exploit" means, with respect to a Picture, the exhibition, distribution, reproduction, subdistribution, transmission, display, broadcast, performance, dissemination, publication, promotion, publicizing, advertising, reproduction, rental, leasing, subleasing, selling, licensing, sublicensing, transfer, disposal of, commercializing, marketing, usage, trading in, turning to account, dealing with and in and otherwise exploiting such Picture by any and all means, methods, processes, media devices and delivery systems of every kind or character, whether now known or hereafter created. The meaning of the term "Exploitation" shall be correlative to the foregoing.

"Film and Video Elements" has the meaning set forth in Section 4.2(f)

"Governmental Entity" means any foreign, national, federal, state, municipal, local, provincial, territorial, government or any department, commission, board, bureau, agency, regulatory authority or instrumentality thereof, or any court, judicial, administrative or arbitral

body or public or private tribunal, including any United States or other such entity anywhere in the world.

"Guilds" means, collectively, the Directors Guild of America, Inc., Screen Actors Guild – American Federation of Television and Radio Artists, the Writers Guild of America West, Inc.

"Guild Secured Pictures" means the Pictures listed on Schedule II attached hereto.

"IRS" means the United States Internal Revenue Service.

"Lab Access Letter" has the meaning set forth in Section 4.2(f)

"Liabilities" means all Claims, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of the Bankruptcy Case) of or against the Debtors or the Estates or any of the Acquired Assets.

"Lien" or "Liens" means, with respect to any asset, any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code of any jurisdiction) and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Material Adverse Effect" means any change, effect, event or condition that has had or would reasonably be expected to have (i) a material adverse effect on the value of the Acquired Assets taken as a whole (not including any Assets that Purchaser will not acquire or (ii) a material adverse effect on the ability of Seller to consummate the Transactions; provided that the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect: (A) changes in general economic conditions or securities or financial markets in general that do not have a disproportionate effect on the Acquired Assets (relative to the effect on other Persons operating in the same industry), (B) changes in the industry in which Seller, on behalf of the Estates, operates and that do not specifically relate to, or have a disproportionate effect on, the Acquired Assets (relative to the effect on other Persons operating in the same industry as the Debtors or the Estates), (C) changes in Applicable Law or interpretations thereof by any Governmental Entity that do not have a disproportionate effect on the Acquired Assets (relative to the effect on other Persons operating in the same industry as the Debtors or the Estates), (D) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism that does not have a disproportionate effect on the Acquired Assets (relative to the effect on other Persons operating in the same industry as the Debtors or the Estates), (E) changes to the extent resulting from the announcement or the existence of, or compliance with, this Agreement and the Transactions (including any lawsuit related thereto), and the impact on relationships with

25

suppliers, customers, employees or others, as a result of this Agreement and/or the Transactions, (F) any changes in accounting regulations or principles that does not have a disproportionate effect on the Acquired Assets (relative to the effect on other Persons operating in the same industry as the Debtors or the Estates) and (G) any changes resulting from actions of Seller, on behalf of the Estates, expressly agreed to or requested in writing by Purchaser or as a result of initiating the Bankruptcy Case and any action taken by the Bankruptcy Court.

"Material Delivery Elements" has the meaning set forth in Section 4.2(g)

"Minimum Guarantees" means the amount of any non-refundable advance, license fee, guaranteed payment or similar amount paid by the Debtors or the Estates under the terms of a Designated Contract for the right to Exploit a Picture in the territory(ies) specified therein.

"Modification" has the meaning set forth in Section 8.1(a)

"Other Deliverables" has the meaning set forth in Section 4.2(h)

"Order" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any governmental body, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"Organizational Documents" means with respect to any Person, its certificate of incorporation, formation or organization (or comparable) document, its by-laws, partnership agreement or any certificate of formation, limited liability company agreement or operating agreement, or any other similar organizational instrument or document governing such Person or applicable to ownership.

"Permits" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"Permitted Liens" means any liens with any Guild with respect to the Guild Secured Pictures; and

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, incorporated organization, association, corporation, institution, public benefit corporation, Governmental Entity or other entity.

"Pictures" means, collectively, the motion pictures, television shows or other intellectual property for which the Estates have Contract Rights including distribution or other Exploitation rights. A true and complete listing of the Pictures subject to the Contract Rights is set forth in Schedule I attached hereto.

"Prevailing Bidder" has the meaning set forth in the Bidding Procedures.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the preamble hereof.

LEGAL\36372615\6 00601.0823.000/390810.000
07/03/2018 8:43 PM

"<u>Purchaser Material Adverse Effect</u>" means a material adverse effect on the business, assets, operations, results of operations or financial condition of Purchaser or on Purchaser's ability to consummate the Transactions or delay the same in any material respect.

"<u>Residuals</u>" means, with respect to a Guild Secured Picture, all amounts accruing after the Closing Date required to be paid to third parties pursuant to collective bargaining, union or guild agreements (in all applicable jurisdictions) by reason of, in connection with, as a condition to or arising from the use or Exploitation of such Guild Secured Picture, or any part thereof, or any use or reuse thereof, in any media, including residuals, supplemental market payments, pension, health and welfare payments, and employer share of taxes.

"<u>Sale Order</u>" means an order of the Bankruptcy Court substantially in the form and substance of <u>Exhibit A</u>, any change to which <u>must</u> be pre-approved in writing by Purchaser, providing, among other things, that (i) the Purchaser is the Prevailing Bidder; (ii) the Agreement is approved; (iii) the sale of Acquired Assets shall be to the fullest extent permitted by the Bankruptcy Code, pursuant to sections 105 and 363 of the Bankruptcy Code and free and clear of all interests in the Acquired Assets, including all Liens and Liabilities other than Permitted Liens and Assumed Liabilities; (iv) the Acquired Assets and the Contract Rights included therein are set forth on <u>Schedule I</u> of the Agreement; (v) Purchaser is deemed to have purchased the Acquired Assets in good faith pursuant to section 363(m) of the Bankruptcy Code; and (vi) Trustee is authorized to execute, upon request by Purchaser, one or more assignments in form, substance, and number reasonably acceptable to Purchaser, evidencing the conveyance pursuant to the Agreement of the Acquired Assets to Purchaser.

"<u>Second-Highest Bidder</u>" has the meaning set forth in the Bidding Procedures.

"<u>Seller</u>" has the meaning set forth in the preamble hereof.

"<u>Sublicense Agreements</u>" means, with respect to any Picture, the license agreements, sublicense agreements, distribution agreements, consent to use agreements, to which the Estates is a party or otherwise bound, pursuant to which the Debtors or the Estates grant or license to any third party any right to Exploit any Picture.

"<u>Tax</u>" or "<u>Taxes</u>" means any and all United States federal, state, local or non-United States taxes, fees, levies, duties, tariffs, imposts, and other similar charges on or with respect to net income, alternative or add-on minimum, gross income, gross receipts, sales, use, *ad valorem*, franchise, capital, paid-up capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, or windfall profit tax, customs duties, value added or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Entity responsible for the imposition of any such tax.

"<u>Tax Authority</u>" means any Governmental Entity with responsibility for, and competent to impose, collect or administer, any form of Tax.

"<u>Tax Return</u>" means any return, claim, election, information return, declaration, report, statement, schedule, or other document required to be filed in respect of Taxes and amended Tax Returns and claims for refund.

<div align="center">27</div>

"Transaction Expenses" means the reasonable, actual, and documented out-of-pocket costs and expenses incurred by the Purchaser in connection with the Transactions contemplated hereby up to a maximum aggregate amount equal to $100,000, including reasonable, actual and documented fees, costs and expenses of counsel and of any other professionals retained by the Purchaser.

"Transactions" means all the transactions provided for or contemplated by this Agreement and/or any other document required hereunder.

"Transfer" means sell, convey, assign, transfer, deliver or otherwise dispose of, and "Transferable" shall have a corollary meaning.

"Transfer Taxes" means all goods and services, harmonized sales, excise, sales, use, transfer, stamp, stamp duty, recording, value added, gross receipts, documentary, filing, and all other similar Taxes or duties, fees  or other like charges, however denominated (including any real property transfer taxes and conveyance and recording fees and notarial fees), in each case including interest, penalties or additions attributable thereto whether or not disputed, arising out of or in connection with the Transactions, regardless of whether the Governmental Entity seeks to collect the Transfer Tax from Seller or Purchaser.

"Trustee" has the meaning set forth in the preamble herein.

Section 11.17 <u>Bulk Transfer Notices</u>.  Seller and Purchaser hereby waive compliance with any bulk transfer provisions of the Uniform Commercial Code (or any similar Applicable Law), to the extent not repealed in any applicable jurisdiction, in connection with this Agreement and the Transactions.

Section 11.18 <u>Interpretation</u>.

(a)    When a reference is made in this Agreement to a Section, Article, subsection, paragraph, item or Exhibit, such reference shall be to a Section, Article, subsection, paragraph, item or Exhibit of this Agreement unless clearly indicated to the contrary.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

LEGAL\36372615\6 00601.0823.000/390810.000
07/03/2018 8:43 PM

(f)     A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)     References to $ are to United States Dollars.

(h)     The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

Section 11.19   <u>Guaranty</u>

(a)     Each of the undersigned persons listed on the signature pages hereto as guarantors (collectively, the "<u>Guarantors</u>") hereby absolutely, unconditionally and irrevocably guarantees the full payment of the Purchase Price and the payment obligations of Purchaser under Section 8.8 of this Agreement as fully as if made by the Guarantors, discharge and performance of each and every obligation, covenant, warranty and representation of Purchaser under this Agreement (subject to the terms, conditions and limitations set forth herein) as fully as if made by the Guarantors.  The Parties hereto agree and acknowledge that Seller may enforce each of the Guarantor's obligations without first (i) suing the Purchaser, (ii) joining the Purchaser in any suit against the Guarantor, (iii) enforcing any rights and remedies against the Purchaser or (iv) otherwise pursuing or asserting any claims or rights against the Purchaser or any of its property.  Each Guarantor's responsibility shall not be discharged, released, diminished, or impaired in whole or in part by (A) any setoff, counterclaim, defense, act or occurrence which the Guarantor may have against Seller as a result or arising out of this or any other transaction, (B) the amendment, modification, waiver or alteration of this Agreement, with or without the knowledge or consent of the Guarantor, or (C) the inaccuracy of any of the representations and warranties of Seller under the Agreement.  Each Guarantor hereby represents and warrants that: (i) the execution, delivery and performance by Guarantor of this Agreement has been duly authorized and this Agreement constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, (ii) such Guarantor has full legal capacity to execute and deliver this Agreement to perform its obligations hereunder and to consummate the transactions contemplated hereby and (iii) the execution, delivery and performance of this Agreement by such Guarantor, and the consummation by such Guarantor of the transactions contemplated by this Agreement, will not result in a default (with due notice or lapse of time or both) or the creation of any Lien or give rise to any right of termination, cancellation or acceleration under any material note, bond, mortgage, indenture, license or agreement to which such Guarantor is a party, violate any Order of a Governmental Entity or laws applicable to such Guarantor.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____

Name:   George L. Miller

Title:   Trustee

**PURCHASER:**

OA ACQUISITIONS LLC

By: _____

Name:   GOETE GROSSMANN

Title:   Authorized Signatory

**GUARANTOR:**

FILMRISE ACQUISITIONS LLC

By: _____

Name:   GOETZ GROSSMANN

Title:   Authorized signatory

30

**Exhibit A**

**<u>Form of Sale Order</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Our Alchemy, LLC, *et al*.,[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 16-11596 (KG)<br><br>(Jointly Administered)<br><br>**Related Doc. No. _____** |

### ORDER APPROVING THE SALE OF
### CERTAIN OF THE DEBTORS' ASSETS

Upon the motion (the "**Sale Motion**")[2] of George L. Miller, in his capacity as chapter 7 trustee (the "**Trustee**") for the Debtors in the above-captioned bankruptcy cases (the "**Bankruptcy Cases**") for an order (this "**Sale Order**") authorizing the Sale of the Acquired Assets pursuant to the Stalking Horse Agreement, free and clear of all claims, liens and encumbrances and providing certain related relief; and the Bankruptcy Court having entered the *Order (I) Establishing Bidding Procedures for the Sale of Certain of the Debtors' Assets; (II) Approving Break-Up Fee and Transaction Expenses; (III) Approving Form And Manner Of Sale Notice; (IV) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; and (V) Granting Certain Related Relief*, on _____, 2018 (the "**Bidding Procedures Order**"); and the Auction having been held on _____, 2018, for the consideration of Qualified Bids and the selection of a Prevailing Bidder; and upon the Bankruptcy Court's consideration of the Sale Motion, the declarations submitted in support of the Sale Motion, the record of the bidding procedures hearing held on July 25, 2018, and the Sale Hearing held on _____, 2018

---

[1] The Debtors are: Our Alchemy, LLC, Case No. 16-11596, and Anderson Digital, LLC, Case No. 16-11597.
[2] Unless otherwise defined herein, capitalized terms shall have the meanings provided in the Sale Motion, the Bidding Procedures, or the Stalking Horse Agreement as applicable.

(the "**Sale Hearing**") with respect to the Sale Motion, the objections thereto, if any, and the testimony and evidence admitted at the Sale Hearing; and after due deliberation thereon, and sufficient cause appearing therefor, it is hereby:

**FOUND, CONCLUDED AND DETERMINED THAT**:[3]

A.        **Jurisdiction and Venue**.  The Bankruptcy Court has jurisdiction to consider this Sale Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested in the Sale Motion are Bankruptcy Code sections 105, 363, and 503, Bankruptcy Rules 2002, 6004, 9006, and 9014 and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

B.        **Notice**.  As evidenced by affidavits of service previously filed with the Bankruptcy Court, and based on representations of counsel at the Sale Hearing: (i) due, proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing, and the transactions contemplated by the Stalking Horse Agreement (the "**Sale Transaction**") has been provided to all parties entitled thereto; (ii) such notice is good, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Sale Motion, the Auction, the Sale Hearing, or the Sale Transaction is or shall be required.

C.        **Opportunity to Object**.  All parties in interest have been given a reasonable opportunity to object and to be heard with respect to the Sale Motion, the Auction, the Sale Hearing, and the Sale Transaction, including, without limitation, the following: (1) the Office of

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

LEGAL\33319044\4 00601.0823.000/390810.000
07/03/2018

the United States Trustee; (2) counsel for the Debtors; (3) counsel to SunTrust; (4) counsel to the Directors Guild of America, Inc., the Screen Actors Guild – American Federation of Television and Radio Artists, and the Writers Guild of America West, Inc.; (5) counsel to the Stalking Horse Purchaser; (6) all entities known by the Trustee to have expressed a *bona fide* interest in purchasing any of the Acquired Assets; (7) all creditors listed on Schedules D and E for each Debtor in the Schedules of Assets and Liabilities filed by the Trustee in the Bankruptcy Cases; (8) the Internal Revenue Service and all other applicable federal, state, county, and municipal taxing authorities; (9) the U.S. Environmental Protection Agency and the California Environmental Protection Agency; (10) the U.S. Attorneys for the Central District of California and the District of Delaware; and (11) the state attorneys general and state labor regulatory authorities for California and Delaware; (12) all persons and entities that have filed a request for service of filings in these Bankruptcy Cases pursuant to Bankruptcy Rule 2002; and (13) all of the Debtors' other known creditors, equity interest holders and/or parties in interest.

D. **Auction**. The Trustee adequately marketed the Acquired Assets. The marketing process created by the Bidding Procedures provided potential bidders with a full and fair opportunity to submit bids and participate in the Auction. The Auction was conducted fairly and in good faith, without collusion and in accordance with the Bidding Procedures Order. At the Auction, the Stalking Horse Purchaser was selected as the Prevailing Bidder. The Trustee's determination that the Stalking Horse Agreement constitutes the best offer for the Acquired Assets constitutes a valid and sound exercise of the Trustee's business judgment.

E. **Arm's-Length Sale**. The Sale Transaction contemplated by the Stalking Horse Agreement and this Order was negotiated and is being undertaken by the Trustee, and the Stalking Horse Purchaser at arm's-length, without collusion or fraud, and in good faith within the

meaning of Bankruptcy Code section 363(m).  The Stalking Horse Purchaser recognized that the Trustee was free to deal with any other party interested in acquiring the Acquired Assets, complied with the Bidding Procedures Order, and agreed to subject its bid to the competitive Bidding Procedures approved in the Bidding Procedures Order.  None of the Stalking Horse Purchaser, its affiliates or their respective representatives is an "insider" of any of the Debtors, as that term is defined in Bankruptcy Code section 101(31).  None of the Trustee, the Stalking Horse Purchaser, or their respective affiliates or representatives has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be avoided under Bankruptcy Code section 363(n) or has acted in any improper or collusive manner with any person.  The terms and conditions of the Sale Transaction and the Stalking Horse Agreement, including without limitation the consideration provided therein, are fair and reasonable and shall not be avoided under Bankruptcy Code section 363(n).

F.    **Good Faith Purchaser**.  The Stalking Horse Purchaser, its affiliates, and their respective representatives have all proceeded in good faith and without collusion in all respects in connection with the Sale Transaction, the Stalking Horse Agreement, the Bidding Procedures, and this sale proceeding.  Such persons are therefore entitled to all of the benefits and protections of Bankruptcy Code section 363(m).  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction unless, prior to the Closing, such authorization is duly stayed pending such appeal.

G.    **Corporate Authority**.  The Trustee and the Debtors: (i) have full corporate power and authority to execute the Stalking Horse Agreement and all other agreements, instruments, and documents contemplated thereby and to consummate their obligations with

4

respect to the Sale Transaction; (ii) have taken all corporate action necessary to authorize and approve their entry into and performance in respect of the Stalking Horse Agreement and the Sale Transaction; and (iii) require no consents or approvals to consummate the Sale Transaction, other than those expressly provided for in the Stalking Horse Agreement and the entry of this Order.  With respect to the Trustee and the Debtors, the Sale Transaction has been duly and validly authorized by all necessary corporate action and/or approval by the Bankruptcy Court.

H.    **Sale in Best Interests**.  The relief requested in the Sale Motion is in the best interests of the Debtors, their Estates, their creditors and all other parties in interest.  Immediate approval by the Bankruptcy Court of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' Estates.

I.    **Business Justification**.  The Trustee has demonstrated both good, sufficient and sound business reasons and compelling circumstances for the Bankruptcy Court to authorize the Trustee's entry into the Stalking Horse Agreement and the consummation of the Sale Transaction under Bankruptcy Code section 363(b) outside the ordinary course of business. Entry of this Order approving the Sale Transaction is a necessary condition precedent to the Stalking Horse Purchaser's consummation of the Sale Transaction.

J.    **Consideration**.  The Purchase Price and other consideration to be provided by the Stalking Horse Purchaser to the Trustee pursuant to the Stalking Horse Agreement (i) represents the highest or otherwise best offer received by the Trustee and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, the laws of the United States, any state, territory, possession thereof or the District of Columbia, or any other applicable law.  The Stalking Horse Agreement represents a fair and reasonable

5

offer to effectuate the terms of the Sale Transaction under these circumstances.  Other than the

Stalking Horse Purchaser, no other person or entity or group of persons or entities has offered to

purchase the Acquired Assets for an amount that would provide greater value to the Debtors.

      K.    **Free and Clear**.  The conveyance of the Acquired Assets in accordance with the

Stalking Horse Agreement will be a legal, valid, and effective transfer of the Acquired Assets,

and, except as otherwise provided in the Stalking Horse Agreement, vests or shall vest the

Stalking Horse Purchaser with all right, title, and interest of the Debtors in and to the Acquired

Assets pursuant to Bankruptcy Code sections 363(f) and 365 free and clear of all Liens, claims

(as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, Liabilities,

demands, guarantees, options, rights, restrictions, contractual commitments, rights of first

refusal, rights of setoff, or interests of any kind or nature that have been, are or could be asserted

against the Trustee, the Debtors, or the Acquired Assets, whether known or unknown, legal or

equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated,

asserted or unasserted, whether arising prior to or subsequent to the commencement of the

Bankruptcy Cases, whether imposed by agreement, understanding, law, equity or otherwise

(collectively, the "**Interests**"), including, but not limited to: (i) those that purport to give to any

party a right or option to effect a setoff against or any forfeiture, modification or termination of

the Debtors' rights, title, and interests in the Acquired Assets, or any similar rights; (ii) those

arising in respect of (a) any tax statutes or ordinances, including, without limitation, the Internal

Revenue Code of 1986, as amended, (b) any employee, worker's compensation, occupational

disease or unemployment or temporary disability related claim, and (c) any environmental laws;

(iii) those arising under all mortgages, deeds of trust, security interests, pledges, Liens,

judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if

any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership; and (iv) those arising in connection with any agreements, acts, or failures to act, of any of the Trustee or the Debtors, or any of the Trustee or the Debtors' predecessors, affiliates, or representatives including, but not limited to, Interests arising under any bulk-transfer laws, doctrines of successor liability, or similar theories. Notwithstanding anything else to the contrary set forth in this paragraph, the term "**Interests**" shall not include any Permitted Liens, any Assumed Liabilities, and any Liens created by or through the Stalking Horse Purchaser.

L.      **Findings Required by Stalking Horse Purchaser**.      The Stalking Horse Purchaser represents that it would not have entered into the Stalking Horse Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their Estates and their creditors: (i) if the Acquired Assets are not conveyed to the Stalking Horse Purchaser free and clear of all Interests of any kind or nature, except as set forth in this Order, or if the Stalking Horse Purchaser would, or in the future could, be liable for any of the Interests; and (ii) unless the Stalking Horse Agreement provides, and the Court so orders, that none of the Releasees (as defined below) or the Acquired Assets shall have any liability whatsoever with respect to any Interest or be required to satisfy any Interest in any manner (whether at law or in equity, by payment, setoff or otherwise, directly or indirectly).  An injunction against creditors and third parties pursuing claims against, and Liens, interests and encumbrances on, the Acquired Assets is necessary to induce the Stalking Horse Purchaser to close the Sale Transaction, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' Estates and will benefit the Estates and their creditors and all other parties in interest.

M.      **Satisfaction of Section 363(f) Standards**.  Pursuant to the terms set forth in the Stalking Horse Agreement, the Trustee may sell the Debtors' rights, title, and interests in the Acquired Assets free and clear of any Interests of any kind or nature as set forth in this Order because in each instance, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.  Each person or entity with any Interest in the Acquired Assets: (i) has, subject to the terms and conditions of this Order, consented to the Sale Transaction, is deemed to have consented to the Sale Transaction, or has had its objections to the Sale Transaction considered and overruled by the Bankruptcy Court; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest; or (iii) otherwise is subject to the provisions of Bankruptcy Code section 363(f).  Those holders of Interests who did not object to the Sale Motion are deemed, subject to the terms of this Order, to have consented to the relief sought in the Sale Motion pursuant to Bankruptcy Code section 363(f)(2).

N.      **No Fraudulent Transfer**.  The Stalking Horse Agreement was not entered into for the purpose of hindering, delaying or defrauding present or future creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.  Neither the Trustee and nor the Stalking Horse Purchaser is entering into the Sale Transaction with actual fraudulent intent within the meaning of such statutory and common law fraudulent conveyance and fraudulent transfer laws.

O.      **No Successor Liability**.  Upon the Closing, except as included in the Assumed Liabilities, the Stalking Horse Purchaser shall not and shall not be deemed to: (i) be a successor or successor employer to any of the Debtors or their Estates under any theory of law or equity; (ii) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or the Debtors' Estates; (iii) be a mere continuation or substantial continuation of any of the Debtors or

8

any enterprise of the Debtors; or (iv) be liable for any acts or omissions of the Trustee or the Debtors in the conduct of the Debtors' business or arising under or related to the Acquired Assets other than as set forth in the Stalking Horse Agreement. The Stalking Horse Purchaser shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws. Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Agreement, the parties intend that the Stalking Horse Purchaser shall not be liable for any Interest or liability (other than Assumed Liabilities and Permitted Liens) against any Debtor, or any of its predecessors or affiliates, and the Stalking Horse Purchaser shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the Closing Date, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent, with respect to the Debtors' business, the Acquired Assets or any liabilities of any Debtor arising prior to the Closing Date. The Stalking Horse Purchaser would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.    **Sale Motion is Granted.** The Sale Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.    **Objections Overruled.** Any objections to the entry of this Order or the relief granted herein and requested in the Sale Motion that have not been withdrawn, waived, settled, or otherwise resolved as set forth on the record at the Sale Hearing and/or memorialized pursuant to the terms hereof (if any) hereby are denied and overruled on the merits with prejudice.

3.      **Approval.**  The Stalking Horse Agreement and all of the terms and conditions therein are approved.  The Trustee and the Stalking Horse Purchaser are hereby authorized to: (i) enter into and perform the Stalking Horse Agreement and execute and perform any additional agreements, instruments or documents that may be reasonably necessary or appropriate to implement the Stalking Horse Agreement, provided that such additional documents do not change its terms in a manner materially adverse to the Trustee; (ii) consummate the Sale Transaction in accordance with the terms and conditions of the Stalking Horse Agreement and the other agreements contemplated thereby; (iii) and take all other and further actions as may be reasonably necessary to implement the Sale Transaction.  The provisions of this Order authorizing the sale of the Acquired Assets free and clear of Interests, except as otherwise set forth in the Stalking Horse Agreement or this Order, shall be self-executing, and none of the Trustee, the Debtors, or the Stalking Horse Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.  However, the Trustee, the Debtors, the Stalking Horse Purchaser, and each of their respective officers, directors, employees, agents, and representatives are hereby authorized and empowered to take all actions and execute and deliver any and all agreements, instruments and documents that the Trustee or the Stalking Horse Purchaser deem necessary or appropriate to implement and effectuate the terms of the Stalking Horse Agreement and this Order.

4.      **Valid Transfer.**  Upon the Closing: (i) the Sale Transaction effects a legal, valid, enforceable and effective sale and transfer of all of the Debtors' rights, title, and interests in Acquired Assets to the Stalking Horse Purchaser, and shall vest the Stalking Horse Purchaser with all of the Debtors' rights, title, and interests in such Acquired Assets free and clear of all

LEGAL\33319044\4 00601.0823.000/390810.000
07/03/2018

Interests of any kind whatsoever, except as expressly provided in this Order and the Stalking

Horse Agreement; and (ii) the Stalking Horse Agreement, the Sale Transaction and any

agreements, instruments, and documents contemplated thereby shall be enforceable against and

binding upon, and not subject to rejection or avoidance by, the Trustee, the Debtors, or any

successor trustee appointed with respect thereto.  All Interests (other than Permitted Liens and

Assumed Liabilities) in and to the Acquired Assets shall attach to the proceeds received by the

Trustee from the sale of the Acquired Assets with the same priority, validity, force and effect as

such Interests had in the Acquired Assets prior to their sale.  The use of such proceeds shall be

subject to, and governed by, the Sharing Agreement, the Sharing and Reimbursement Order, and

the Guilds Stipulation.

5.    **General Assignment.**  Effective as of the Closing, this Order shall be construed

and shall constitute for any and all purposes a full and complete general assignment, conveyance

and transfer of the Debtors' rights, title, and interests in the Acquired Assets to the Stalking

Horse Purchaser.  Each and every federal, state, and local governmental agency or department is

hereby authorized to accept any and all documents and instruments necessary and appropriate to

consummate the Sale Transaction.

6.    **Exculpation.**  None of the Stalking Horse Purchaser, its affiliates, successors and

assigns, and each of their respective current and former officers, directors, employees, managers,

partners, controlling persons, members, advisors, attorneys, agents and representatives

(collectively, the "**Releasees**") shall have or incur any liability to, or be subject to any claim or

action by, the Trustee, the Debtors, the Debtors' Estates, or any of their respective predecessors,

successors and assigns, arising out of the negotiation, investigation, preparation, execution,

delivery of the Stalking Horse Agreement and the entry into and consummation of the Sale Transaction, except as expressly provided in the Stalking Horse Agreement and this Order.

7.        **Injunction.**  Except as otherwise provided in the Stalking Horse Agreement or by this Order, all persons and entities, including, but not limited to, all debt holders, equity holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, and other persons, holding Interests of any kind or nature whatsoever in the Debtors or against the Trustee, the Debtors, or the Debtors' rights, title, and interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, whether imposed by agreement, understanding, law, equity or otherwise), including, without limitation, those arising under, out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business, or the transfer of the Debtors' rights, title, and interests in the Acquired Assets to the Stalking Horse Purchaser, shall be and hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against the Releasees, the Acquired Assets, or the rights, title, and interests of the Estates in such Acquired Assets.  Following the Closing, no holder of an Interest against the Estates, the Debtors, or the Acquired Assets shall interfere with the Stalking Horse Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to such Interests except as otherwise provided in the Stalking Horse Agreement or by this Order.  For the avoidance of doubt, the foregoing shall not prevent the Trustee from enforcing the terms of the Stalking Horse Agreement against the Stalking Horse Purchaser and/or its successors and assigns.

LEGAL\33319044\4 00601.0823.000/390810.000
07/03/2018

8.        **No Successor Liability.**  Upon the Closing, except as otherwise provided in the Stalking Horse Agreement, the Releasees shall not and shall not be deemed to: (i) be a successor or successor employer to any of the Debtors or their Estates under any theory of law or equity; (ii) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or the Debtors' Estates; (iii) be a mere continuation or substantial continuation of any of the Debtors or any enterprise of the Debtors; or (iv) be liable for any acts or omissions of the Trustee or the Debtors in the conduct of the Debtors' business or arising under or related to the Acquired Assets other than as set forth in the Stalking Horse Agreement.  The Stalking Horse Purchaser shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws.  Except with respect to the Assumed Liabilities and the Permitted Liens, none of the Releasees or the Acquired Assets shall have (i) any Liability or responsibility for or be required to satisfy in any manner (whether at law or in equity, by payment, setoff or otherwise, directly or indirectly) any claim or any Interest against any of the Debtors, or (ii) any successor or vicarious Liabilities of any kind or character, including, but not limited to, federal, state or other tax Liabilities, U.S. or foreign pension Liabilities, or Liabilities based on any theory of antitrust law, environmental law, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, *de facto* merger or substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Chapter 7 Cases, whether imposed by agreement, understanding, law, equity or otherwise with respect to any of the Debtors or any obligations of the Debtors, including, but not limited to, Liabilities on account of any taxes arising, accruing or payable

LEGAL\33319044\4 00601.0823.000/390810.000
07/03/2018

under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any taxes in connection with, or in any way relating to, the cancellation of debt of the Debtors or their affiliates.

9. **Binding Effect of Order.**  The terms and provisions of the Stalking Horse Agreement and this Order shall be binding in all respects upon the Trustee, the Debtors, the Debtors' Estates, all creditors of and holders of equity interests in the Debtors (whether known or unknown), all other parties in interest, and their respective affiliates, successors and assigns, and any third parties.

10. **Sale Free and Clear of Interests.**  This Order (i) shall vest the Stalking Horse Purchaser with all right, title and interest in the Acquired Assets free and clear of any and all Interests of any kind or nature whatsoever, except as otherwise provided in the Stalking Horse Agreement or this Order, and (ii) shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.  Upon the occurrence of the Closing, the Trustee, the Debtors, and all persons holding an Interest in the Acquired Assets immediately prior to the Closing are hereby authorized to execute such documents and take all other actions as may be reasonably necessary to release their Interests in the Acquired Assets (if any) as such Interests may have been recorded or may

14

otherwise exist.   Other than Permitted Liens and Assumed Liabilities, all recorded Interests against the Acquired Assets shall be deemed stricken from their records, official and otherwise.

11.     **Release of Liens**.   If any person or entity which has filed statements or other documents or agreements evidencing Interests in the Acquired Assets shall not have delivered to the Trustee before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and easements, and any other documents required to document the release of such Interests (other than the Permitted Liens and Assumed Liabilities), the Trustee and the Stalking Horse Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.   Each and every federal, state and governmental agency or department and any other person or entity is hereby authorized and directed to accept any and all documents and instruments in connection with or necessary to consummate the Sale of the Acquired Assets contemplated by the Stalking Horse Agreement or evidence the release of Interests in the Acquired Assets.

12.     **Assumed Liabilities and Permitted Liens**.   For the avoidance of doubt, notwithstanding any other provisions of this Order, the sale of the Acquired Assets to the Stalking Horse Purchaser shall be subject to the Assumed Liabilities and the Permitted Liens as set forth in the Stalking Horse Agreement.

13.     **Retention of Jurisdiction.**   This Court retains exclusive jurisdiction to interpret, implement, and enforce the terms and provisions of, and to resolve any and all disputes that may arise under or in connection with, this Order and the Stalking Horse Agreement, all amendments thereto and any waivers and consents thereunder, including, but not limited to, the authority to (i) compel delivery of the Acquired Assets to the Stalking Horse Purchaser; (ii) interpret,

implement and enforce the provisions of this Order and any related order; and (iii) protect the Releasees and the Acquired Assets against any Interests of any kind or nature whatsoever (except as otherwise provided in the Stalking Horse Agreement or this Order).

14. **Retention of Rights By the Government.** Nothing in this Order or in the Stalking Horse Agreement (i) releases, nullifies, or enjoins the enforcement of any liability to a governmental unit of the United States or any state or municipality of the United States under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order; or (ii) should be construed to give the Stalking Horse Purchaser any more protection against any governmental unit of the United States or any state or municipality of the United States than the Stalking Horse Purchaser is otherwise entitled to under Bankruptcy Code section 363(f). Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not otherwise exist under law.

15. **No Material Modifications.** The Stalking Horse Agreement and any related agreements, instruments or other documents may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court; <u>provided</u> that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' Estates and has been agreed to between the Trustee, after consultation with SunTrust, and the Stalking Horse Purchaser.

16. **Subsequent Orders.** Nothing contained in any subsequent order of this Court shall nullify, alter, conflict with or derogate from the provisions of this Order, and the provisions of this Order shall survive and remain in full force and effect.

17. **Failure to Specify Provisions.** The failure to reference or specifically include any particular provisions of the Stalking Horse Agreement in this Order shall not diminish or

LEGAL\33319044\4 00601.0823.000/390810.000
07/03/2018

impair the effectiveness of such provisions, it being the intent of the Court that the Stalking Horse Agreement and the Sale Transaction be authorized and approved in its entirety.

18. **No Stay of Order.** Notwithstanding the provisions of Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry.

19. **No Application of Bulk Sales Laws or Commissions**. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction. No obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the Stalking Horse Agreement or the transactions contemplated hereby or thereby for which the Stalking Horse Purchaser is or will become liable.

20. **Inconsistencies with Prior Orders, Pleadings or Agreement.** To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Bankruptcy Cases, the terms of this Order shall govern. To the extent that this Order is inconsistent with the terms of the Stalking Horse Agreement (including all ancillary documents executed in connection therewith), the terms of the Order shall govern.

BY THE COURT:

Dated: _____, 2018
       Wilmington, Delaware

_____
The Honorable Kevin Gross
United States Bankruptcy Judge

LEGAL\33319044\4 00601.0823.000/390810.000
07/03/2018

**Exhibit B**

**<u>Bidding Procedures Order</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| Our Alchemy, LLC, *et al.*,[1] | Case No.  16-11596 (KG) |
| Debtors. | (Jointly Administered) |
| | **Related Doc. Nos.  __** |

**ORDER (I) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF CERTAIN
OF THE DEBTORS' ASSETS; (II) APPROVING BREAK-UP FEE AND
TRANSACTION EXPENSES; (III) APPROVING FORM AND MANNER OF SALE
NOTICE; (IV) SCHEDULING AN AUCTION AND A
HEARING TO CONSIDER THE APPROVAL OF THE SALE; AND (V) GRANTING
CERTAIN RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of George L. Miller, in his capacity as chapter 7

trustee (the "**Trustee**") for the Debtors in the above-captioned chapter 7 cases (the "**Chapter 7**

**Cases**") (A) for an order (this "**Order**"):  (i) approving the proposed auction and bidding

procedures, which are attached as **Exhibit "1"** hereto (the "**Bidding Procedures**"), to be

employed in connection with the proposed sale (the "**Sale**") of certain of the Debtors' assets (as

defined in the Stalking Horse Agreement, the "**Acquired Assets**"); (ii) approving a break-up fee

equal to $60,000 and the Transaction Expenses (the "**Break-Up Fee**"), pursuant to the terms of

that certain stalking horse asset purchase agreement (including all exhibits, schedules and

ancillary agreements related thereto, and as amended and in effect, the "**Stalking Horse**

**Agreement**"),[3] by and among the Trustee, as seller, and OA Acquisitions LLC as buyer (the

"**Stalking Horse Purchaser**"), dated as of July 3, 2018; (iii) approving the form and manner of

---

[1] The Debtors are: Our Alchemy, LLC, Case No. 16-11596, and Anderson Digital, LLC, Case No. 16-11597.

[2] Unless otherwise defined herein, capitalized terms shall have the meanings provided in the Motion or the Bidding Procedures (as defined below), as applicable.

[3] The Stalking Horse Agreement is attached as Exhibit B to the Motion.

the notice of the Sale (the "**Sale Notice**") and the other notices set forth herein; (iv) scheduling

an auction (the "**Auction**") and a hearing (the "**Sale Hearing**") to consider approval of the Sale;

and (v) granting related relief (collectively, (A)(i) through (v) above, the "**Bidding Procedures**

**Relief**"); and (B) for an order (the "**Sale Order**") authorizing the Sale of the Acquired Assets to

the bidder with the highest or otherwise best bid (the "**Prevailing Bidder**") pursuant to the

Stalking Horse Agreement and/or Alternative Asset Purchase Agreement, in each case free and

clear of all claims, liens and encumbrances except as provided therein or in the Sale Order; and

the Court having considered the portion of the Motion seeking the Bidding Procedures Relief,

and the arguments of counsel made and the evidence adduced, at the hearing on that portion of

the Motion (the "**Bidding Procedures Hearing**"); and due and sufficient notice of the Bidding

Procedures Hearing and the relief sought therein having been given under the particular

circumstances; and it appearing that no other or further notice need be provided; and it appearing

that the Bidding Procedures Relief requested in the Motion is in the best interests of the Debtors,

their Estates, their creditors and other parties in interest; and after due deliberation thereon and

good and sufficient cause appearing therefor, it is hereby,

### FOUND, CONCLUDED AND DETERMINED THAT:[4]

A.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The relief granted herein is in the best interests of the Debtors, their

Estates and creditors, and other parties in interest.  The Trustee has articulated good and

---

[4] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

sufficient business reasons for the Court to: (i) approve the Bidding Procedures, Break-Up Fee, Transaction Expenses, form and manner of the Sale Notice, and the other notices of the Motion, the Auction, and the Sale Hearing as set forth herein; (ii) set the date for the Auction, the Sale Hearing and the other dates set forth herein; and (iii) grant the relief requested in the Motion as provided herein.

      C.     Due, sufficient and adequate notice of the Bidding Procedures Hearing and the relief granted in this Order has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required. The Trustee's shortened notice of the Motion and the Bidding Procedures Relief requested in the Motion is appropriate and reasonably calculated to provide all interested parties with timely and proper notice under Bankruptcy Rules 2002 and 6004 and the applicable Local Rules and no other or further notice of, or hearing on, this Order and that portion of the Motion being approved hereby is required.

      D.     The Trustee's proposed Sale Notice and other notices contemplated with respect to the Sale, the Auction, and the Sale Hearing are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof and no further notice of each is necessary or required.

      E.     The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, and incorporated herein by reference, the Break-Up Fee, and the Transaction Expenses are fair, reasonable and appropriate, were negotiated in good faith by the Trustee and the Stalking Horse Purchaser and represent the best method for maximizing the value of the Debtors' estates in connection with the Sale.

      F.     The Break-Up Fee and Transaction Expenses: (i) shall be deemed actual and necessary costs of preserving the Debtors' estates within the meaning of Bankruptcy Code

LEGAL\33319042\6 00601.0823.000/390810.000
07/03/2018

section 503(b), (ii) are of substantial benefit to the Debtors' estates and the collateral of parties asserting liens, security interests, encumbrances or other interests in and to the Acquired Assets, which are adequately protected from any diminution arising from such Break-Up Fee and Transaction Expenses, (iii) are reasonable and appropriate, including in light of the size and nature of the Sale and the efforts that have been and will be expended by the Stalking Horse Purchaser, (iv) have been negotiated by the parties and their respective advisors at arm's-length and in good faith, and (v) are necessary to ensure that the Stalking Horse Purchaser will continue to pursue the proposed Sale of the Acquired Assets.  The Break-Up Fee and the Transaction Expenses are material inducements for, and a condition of, the Stalking Horse Purchaser's entry into the Stalking Horse Agreement.  The Stalking Horse Purchaser is unwilling to commit to purchase the Acquired Assets under the terms of the Stalking Horse Agreement unless the Stalking Horse Purchaser receives the Break-Up Fee and the Transaction Expenses.

**IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:**

1.      Those portions of the Motion seeking approval of the Bidding Procedures Relief are GRANTED.

2.      Any objection to the portions of the Motion seeking approval of the Bidding Procedures Relief or any other relief granted in this Order, to the extent not resolved, waived or withdrawn, and all reservations of rights included therein, is hereby overruled and denied on the merits.

3.      The form of the Stalking Horse Agreement (which may be obtained from counsel to the Trustee upon written request), is hereby approved and is appropriate and reasonably calculated to enable the Trustee and other parties in interest to easily compare and contrast the differing terms of the bids presented at the Auction.

## **Bidding Procedures**

4.      The Bidding Procedures, in the form attached hereto as **Exhibit 1**, are hereby approved and are incorporated herein by reference as if fully set forth in this Order.  The Trustee is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.  The failure to specifically include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

## **The Bid Deadline**

5.      As further described in the Bidding Procedures, a potential Bidder who desires to make a Bid for the Acquired Assets shall deliver its Bid in accordance with the Bidding Procedures to:  (i) the Trustee, George L. Miller, Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, PA 19103 (gmiller@mctllp.com); (ii) counsel to the Trustee, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE 19801, Attention:  John T. Carroll, III (jcarroll@cozen.com); (iii) counsel to the Stalking Horse Purchaser, Law offices of Vince Ravine, PC, 5120 Gloria Ave., Encino, CA  91436, Attention: Vince Ravine (vince@vravinelaw.com); (iv) counsel to SunTrust Bank,  as Administrative Agent, Akin Gump Strauss Hauer & Feld LLP, 1999 Avenue of the Stars, Suite 600, Los Angeles, CA 90067, Attention: David P. Simonds (dsimonds@akingump.com) and Ashby & Geddes, 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attention: Ricardo Palacio (RPalacio@ashbygeddes.com), so as to be received by no later than _____ **(prevailing Eastern Time) on** [T.B.D.]  (the "**Bid Deadline**").

**Notices of Sale, Bidding Procedures, Break-Up Fee and the Sale Hearing**

6.    The notices described below are hereby approved, and service or publication thereof (as applicable) as set forth below constitutes proper, timely, adequate and sufficient notice of the Motion, the Sale, the Bidding Procedures, the Break-Up Fee, the Transaction Expenses, and the Sale Hearing, and no other or further notice shall be required.

7.    Within two (2) Business Days after the entry of this Order, or as soon thereafter as practicable (the "**Mailing Date**"), the Trustee (or his agents) shall serve the Motion, the Stalking Horse Agreement, this Order, and the Bidding Procedures by first-class mail, postage prepaid, or by email, where available, upon the Notice Parties.

8.    On the Mailing Date, or as soon thereafter as practicable, the Trustee (or his agents) shall serve by first-class mail, postage prepaid, the Sale Notice, substantially in the form attached hereto as **Exhibit 2** (the "**Sale Notice**"), upon the Notice Parties.

9.    The Sale Hearing to approve the Sale shall be held on _____, 2018 at _____ (**prevailing Eastern Time**), at the United States Bankruptcy Court for the District of Delaware, 824 Market Street North, Wilmington, Delaware 19801, before the Honorable Kevin Gross.

10.    Objections, if any, to the relief sought in the Sale Order ("**Sale Objection(s)**") shall be in writing, shall state with particularity the grounds for such objections or other statements of position, and must be filed with the Clerk of this Court (the "**Clerk**"), 824 Market Street North, Wilmington, Delaware 19801, together with proof of service, and served so as to be received by the Sale Objection Notice Parties, on or before _____, **2018 at 4:00 p.m. (prevailing Eastern Time)**; provided, however, that objections to the conduct of the Auction or selection of the Prevailing Bid or Second-Highest Bid (the "**Supplemental**

**Objections**") shall be in writing, filed with the Clerk, together with proof of service, and served so as to be received by the Sale Objection Notice Parties on or before **4:00 p.m. (prevailing Eastern Time)** on _____, 2018.

11. Failure to file and serve a Sale Objection or Supplemental Objection as aforesaid shall be deemed to be consent to the Sale, *inter alia,* for purposes of Bankruptcy Code section 363(f).

12. The Sale Hearing, may be adjourned by the Trustee from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Bankruptcy Cases.

### The Auction

13. The Trustee is authorized to conduct an auction (the "**Auction**") with respect to the Acquired Assets.  The Auction shall take place on [T.B.D.]  **(prevailing Eastern Time)** at the offices of Cozen O'Connor, 1650 Market Street, One Liberty Place, Suite 2800, Philadelphia, PA 19103 or such other place and time as the Trustee shall notify all Qualified Bidders, SunTrust, and each of their respective counsel.  The Trustee is authorized, subject to the terms of this Order, to take actions reasonably necessary, in the discretion of the Trustee, to conduct and implement the Auction.

14. Only the Trustee, the Debtors, the Stalking Horse Purchaser, SunTrust, and any Qualified Bidders, in each case, along with their respective representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Purchaser, and such other Qualified Bidder(s) will be entitled to make any Bids at the Auction.  The Trustee and his professionals shall direct and preside over the Auction and the Auction shall be transcribed.

15.     The Stalking Horse Purchaser (in its capacity as a Qualified Bidder) and each other Qualified Bidder participating in the Auction must confirm that it has (a) not engaged in any collusion with respect to the bidding or Sale of any of the Acquired Assets, (b) reviewed, understands and accepts the Bidding Procedures, and (c) consented to the core jurisdiction of this Court and to the entry of a final order by this Court on any matter related to this Order, the Sale or the Auction if it is determined that this Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

16.     The Trustee may, after consultation with SunTrust, (a) determine, in his reasonable business judgment, pursuant to the Bidding Procedures, which Qualified Bid is the best proposal for the Acquired Assets and which is the next best proposal for the Acquired Assets and (b) reject any bid that, in the Trustee's reasonable business judgment, is (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bidding Procedures, or (z) contrary to the best interests of the Debtors and their Estates, creditors, interest holders or other parties-in-interest.

17.     Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse Purchaser and SunTrust shall be considered Qualified Bidders.

18.     Pursuant to Bankruptcy Code section 363(k), SunTrust shall be entitled to credit bid at the Auction in compliance with the Bidding Procedures.  The Stalking Horse Purchaser may credit bid the Break-Up Fee.

19.     If the Stalking Horse Purchaser is not the Prevailing Bidder at the Auction, the Stalking Horse Purchaser shall be reimbursed for the Transaction Expenses, if any, due

LEGAL\33319042\6 00601.0823.000/390810.000
07/03/2018

pursuant to Section 10.3(a) of the Stalking Horse Agreement, which amounts shall be paid pursuant to the terms of the Stalking Horse Agreement.

## The Stalking Horse Agreement and Break-Up Fee

20.     Any obligations of the Trustee set forth in the Stalking Horse Agreement that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order are authorized as set forth herein and therein.

21.     The Break-Up Fee and Transaction Expense reimbursement set out in the Stalking Horse Agreement is hereby approved.  Pursuant to Bankruptcy Code sections 105, 363, and 503, the Trustee is hereby authorized to pay the Break-Up Fee and Transaction Expenses pursuant to and subject to the terms and conditions set forth in the Stalking Horse Agreement. The obligation of the Trustee as Seller to pay the Break-Up Fee and unreimbursed Transaction Expenses shall constitute an administrative expense of the Debtors to be paid from the proceeds of the Sale at closing in the event of an Alternative Transaction.  The amount of the Break-Up Fee shall be considered as added to the Stalking Horse Purchaser's bid in determining whether its bid is a higher and better offer for the Acquired Assets.

22.     The Trustee shall pay to the Stalking Horse Purchaser, in cash, by wire transfer of immediately available funds, upon the consummation of an Alternate Transaction (as defined in the Bidding Procedures), an amount equal to the Break-Up Fee.  The Break-Up Fee shall be paid at closing from the proceeds of any sale of the Acquired Assets prior to the attachment to such proceeds of any lien, security interest, or other encumbrance, without further order of the Court.

23.     The Trustee confirms that it is critical to the process of maximizing the value, and arranging an orderly sale, of the Acquired Assets to select the Stalking Horse Purchaser and enter into the Stalking Horse Agreement.  Without the Stalking Horse Purchaser

having committed considerable time and expense in connection with the Sale of the Acquired Assets, the Trustee would potentially realize a lower price for such assets. Therefore, the contributions of the Stalking Horse Purchaser to the process have indisputably provided a substantial benefit to the Debtors and their Estates.

24.     The Break-Up Fee shall be the sole remedy of the Stalking Horse Purchaser if the Stalking Horse Agreement is terminated under circumstances where the Break-Up Fee is payable.

## **Related Relief**

25.     The Trustee is hereby authorized and empowered to take such actions as may be reasonably necessary to implement and effect the terms and requirements established by this Order.

26.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

27.     The Trustee is authorized to proceed with the Auction and the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

28.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

29.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated: _____, 2018        _____
                                The Honorable Kevin Gross
                                United States Bankruptcy Judge

LEGAL\33319042\6 00601.0823.000/390810.000
07/03/2018

**Exhibit 1 – Bidding Procedures**

# BIDDING PROCEDURES[1]

By motion (the "**Motion**"), the chapter 7 trustee (the "**Trustee**") for Our Alchemy, LLC and Anderson Digital, LLC (together, the "**Debtors**"),[2] which are debtors in chapter 7 cases (the "**Chapter 7 Cases**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), sought approval of, among other things, the procedures through which the Trustee will determine the highest or otherwise best offer for the sale of certain of the Debtors' assets.

A stalking horse asset purchase agreement, dated as of July 3, 2018 (including all exhibits, schedules and ancillary agreements related thereto, and as amended and in effect, the "**Stalking Horse Agreement**") has been entered into by and among the Trustee, as seller, and OA Acquisitions LLC as buyer (the "**Stalking Horse Purchaser**"), which Stalking Horse Agreement contemplates a purchase and sale of the Acquired Assets (as defined therein) to the Stalking Horse Purchaser, on the terms and conditions provided therein.  A copy of the Stalking Horse Agreement was filed in the Bankruptcy Cases.[3]

On _____, 2018, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") which, among other things, authorized the Trustee to determine the highest or otherwise best offer for the Acquired Assets through the process and procedures set forth below (the "**Bidding Procedures**").

## Assets to Be Sold

All of the Debtors' right, title, and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "**Liens**"), with such Liens to attach to the proceeds of the sale of the Acquired Assets with the same validity and priority as such Liens applied against the Acquired Assets, except as otherwise specifically provided herein and in the Stalking Horse Agreement or an Alternative Asset Purchase Agreement (as defined below) submitted by a Prevailing Bidder (as defined below) (including any exhibits or schedules thereto) and reflected in the Sale Order.

## Bidding Process

A party may participate in the bidding process by submitting an offer, solicitation, or proposal (a "**Bid**") for all or substantially all of the Acquired Assets.  Each party submitting a Bid shall be referred to herein as a "**Bidder**."

The Trustee and his advisors shall, subject to the other provisions of these Bidding Procedures: (a) determine whether any person is a Qualified Bidder (as defined below), (b)

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings provided in the Stalking Horse Agreement.

[2]    The Debtors are: Our Alchemy, LLC, Case No. 16-11596, and Anderson Digital, LLC, Case No. 16-11597.

[3]    The Stalking Horse Agreement was filed on the docket of the jointly administered Bankruptcy Cases at Docket No. __.

07/03/2018

coordinate the efforts of Preliminary Interested Investors (as defined below) in conducting their due diligence investigations, (c) receive offers from Bidders, and (d) negotiate any offers made to purchase all or substantially all of the Acquired Assets.

## Key Dates in Bidding and Sale Process

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Trustee and to submit competing Bids. The Trustee, through his consultants and/or counsel, shall assist Preliminary Interested Investors in conducting their respective due diligence investigations and shall accept Bids until [T.B.D.] **(prevailing Eastern time)** (the "**Bid Deadline**").

The key dates for the sale process are as follows:[4]

| | |
|---|---|
| [T.B.D.]  (prevailing Eastern time) | Sale Objection Deadline |
| [T.B.D.]  (prevailing Eastern time) | Bid Deadline - Due Date for Bids and Deposits |
| [T.B.D.]  (prevailing Eastern time) | Auction, which will be held at Cozen O'Connor, 1650 Market Street, One Liberty Place, Suite 2800, Philadelphia, PA  19103 |
| [T.B.D.]  (prevailing Eastern time) | Supplemental Objection Deadline |
| [T.B.D.]  (prevailing Eastern time) | Sale Hearing, which will be held at the United States Bankruptcy Court for the District of Delaware, 824 Market Street North, Wilmington, DE 19801 |

*Access to Diligence Materials.*

To participate in the bidding process and to receive access to due diligence materials (the "**Diligence Materials**"), a party must submit to the Trustee (i) an executed confidentiality agreement, and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Acquired Assets (an "**Alternative Transaction**"), each in a form reasonably acceptable to the Trustee, as determined by the Trustee and his advisors in consultation with SunTrust.

A party who qualifies for access to Diligence Materials shall be a "**Preliminary Interested Investor**." The Trustee shall afford any Preliminary Interested Investor the time and opportunity to conduct reasonable due diligence; provided, however, that the Trustee shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below) and may limit the amount of further due

---

4    These dates are subject to extension or adjournment as provided herein.

07/03/2018

diligence available to Qualified Bidders after the Bid Deadline. Neither the Trustee nor his representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Investor.

The Trustee reserves the right to withhold any Diligence Materials that the Trustee, in consultation with SunTrust, determines are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Investor who was a competitor of the Debtors or is affiliated with any competitor of the Debtors.

All due diligence requests for the Acquired Assets must be directed to William A. Homony at Miller Coffey Tate LLP (BHomony@mctllp.com).

***Due Diligence from Bidders.***

Each Preliminary Interested Investor and each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Trustee or his advisors regarding such Preliminary Interested Investor or Bidder, as applicable, and its contemplated transaction. Failure by a Preliminary Interested Investor or Bidder (other than the Stalking Horse Purchaser) to comply with such requests for additional information and due diligence access may be a basis for the Trustee to determine, after consulting with SunTrust, that such Bidder is not a Qualified Bidder.

<u>**Auction Qualification Process**</u>

To be eligible to participate in the Auction, each Bid and each Bidder (other than the Stalking Horse Purchaser), must be reasonably determined by the Trustee to satisfy each of the following conditions:

(a)     **<u>Deposit</u>**:  Each Bid must be accompanied by a cash deposit in the amount of not less than 10% of the purchase price set forth in the Alternative Asset Purchase Agreement (as defined below). Such deposit shall be held in an escrow account to be identified and established by the Trustee (the "**<u>Deposit</u>**").

(b)     **<u>Same or Better Terms</u>**:

(i)     Each Bid must be on terms that the Trustee, in his business judgment and after consulting with SunTrust, determines are the same or better for the Trustee than the terms of the Stalking Horse Agreement.

(ii)    No Bid may contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Trustee than those set forth in the Stalking Horse Agreement, as determined by the Trustee, in good faith, and after consulting with SunTrust.

3

(c) **Executed Agreements**:

   (i)   Each Bid must be based on the Stalking Horse Agreement, and must include binding, executed transaction documents, in the form of an asset purchase agreement and related documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (an "**Alternative Asset Purchase Agreement**").  Each Bid must also include a copy of the Alternative Asset Purchase Agreement (including all exhibits thereto) marked against the Stalking Horse Agreement, to show all changes requested by the Bidder (including those related to purchase price, and to remove any provisions that apply only to the Stalking Horse Purchaser, such as the break-up fee provision contained in the Stalking Horse Agreement, which shall not be in any Alternative Asset Purchase Agreement).

   (ii)  Notwithstanding any other provisions of these Bidding Procedures, a Bidder's Alternative Asset Purchase Agreement: (i) must incorporate, and may not materially alter, subsection (b) of the definition of "Assumed Liabilities" in the Stalking Horse Agreement, and must provide that the transfer of the Acquired Assets to the purchaser shall be subject to the Assumed Liabilities set out in subsection (b) of the definition of "Assumed Liabilities" in the Stalking Horse Agreement; and (ii) must provide that the transfer of the Acquired Assets to the purchaser shall be subject to the Permitted Liens.   Any Alternative Asset Purchase Agreement submitted by SunTrust shall, to the extent applicable, conform with the *Stipulation Between the Chapter 7 Trustee, SunTrust Bank, as Administrative Agent for Itself, Certain Other Secured Lenders, and the Guilds Regarding the Sharing and Reimbursement Agreement*, dated October 25, 2017 and filed with the Bankruptcy Court at docket No. 543.

(d) **Scope of Bid**:  Each Bid must be for all or substantially all of the Acquired Assets, unless the Trustee determines, in his discretion, and after consulting with SunTrust, to sell less than all or substantially all of the Acquired Assets.

(e) **Minimum Bid Amount**:   Each Bid must be in the minimum amount of $1,385,000 (representing (i) $1,200,000 *plus* (ii) the Break-Up Fee ($60,000) *plus* (iii) the maximum unreimbursed Transaction Expense amount ($100,000) *plus* (iv) $25,000.

(f) **Corporate Authority**: Each Bid must include written evidence reasonably acceptable to the Trustee demonstrating appropriate corporate authorization to consummate the proposed Alternative Transaction.  If the Bidder is an entity specially formed for the purpose of effectuating the Alternative Transaction, then the Bidder must (i) disclose the identity/ies of (all of) its equity holder(s) and (ii) furnish written evidence reasonably acceptable to the Trustee, after consulting

4

with SunTrust, of the approval of the Alternative Transaction by such equity holder(s).

(g) **Disclosure of Identity of Bidder**:  Each Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets (including any equity holders, in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction), or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  Each Bid must also fully disclose any connections or agreements with the Trustee, the Debtors, the Stalking Horse Purchaser, or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity holder of the Debtors.  All information disclosed pursuant to this paragraph shall be made available by the Trustee to the Stalking Horse Purchaser promptly upon receipt but in any event no later than one (1) business day following the Bid Deadline.

(h) **Contact Information and Affiliates**:  Each Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

(i) **Proof of Financial Ability to Perform**:  Each Bid must include written evidence that the Trustee and his advisors may conclude, in consultation with SunTrust, demonstrates that the Bidder has the necessary financial ability to close the Alternative Transaction.  Such information must include, *inter alia*, the following:

(1) contact names and numbers for verification of any financing sources;

(2) evidence of the Bidder's internal resources and proof of available cash or unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of irrevocable letters of credit from a recognized banking institution issued in favor of the Trustee in the amount of the Bid, in each case, as are needed to close such Alternative Transaction;

(3) the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Trustee;

(4) a description of the Bidder's pro forma capital structure; and

(5) any such other form of financial disclosure or credit-quality support information reasonably acceptable to the Trustee, in consultation with SunTrust, demonstrating that such Bidder has the ability to close the Alternative Transaction.

07/03/2018

LEGAL\33319043\8 00601.0823.000/390810.000

(j)     **Regulatory and Third Party Approvals**:  Each Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternative Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Alternative Asset Purchase Agreement, the actions that the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(k)     **No Contingencies**:   No Bid may be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of due diligence.

(l)     **Irrevocable**:   Subject to the provisions herein regarding the Second-Highest Bidder (as defined below), each Bid must be irrevocable until five (5) business days after the Sale Hearing; provided that if such Bid is accepted as the Prevailing Bid, such Bid shall continue to remain irrevocable until the closing of the Sale.

(m)     **Compliance with Diligence Requests**:  The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Trustee to the reasonable satisfaction of the Trustee, after consultation with SunTrust.

(n)     **Confidentiality Agreement**:  To the extent not already executed, the Bid must include an executed confidentiality agreement to the Trustee.

(o)     **Termination Fees**:  The Bid (other than the Bid pursuant to the Stalking Horse Agreement) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code section 503 related in any way to the submission of its Bid or participation in any Auction.

(p)     **Closing Date**:  The Bid must include a commitment to close the transactions contemplated by the Alternative Asset Purchase Agreement by no later than **September 30, 2018.**

(q)     **Parties Entitled to Receive Bid**:  For a Bid to be considered timely, the following parties must receive the Bid in writing (in both PDF and Word format), on or before the Bid Deadline:  (i) the Trustee, George L. Miller, Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, PA 19103 (gmiller@mctllp.com); (ii) counsel to the Trustee, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE  19801, Attention: John T. Carroll, III (jcarroll@cozen.com); (iii) counsel to the Stalking Horse Purchaser, Law offices of Vince Ravine, PC, 5120 Gloria Ave., Encino, CA  91436, Attention: Vince Ravine (vince@vravinelaw.com); (iv) counsel to

6

SunTrust Bank, as Administrative Agent, Akin Gump Strauss Hauer & Feld LLP, 1999 Avenue of the Stars, Suite 600, Los Angeles, CA 90067, Attention: David P. Simonds (dsimonds@akingump.com) and Ashby & Geddes, 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attention: Ricardo Palacio (RPalacio@ashbygeddes.com).

A Bid received from a Bidder before the Bid Deadline that meets the above requirements, as reasonably determined by the Trustee, in consultation with SunTrust, shall constitute a "**Qualified Bid**" and such Bidder shall be a "**Qualified Bidder**"; provided that if the Trustee receives a Bid prior to the Bid Deadline that is not a Qualified Bid, the Trustee may provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction; provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Trustee to his reasonable satisfaction, the Trustee may, after consulting with SunTrust, disqualify any Qualified Bidder and Qualified Bid, and such Bidder shall not be entitled to attend or participate in the Auction. Any amendments, supplements or other modifications to any Bids (including pursuant to this paragraph) shall be delivered to the parties listed in paragraph (q) above as provided therein. The Trustee shall inform SunTrust and any Qualified Bidders whether any Bid is considered to be a Qualified Bid as soon as practicable but no event later than one (1) business day before the Auction.

Notwithstanding anything herein to the contrary, the Stalking Horse Agreement shall be deemed a Qualified Bid, and the Stalking Horse Purchaser shall be deemed a Qualified Bidder.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties, or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Trustee and his agents and representatives (other than as may be set forth in a definitive agreement executed by the Trustee), regarding the Debtors, any of the Acquired Assets, the Auction, these Bidding Procedures or any information provided in connection therewith.

All Bids will be considered, but the Trustee reserves his right to reject any Bid that is not a Qualified Bid. Bids that are unconditional and contemplate sales that may be consummated on or soon after the date of the Sale Hearing are preferred.

## Auction for Acquired Assets

If one or more Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) are submitted by the Bid Deadline, the Trustee will conduct an auction (the "**Auction**") to determine the highest or otherwise best Qualified Bid for the Acquired Assets. This determination shall take into account any factors that the Trustee, in consultation with SunTrust, reasonably deems relevant to the value of the Qualified Bid to the Estates and may include, without limitation, the following: (i) the amount and nature of the consideration, including any assumed liabilities; (ii) the number, type, and nature of any modifications to the Stalking Horse Agreement requested by each Bidder in such Bidder's Alternative Asset Purchase

Agreement; (iii) the extent to which such modifications are likely to delay closing of the Alternative Transaction and the cost to the Trustee of such modifications or delay; (iv) the total consideration to be received by the Trustee; (v) the likelihood of the Bidder's being able to close a transaction and the timing thereof; and (vi) the net benefit to the Estates (collectively, the "**Bid Assessment Criteria**").

If no timely Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) for the Acquired Assets are received, the Auction shall be canceled and the Stalking Horse Agreement shall be the Prevailing Bid and the Stalking Horse Purchaser shall be the Prevailing Bidder.

## Procedures for Auction

If one or more Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) are submitted by the Bid Deadline, the Trustee shall conduct the Auction for the Acquired Assets on [T.B.D.] **(prevailing Eastern Time)** at the offices of Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE 19801 or such other place and time as the Trustee shall notify all Qualified Bidders, SunTrust, and each of their respective counsel. The Auction shall be conducted according to the following procedures:

***Participation.***

Only the Trustee, the Debtors, SunTrust, the Stalking Horse Purchaser, and any other Qualified Bidders, and the representatives and counsel of each, may attend the Auction (such attendance to be in person, provided however that with the Trustee's consent, participants may attend the Auction remotely via telephone and/or video conference), and only the Stalking Horse Purchaser and Qualified Bidders will be entitled to make any Bids at the Auction.

All Qualified Bidders (including the Stalking Horse Purchaser) at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and transaction documents.

***The Trustee Shall Conduct the Auction.***

The Trustee and his professionals shall direct and preside over the Auction and the Auction shall be transcribed.  The Auction shall be a voice auction.  Other than as expressly set forth herein, the Trustee (in consultation with SunTrust) may conduct the Auction in the manner he reasonably determines is most likely to maximize the value of the bidding.

One (1) day prior to the Auction, the Trustee will:

(i)     notify each Qualified Bidder that its Bid has been deemed a Qualified Bid;

(ii)    provide each Qualified Bidder with a copy of the Alternative Asset Purchase
        Agreements of all Qualified Bidders and an indication as to which Qualified Bid

07/03/2018

is the highest or otherwise best Qualified Bid, as determined by the Trustee in consultation with SunTrust (such highest or otherwise best Qualified Bid, the "**Auction Baseline Bid**").

In addition, at the start of the Auction, the Trustee shall describe the terms of the Auction Baseline Bid.  Each Qualified Bidder participating in the Auction must confirm that it: (a) has not engaged in any collusion with respect to the bidding or sale of any of the Acquired Assets; and (b) has reviewed, understands, and accepts the Bidding Procedures.

The Trustee shall consult in good faith with SunTrust throughout the Auction to the extent reasonably practicable.  All bids will be made and received in one room, on an open basis and on the record, and all other Qualified Bidders will be entitled to be present for all bidding, with the understanding that the true identity of each Qualified Bidder will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid submitted in response to the Auction Baseline Bid, or to any successive bids made at the Auction, will be fully disclosed to all other Qualified Bidders bidding throughout the Auction, and each Qualified Bidder will be permitted what the Trustee determines to be an appropriate amount of time to respond to the previous bid at the Auction.

*Overbids.*

All Qualified Bidders, including the Stalking Horse Purchaser, shall have the right to submit additional bids and make additional modifications to the Stalking Horse Agreement or Alternative Asset Purchase Agreement, as applicable, provided that any such modifications to the Stalking Horse Agreement or Alternative Asset Purchase Agreement, on an aggregate basis and viewed in whole, shall not, in the reasonable business judgment of the Trustee, be less favorable to the Trustee than the terms of the Stalking Horse Agreement, and provided that the modified Stalking Horse Agreement or Alternative Asset Purchase Agreement meets the requirements for being a Qualified Bid described above.

An "**Overbid**" is any Bid made at the Auction subsequent to the Trustee's announcement of the Auction Baseline Bid.  To submit an Overbid, a Bidder must comply with the following conditions:

(a)     **Minimum Overbid Amount**:  An initial Overbid at the Auction must be in the minimum amount of the Auction Baseline Bid *plus* an additional $25,000 in cash.

(b)     **Minimum Overbid Increments**:   Subsequent Overbids shall be made in increments of not less than $25,000 in cash.

(c)     **Stalking Horse Purchaser May Credit Bid Break-Up Fee**:  The Stalking Horse Purchaser shall be entitled to submit Overbids including credit bid amounts up to the aggregate amount of the Break-Up Fee.

(d)     **Remaining Terms Are the Same as for Qualified Bids**:  Overbids must comply with the conditions for a Qualified Bid set forth above, provided, however, that

07/03/2018

LEGAL\33319043\8 00601.0823.000/390810.000

the Bid Deadline shall not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement and Alternative Asset Purchase Agreement, as the case may be, in connection therewith.  Any Overbid must remain open and binding on the Bidder as provided herein.

(e)     **Additional Evidence of Ability to Close**:   At the Trustee's discretion, after consultation with SunTrust, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality information reasonably acceptable to the Trustee) reasonably demonstrating such Bidder's ability to close the Alternative Transaction proposed by such Overbid.

*Announcement and Consideration of Overbids.*

(a)     **Announcement of Overbids**:  The Trustee shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in such Overbid, and the basis for calculating such total consideration.

(b)     **Consideration of Overbids**:  Subject to the deadlines set forth herein, the Trustee reserves the right, in his reasonable business judgment and in consultation with SunTrust, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Trustee and Qualified Bidders; allow Qualified Bidders to consider how they wish to proceed; or give Qualified Bidders the opportunity to provide the Trustee with such additional evidence, as the Trustee in his reasonable business judgment may require, that such Qualified Bidders have sufficient resources, or have received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Alternative Transaction at the prevailing Overbid amount.  When comparing Overbids to the Qualified Bid made by the Stalking Horse Purchaser, the Trustee shall treat any credit bid of the Break-Up Fee made by the Stalking Horse Purchaser, or any credit bid made by SunTrust, as being made in cash or cash equivalents and shall consider the amount of any reimbursement to be paid to the Stalking Horse Purchaser under the Stalking Horse Agreement upon the closing of any Alternative Transaction.

*Additional Procedures.*

In his discretion, and after consultation with SunTrust, the Trustee may implement additional rules that may be reasonable under the circumstances for conducting the Auction, which he will announce at the Auction, so long as such rules are not inconsistent in any material respect with the Bidding Procedures Order or the Stalking Horse Agreement.  Any Auction rules adopted by the Trustee will not modify any of the terms of the Stalking Horse Agreement without the consent of the Stalking Horse Purchaser.

*Sale Is As Is/Where Is.*

Except as otherwise provided in the Stalking Horse Agreement, any Alternative Asset Purchase Agreement, or any order by the Bankruptcy Court approving the Sale, the Acquired Assets sold pursuant to the Bidding Procedures shall be conveyed at the closing in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

*Closing the Auction.*

The Auction shall continue in additional rounds of bidding until the Trustee selects, after consultation with SunTrust, the Bid that is the highest or otherwise best offer for all or substantially all of the Acquired Assets (such bid, a "**Prevailing Bid**," and the Bidder submitting such Prevailing Bid, the "**Prevailing Bidder**").  The Prevailing Bidder shall have the rights and responsibilities of the purchaser as set forth in the applicable Stalking Horse Agreement, or Alternative Asset Purchase Agreement.  In selecting the Prevailing Bid, the Trustee and SunTrust shall consider the Bid Assessment Criteria.

The Auction shall close when the Prevailing Bidder submits fully executed sale and transaction documents memorializing the terms of its Prevailing Bid.

Promptly following the Trustee's selection of the Prevailing Bid and the conclusion of the Auction, the Trustee shall announce the Prevailing Bid and Prevailing Bidder and shall file notice of the Prevailing Bid and Prevailing Bidder with the Bankruptcy Court.  The Trustee shall not consider any Bids submitted after the conclusion of the Auction.

*Second-Highest Bidder.*

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Trustee, in the exercise of his reasonable business judgment and after consulting with SunTrust, will be designated as the second-highest bidder (the "**Second-Highest Bidder**"); provided, however, that the Stalking Horse Purchaser shall not be designated as the Second-Highest Bidder without the prior written consent of the Stalking Horse Purchaser.  The Second-Highest Bidder shall be required to keep its Bid (including, if the Second-Highest Bidder submitted one or more Overbids at the Auction, the Second-Highest Bidder's final Overbid (the "**Second-Highest Bid**"), open and irrevocable until the closing of the relevant transaction with the Prevailing Bidder.

Following the Sale Hearing, if the Prevailing Bidder fails to consummate the Alternative Transaction, the Trustee may deem the Second-Highest Bidder to have the new Prevailing Bid, and the Trustee will be authorized, without further order of the Bankruptcy Court, to consummate the transaction with such Second-Highest Bidder at the price of its last bid.  Such Second-Highest Bidder will be deemed to be the Prevailing Bidder and the Trustee will be authorized, but not directed, to effectuate a sale of the Acquired Assets to such Second-Highest Bidder (subject to the terms of the Second-Highest Bid) without further order of the Bankruptcy

11

Court.  All Qualified Bids (other than each Prevailing Bid and Second-Highest Bid) shall be deemed rejected by the Trustee on and as of the date of approval of the Prevailing Bid and Second-Highest Bid by the Bankruptcy Court.

## **Break-Up Fee**

In the event that the Stalking Horse Purchaser is not the Prevailing Purchaser (or if the Stalking Horse Purchaser is the Second-Highest Purchaser and the Sale to the Prevailing Purchaser is consummated), the Stalking Horse Purchaser is entitled to the Break-Up Fee and reimbursement of the Transaction Expenses in the amounts set forth in, and in accordance with the terms of, the Stalking Horse Agreement and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for the Stalking Horse Purchaser, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination fee, or similar fee or payment.

## **Sale Hearing**

The Prevailing Bid and Second-Highest Bid (or, if no Qualified Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Bankruptcy Court.  The sale hearing to approve the Prevailing Bid and any Second-Highest Bid (or the Stalking Horse Agreement, if no Qualified Bid other than that of the Stalking Horse Purchaser is received) shall take place on [T.B.D.] **(prevailing Eastern time)** before the Bankruptcy Court (the "**Sale Hearing**").  The Sale Hearing may be adjourned by the Trustee from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Bankruptcy Cases.

## **Return of Deposits**

The Deposits of all Qualified Bidders shall be held in one or more escrow accounts by the Trustee, but shall not become property of the Debtors' Estates absent further order of the Bankruptcy Court or as expressly provided below.  The Deposits of any Qualified Bidder that is neither a Prevailing Bidder nor a Second-Highest Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing.  The Deposit of the Second-Highest Bidder, if any, shall be returned to the Second-Highest Bidder no later than seventy-two (72) hours after the closing of the transaction with the Prevailing Bidder.  If the Prevailing Bidder timely closes on its winning transaction, its Deposit shall be credited towards the purchase price set forth in its Asset Purchase Agreement, and shall then be deemed property of the Debtors' Estates.  If a Prevailing Bidder (or Second-Highest Bidder, if applicable) fails to consummate an Alternative Transaction, because of a breach or failure to perform on the part of such Prevailing Bidder (or Second-Highest Bidder, if applicable), the Trustee will not have any obligation to return the Deposit of such Prevailing Bidder (or Second-Highest Bidder, if applicable), and the Deposit shall irrevocably become property of the Debtors' Estates, as liquidated damages.

07/03/2018

LEGAL\33319043\8 00601.0823.000/390810.000

## <u>Reservation of Rights of the Trustee</u>

Except as otherwise provided in the Stalking Horse Agreement or the Bidding Procedures Order, the Trustee reserves the right as he may reasonably determine to be in the best interests of the Debtors' Estates, to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the Auction Baseline Bid; (d) determine which Qualified Bid is the highest or otherwise best proposal for the Acquired Assets and which is the next highest or otherwise best proposal for the Acquired Assets; (e) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their Estates; (f) modify the Bidding Procedures, including without limitation by: (i) waiving terms and conditions; (ii) modifying existing, or imposing additional, rules, procedures, terms, and conditions; (iii) extending any deadlines; (iv) modifying bidding increments; (v) continuing or canceling the Auction and/or Sale Hearing at the Auction or in open court (as applicable) or by filing a notice on the docket of the Bankruptcy Cases, without further notice to creditors or other parties in interest; <u>provided</u> <u>however</u> that such actions shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order, or any other Order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court.

07/03/2018

LEGAL\33319043\8 00601.0823.000/390810.000

## Exhibit 2 – Sale Notice

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Our Alchemy, LLC, *et al*.,[1]<br><br>        Debtors. | Chapter 7<br><br>Case No. 16-11596 (KG)<br>(Jointly Administered) |

### NOTICE OF SALE FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, BIDDING PROCEDURES, AUCTION DATE, AND SALE HEARING

**PLEASE TAKE NOTICE THAT:**

1.　　On July 3, 2018, George L. Miller, in his capacity as chapter 7 trustee (the "**Trustee**") for the Debtors in the above-captioned chapter 7 cases (the "**Chapter 7 Cases**") filed the Motion (the "**Motion**") for (A) an Order (I) Establishing Bidding Procedures for the Sale of Certain of the Debtors' Assets; (II) Approving Break-Up Fee; (III) Approving Form and Manner of Sale Notice; and (IV) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (B) an Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Claims, Liens and Interests; and (C) Certain Related Relief.[2]  By the Motion, the Trustee seeks, *inter alia*, to sell (the "**Sale**") certain of the Debtors' assets to OA Acquisitions LLC (the "**Stalking Horse Purchaser**") pursuant to a certain stalking horse asset purchase agreement by and among the Trustee, as seller, the Stalking Horse Purchaser (as may be amended and in effect, the "**Stalking Horse Agreement**"), subject to higher or otherwise better offers at the Auction.

2.　　On _____, 2018, pursuant to the Motion, the Court entered an Order (the "**Bidding Procedures Order**") approving auction and bidding procedures (the "**Bidding Procedures**") in connection with the proposed Sale.  A copy of the Motion, the Bidding Procedures Order, the Bidding Procedures, and Stalking Horse Agreement can be obtained free of charge by contacting counsel to the Trustee, John T. Carroll at Cozen O'Connor, at jcarroll@cozen.com.

3.　　The Auction shall take place on [T.B.D.] **(prevailing Eastern Time)** at the offices of Cozen O'Connor, 1650 Market Street, One Liberty Place, Suite 2800, Philadelphia, PA 19103, or such other place and time as the Trustee shall notify all Qualified Bidders and each of their respective counsel and advisors.

4.　　Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.  Any person wishing to bid on the Acquired Assets must become a "Qualified Bidder."  The procedures for becoming a Qualified Bidder are contained in the Bidding Procedures.  A Qualified Bidder desiring to make a bid must deliver written copies of its Bid by

---

[1] The Debtors are: Our Alchemy, LLC, Case No. 16-11596, and Anderson Digital, LLC, Case No. 16-11597.

[2] Capitalized terms used herein but not otherwise defined in this Notice (the "**Notice**") shall have the meanings provided in the Bidding Procedures Order, Bidding Procedures, or the Stalking Horse Agreement, as applicable.

[T.B.D.] **(prevailing Eastern time)** (the "**Bid Deadline**"), to: (i) the Trustee, George L. Miller, Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, PA 19103 (gmiller@mctllp.com); (ii) counsel to the Trustee, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE 19801, Attention: John T. Carroll, III (jcarroll@cozen.com); (iii) counsel to the Stalking Horse Purchaser, Law offices of Vince Ravine, PC, 5120 Gloria Ave., Encino, CA 91436, Attention: Vince Ravine (vince@vravinelaw.com); (iv) counsel to SunTrust Bank, as administrative agent, Akin Gump Strauss Hauer & Feld LLP, 1999 Avenue of the Stars, Suite 600, Los Angeles, CA 90067, Attention: David P. Simonds (dsimonds@akingump.com) and Ashby & Geddes, 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attention: Ricardo Palacio (RPalacio@ashbygeddes.com).

5.      A hearing to approve the Sale (the "**Sale Hearing**") will be held on [T.B.D.] **(prevailing Eastern Time)**, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street North, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801, before the Honorable Kevin Gross.  The Sale Hearing may be adjourned by the Trustee from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Bankruptcy Cases.

6.      Except as otherwise provided in the Sale Order and the Stalking Horse Agreement or, if applicable, in any Alternative Asset Purchase Agreement, the sale will be free and clear of any and all Liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, Liabilities, demands, guarantees, options, rights, restrictions, contractual commitments, rights of first refusal, rights of setoff, or interests of any kind or nature that have been, are or could be asserted against the Estates, the Debtors, or the Acquired Assets, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, whether imposed by agreement, understanding, law, equity or otherwise (collectively, "**Interests**") pursuant to section 363(f) of the Bankruptcy Code, and the Sale Order will provide that the Stalking Horse Purchaser or other successful purchaser will have no liability to creditors or other parties in interest under principles of successor liability or otherwise.   UNLESS AN OBJECTION IS TIMELY FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, HOLDERS OF INTERESTS AND OTHER CREDITORS AND PARTIES IN INTEREST RECEIVING THIS NOTICE WILL BE DEEMED TO HAVE CONSENTED TO SUCH RELIEF AND WILL BE BOUND BY THE TERMS OF THE ORDER APPROVING THE SALE.

7.      Pursuant to the Bidding Procedures Order, any objections to the Sale ("**Sale Objections**") must be set forth in writing and must state with particularity the grounds for such objections or other statements of position.  Sale Objections must be filed with the Clerk of the Bankruptcy Court, at United States Bankruptcy Court for the District of Delaware, 3rd Floor, 824 North Market Street, Wilmington, Delaware 19801, together with proof of service, and served on (a) the Trustee, George L. Miller, Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, PA 19103 (gmiller@mctllp.com); (b) counsel to the Trustee, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE 19801, Attention:  John T. Carroll, III (jcarroll@cozen.com); (c) counsel to the Stalking Horse

Purchaser, Law offices of Vince Ravine, PC, 5120 Gloria Ave., Encino, CA 91436, Attention: Vince Ravine (vince@vravinelaw.com); (d) counsel to SunTrust Bank, Akin Gump Strauss Hauer & Feld LLP, 1999 Avenue of the Stars, Suite 600, Los Angeles, CA 90067, Attention: David P. Simonds (dsimonds@akingump.com) and Ashby & Geddes, 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attention: Ricardo Palacio (RPalacio@ashbygeddes.com)) (collectively, the "**Sale Objection Notice Parties**"), so as to be received by no later than **4:00 p.m. (prevailing Eastern Time)** on [T.B.D.]; provided that objections to the conduct of the Auction or selection of the Prevailing Bid or Second-Highest Bid shall be in writing, filed with the Clerk of the Bankruptcy Court, together with proof of service, and served so as to be received by the Sale Objection Notice Parties on or before **4:00 p.m. (prevailing Eastern Time) on** [T.B.D.] UNLESS AN OBJECTION IS TIMELY FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE COURT AND THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

8.    This Notice is subject to the fuller terms and conditions of the Stalking Horse Agreement and the Bidding Procedures Order, which shall control in the event of any conflict, and the Trustee encourages parties-in-interest to review such documents in their entirety.

Dated: _____, 2018          **COZEN O'CONNOR**
       Wilmington, Delaware

                                   _____
                                   John T. Carroll, III (DE No. 4060)
                                   Simon E. Fraser (DE No. 5335)
                                   1201 N. Market Street
                                   Suite 1001
                                   Wilmington, DE 19801
                                   Telephone: (302) 295-2000
                                   Facsimile: (302) 295-2013
                                   jcarroll@cozen.com
                                   sfraser@cozen.com

                                   *Counsel to George L. Miller,*
                                   *Chapter 7 Trustee*

**Exhibit C**

**<u>Lab Access Letter</u>**

[Date]

To Any and All Laboratories Holding Material and/or Films
From Our Alchemy, LLC and Anderson Digital, LLC

Re:  Sale to OA Acquisitions LLC
To Whom It May Concern:

I serve in the capacity as chapter 7 trustee (the "Trustee") of the bankruptcy estates of Our Alchemy, LLC and/or Anderson Digital, LLC (collectively "Alchemy"), and therefore am empowered with all rights and standing of such companies.  Alchemy has on deposit with you ("Laboratory") or granted access to certain materials (the "Materials") with respect to certain motion pictures as listed on Schedule 1 attached (the "Pictures").

Pursuant to an Asset Purchase Agreement entered by and between the Trustee and OA Acquisitions LLC ("OAA"), and approved by the bankruptcy court, the Trustee transferred any and all remaining rights, title, and interest of Alchemy to the Pictures to OAA.

Accordingly, you are hereby authorized and irrevocably directed and instructed to provide to OAA absolute access and control over the Materials for the Pictures for any reason, including without limitation, direction to release and deliver to OAA such Materials for the Pictures, and use of the Materials for the Pictures and any and all laboratory services with respect to the aforementioned Pictures. All services and materials ordered by OAA, its successors and assigns shall be at the sole cost and expense of OAA, or its successors and assigns.  Any and all Materials on deposit in your vault relating to the Pictures shall be retained by Laboratory for OAA's order and shall not be transferred to any other laboratory or similar facilities without the prior written consent of OAA; it being understood that OAA or its designees shall have, at all times, the right to remove any copies ordered by OAA or its designees.

Very truly yours,

_____
George L. Miller, as chapter 7 trustee of the estates of
Our Alchemy, LLC and Anderson Digital, LLC

**Exhibit D**

**Release of Security Interests of SunTrust Bank N.A. as administrative agent**

**PARTIAL RELEASE OF SECURITY INTEREST**

This PARTIAL RELEASE OF SECURITY INTEREST UNDER AMENDED AND RESTATED COPYRIGHT SECURITY AGREEMENT (this "Partial Release") is executed by SunTrust Bank, as administrative agent for the Secured Parties (in such capacity, "Mortgagee"), with reference to the following documents relating to the motion pictures set forth on Schedule I attached hereto (collectively, the "Pictures"): (1) the Guaranty and Security Agreement dated as of September 4, 2014 (as amended, modified, supplemented or restated from time to time, the "Security Agreement") among Our Alchemy, LLC (F/K/A Millennium Entertainment, LLC), a Delaware limited liability company (the "Borrower"), as borrower, and certain subsidiaries of the Mortgagor (including Anderson Digital, LLC, a Delaware limited liability company ("Anderson," and collectively with Borrower, the "Mortgagor") identified on the signature pages thereto as guarantors (the "Guarantors") on the one hand, and Mortgagee, on the other hand; and (2) the Amended and Restated Copyright Security Agreement dated as of July 9, 2015 executed by Mortgagor and the Guarantors in favor of Mortgagee (as amended, modified, supplemented or restated from time to time, the "Copyright Security Agreement") (which Copyright Security Agreement was submitted on or about July 9, 2015 to the U.S. Copyright Office for recordation).

WHEREAS, pursuant to the Security Agreement and the Copyright Security Agreement, Mortgagor and certain other Guarantors have granted to Mortgagee a continuing security interest in all of Mortgagor's right, title and interest in and to the Pictures and the other Collateral (as such term is respectively defined in the Security Agreement and the Copyright Security Agreement).

Mortgagee hereby (i) releases and terminates any and all liens, security interests, powers of attorney and any other rights of Mortgagee with respect to the Released Collateral  granted to Mortgagee by Mortgagor (only) pursuant to the Security Agreement, the Copyright Security Agreement and/or any of the other Loan Documents (as defined in the Security Agreement) and (ii) to the extent that Mortgagee has or shall be deemed to have any right, title or interest in any of the Released Collateral with respect to the Mortgagor (only), grants, re-assigns, transfers, sets over and conveys to Mortgagor, without recourse, representation or warranty, all of Mortgagee's right, title and interest in and to the Released Collateral.

As used herein, the following terms have the following means:

"APA" means the Asset Purchase Agreement, dated as of _____, 2018, between the Trustee and OA Acquisitions LLC.

"Closing Date" has the meaning ascribed thereto in the APA.

"Purchase Price" has the meaning ascribed thereto in the APA.

"Released Collateral" means all right, title and interest, throughout the universe, of every kind and nature and in any and all media now known and hereafter recognized, of the Mortgagor (only) in connection with and to the Pictures, the Film and Video Elements (as such term is defined in the APA), and any underlying materials on which any of the Pictures are based (collectively, the "Property"); provided that the Released Collateral expressly excludes the Retained Rights,

1

which Retained Rights remain included within the Collateral that is subject to the Security Agreement, the Copyright Security Agreement and the other Loan Documents.

"<u>Retained Rights</u>" means all of Mortgagee's right, title and interest in and to the Sale Proceeds, with the same priority, validity, force and effect held by Mortgagee in and to the Released Collateral prior to the Closing Date.

"<u>Sale Proceeds</u>" collectively means the Purchase Price and all other amounts payable to the Trustee under the APA.

"<u>Trustee</u>" means George L. Miller, the chapter 7 trustee of the chapter 7 estates of the Mortgagor.

Except for the Collateral consisting of the Released Collateral, nothing set forth in this Partial Release shall effect a release, termination or assignment of any other Collateral or rights in such other Collateral.  For the avoidance of doubt, this Partial Release does not constitute a release of Mortgagee's lien in or security on any Collateral related to Calrissian, L.P. under the Security Agreement, the Copyright Security Agreement or the other Loan Documents.

Except as expressly modified hereby, the Security Agreement, the Copyright Security Agreement and the other Loan Documents shall remain in full force and effect.

<center>[<em>signature page follows</em>]</center>

<center>2</center>

This Partial Release and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Partial Release shall be construed in accordance with and be governed by the law (without giving effect to the conflict of law principles thereof except for Sections 5-1401 and 5-1402 of the New York General Obligations Law) of the State of New York and the applicable federal laws of the United States.

Dated:  As of _____, 2018

<div style="margin-left:40%">

SunTrust Bank,
as Administrative Agent


By:    _____
Name:
Title:

</div>

**PICTURES**


**SEE SCHEDULE I
OF ASSET PURCHASE AGREEMENT**

**Exhibit E**

**<u>Bill of Sale</u>**

## BILL OF SALE

**WHEREAS,** GEORGE L. MILLER, as Chapter 7 Trustee (the "Seller") for the bankruptcy estates (the "Estates") of Our Alchemy, LLC and Anderson Digital, LLC (the "Debtors"), and OA Acquisitions LLC (the "Buyer"), have agreed to the sale by the Seller to the Buyer of the assets described herein on the terms and subject to the conditions set forth in that certain Asset Purchase Agreement dated as of July 3, 2018 (the "Purchase Agreement"), by and between the Seller and the Buyer:

## NOW, THEREFORE, THIS INSTRUMENT WITNESSETH:

1.     For good and valuable consideration, receipt of which is hereby acknowledged, the Seller does hereby grant, assign, transfer, and convey unto the Buyer all right, title, and interest, legal or equitable, of the Estates in and to all of the personal property that is to be conveyed to the Buyer under the terms of the Purchase Agreement (the "Purchased Assets"), on an "as is where is" basis with all faults and, except as provided in the Purchase Agreement, specifically and expressly without any warranties, representations, or guarantees, either express or implied, of any kind or nature of or on behalf of the Seller.

2.     The Purchased Assets are granted, assigned, transferred, and conveyed to the Buyer and its representatives, successors, and assigns forever, pursuant to the terms and conditions of the Purchase Agreement.

3.     The Purchased Assets are being assigned, transferred and conveyed to the Buyer pursuant to and in accordance with the Order Approving the Sale of Certain of the Debtors' Assets entered on _____ by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") which granted the Seller's Motion for (A) an Order (I) Establishing Bidding Procedures for the Sale of Certain of the Debtors' Assets; (II) Approving Break-Up Fee; (III) Approving Form and Manner of Sale Notice; and (IV) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (B) an Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Claims, Liens and Interests; and (C) Certain Related Relief (the "Sale Motion").

4.     Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any person, firm or corporation other than the parties hereto and their respective successors and assigns, any remedy or claim under or by reason of this instrument or any term, covenant or condition hereof, and all the terms, covenants, conditions and agreements contained in this instrument shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns.

5.     This instrument shall become effective as of the date set forth below.

6.     Unless otherwise defined herein, each capitalized term used herein shall have the meaning ascribed to such term in the Purchase Agreement.  In the event of any conflict between this Bill of Sale and the Purchase Agreement, the Purchase Agreement shall control.

7.     This instrument shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the choice of law principles thereof.

8.     This instrument may be executed electronically and delivery of an executed copy of by facsimile or other electronic transmission shall be as effective as delivery of a manually executed original counterpart of this Bill of Sale.


IN WITNESS WHEREOF, the Seller has executed this instrument effective the __ day of _____, 2018.

GEORGE L. MILLER, AS CHAPTER 7 TRUSTEE FOR THE ESTATES OF OUR ALCHEMY, LLC AND ANDERSON DIGITAL, LLC


By: _____

George L. Miller, Chapter 7 Trustee

**Schedule I**

Pictures and Designated Contracts

**SCHEDULE 1**

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| 10 Items or Less | 10 Items, LLC | Distirbution License, dates as of December 6, 2006, by and between First Look Studios, Inc. and 10 Items, LLC. |
| 2001 Maniacs: Field of Screams | Arsenal Pictures Distribution, LLC | Acquisition Agreement, dated as of February 10, 2010 by and between First Look Studios, Inc., and Arsenal Pictures Distribution, LLC. |
| 2005 Glitter Awards | Jorge Ameer | Agreement dated Februray 2, 2005 by and between Vanguard International Cinema and Jorge Ameer |
| 2006 Glitter Awards | Jorge Ameer | Agreement dated January 20, 2006 by and between AJ Productions and Hollywood Independents c/o Jorge Ameer |
| 24 Hours in London | 24 Hours In London PLC | Acquisition Agreement, dated as of February 25, 2002, by and between Blockbuster Inc. and Victorfilm Co. Ltd as agent for 24 Hours in London PLC.<br><br>First Amendment to Acquisition Agreement, dated as of July 10, 2002, by and Blockbuster Inc. Victorfilm Co. Ltd as agent for 24 Hours in London PLC. |
| 4 Dead Girls | Fairway Film Alliance | Exclusive Distribution Agreement, dated as of February 27, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| 75 Degrees in July | Seventy-Five Degrees in July LP | Agreement dated January 6, 2006 by and between Vanguard International Cinema and Seventy-Five Degrees in July LP |
| A Dance For Bethany | Princ Films Inc | Distribution Agreement dated February 11, 2013 by and between Anderson Digital, LLC and Princ Films, Inc. |
| A Gaudi Afternoon | LOLAFILMS S.A. | Distribution Agreement dated May 16, 2002 by and between First Look Media, Inc. and LOLAFILMS S.A. |
| A Girl Named Willow (Part II) | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| A New Monk in Town (Part I) | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Absolon | GFT Absolon Films | Acquisition Agreement, dated as of April 18, 2002, by and between Blockbuster Inc. and GFT Absolon Films Inc.<br><br>First Amendment to Acquisition Agreement, dated as of May 15, 2002, by and between Blockbuster Inc. and GFT Absolon Films Inc. |
| Accidental Love | Nailed Partners, LLC | Acquisition Agreement, dated as of September 20, 2014, by and between Millennium Entertainment, LLC, and Nailed Partners, LLC. |
| Act of Vengeance | Arsenal Pictures Distribution, LLC | Acquisition Agreement, dated as of July 26, 2011, by and between Millennium Entertainment, LLC and Arsenal Pictures Distribution, LLC. |
| After Freedom | After Freedom Film LP | Agreement dated March 6, 2006 by and between Vanguard International Cinema and After Freedom Film, L.P. |

SCHEDULE 1

PICTURES AND DESIGNATED CONTRACTS

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Aftershock | Bonaire Films Inc. | Distribution Agreement, dated as of 1988, by and between Spectrum Entertainment Ltd. and Bonaire Films Inc.<br><br>Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup and Spectrum Entertainment Group PLC. |
| Alegria | Lampo Di Vita Films Inc.; Mainstrean SA; and Egmond Film and Television BV | Letter Agreement, dated as of June 12, 1997, by and among Overseas Filmgroup, Inc.; Lampo Di Vita Films, Inc.; Mainstream S.A.; and Egmond Film & Television BV.<br><br>Amendment, dated as of January 9, 1998, by and among Overseas Filmgroup, Inc.; Lampo Di Vita Films, Inc.; Mainstream S.A.; and Egmond Film & Television BV. |
| All For Lust | New City Releasing | Acquisition Agreement, dated as of May 2, 2002, by and between Blockbuster Inc. and New City Releasing, Inc. |
| Amateurs, The | N1 European Film Produktions GmbH&Co. KG | Agreement, dated as of November 1, 2007, by and between First Look Studios, Inc. and N1 European Film Produktions GmbH &Co. KG. |
| Ambush | The Film Kitchen.Com | Agreement made as of January 9, 2002 by and between Vanguard Internation Cinema and The Film Kitchen.Com |
| American Beer | Brother Jack Films | Agreement dated May 28, 2004 by and between Vanguard International Cinema and Brother Jack Films |
| American Crime, An | American Crime Productions, Inc. | Motion Picture Rights Acquisition Agreement dated as of May 15, 2006 by and between First Look Studios, Inc. and American Crime Productions, Inc. |
| American Joyride | Markwood Films LLC | Indpendent Movie Distirbution Agreement dated January 2, 2013 by and between Anderson Digital LLC and Markwood Films |
| American Rap Stars | Omar Lindsey (p/k/a Omar Sharif) | Buyout Agreement, dated as of October 1, 2003, by and between First Look Media, Inc. and Omar Lindsey p/k/a Omar Sharif. |
| American Virgins | Artist View Entertainment, Inc. | Term sheet will confirm the material terms of the acquisition agreement made as of November 28, 2000 between Blockbuster, Inc. and Artist View Entertainment, Inc. |
| American Yakuza | Tendo Productions, Inc | Purchase Agreement, dated as of March 12, 1993, by and between Overseas Filmgroup, Inc. and Tendo Productions, Inc. |
| American Yakuza 2: Back to Back | Blam, Inc. | Distribution Agreement, dated as of June 15, 1995, by and between Overseas Filmgroup, Inc. and Blam, Inc. |
| Angel Camouflaged | Rogue Arts | Agreement dated March 9, 2012 by and between Vanguard International Cinema and Rogue Arts |
| Angela | Adriana Chiesa Enterprises S.R.L., in the name of and on behalf of Rita Rusic Company and Movieweb | Distribution Agreement, dated as of May 22, 2002, by and between First Look Media, Inc. and Adriana Chiesa Enterprises as agent for Rita Rusic Company and Movieweb. |
| Angel's Fall | Kaplan Film Productions | Agreement dated April 27, 2007 by and between Vanguard International Cinema and Kaplan Film Productions |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Angus & Cheryl Season 1 | BRB Internacional S.A. | This Distribution Agreement dated as of February 1, 2012 and when fully executed, shall confirm the terms pursuant to which BRB Internacional S.A. hereby grants and assigns to SoPeachi Entertainment, LLC. |
| Animal | Animal Film, LLC | Agreement, dated as of September 24, 2004, by and between DEJ Productions Inc. and Animal Film, LLC.  First Amendment to Agreement, dated as of November 15, 2004, by and between DEJ Productions Inc. and Animal Film, LLC.  Sequel Relinquishment Letter, dated as of September 28, 2006, by and between DEJ Productions Inc. (now referred to as First Look Studios, Inc.) and Animal Film, |
| Antibody | Unified Film Organization LLC | Distribution Agreement, dated as of July 31, 2002, by and between Our Alchemy, LLC and Unified Film Organization LLC.; Distribution Agreement between Unified Film Organizations LLC and Blockbuster Inc dated Nov 19, 2001 |
| Are You Here | You Are Here Films, LLC | Distribution Agreement entered into as of December 19, 2013 by and between Millennium Entertainment, LLC and You Are Here Films, LLC. |
| Arizona Heat | Arizona Heat Productions Inc. | Financing and Distribution Agreement, dated as of October 20, 1986, by and between Spectrum Entertainment Limited and Arizona Heat Productions Inc.  Agreement, dated as of August 30, 1987, by and between Spectrum Entertainment Limited and Arizona Heat Productions Inc.  Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup Inc. and Spectrum Entertainment |
| Armed & Deadly | Fairway Film Alliance | Distribution Agreement, dated as of January 1, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Art of Travel, The | Brenster Productions, LLC | Acquisition Agreement, dated as of February 29, 2008 by and between First Look Studios, Inc. and Brenster Productions. |
| As Night Falls | Fairway Film Alliance | Distribution Agreement, dated as of January 1, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Ash Wednesday | Good Machine International, Inc. | Acquisition Agreement, dated as of June 19, 2002, by and between Blockbuster Inc. and Good Machine International, Inc. as agent for 10th Avenue Productions, LLC. |
| Assassin Next Door, The (a.k.a. Kirot) | Kirot the Film LP | Agreement dated as of March 15, 2010 by and between First Look Studios, Inc. and Bleiberg Entertainment, LLC as exclusive agent for Kirot the Film Limited Partnership |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| ASSASSIN'S BULLET | Xlrator Media, LLC | Exclusive Distribution Agreement, dated as of March 5, 2012, by and between Anderson Merchandisers, L.P. and Xlrator Media LLC.<br><br>First Amendement dated January 25, 2013. |
| Attack of the Killer Backpacks | Rogue Arts, LLC | Agreement dated March 9, 2012 by and between Vanguard International Cinema and Rogue Arts, LLC. |
| Attic Expeditions, The | Tse Tse Fly Productions | Acquisition Agreement, dated as of September 25, 2001, by and between Blockbuster Inc. and Tse Tse Fly Productions, LLC.<br><br>Acquisition Agreement, dated as of August 16, 2002, by and between Blockbuster Inc. and Mainline Releasing as agent for Tse Tse Fly Productions, LLC. |
| Autumn Spring | Buc Film and Ceska Televize | Distribution Agreement, dated as of September 12, 2002, by and between Fist Look Media and  Buc Film / Ceska Televize. |
| Avenging Angelo | Angelo Productions LLC | Acquisition Agreement made as of July 22, 2002 by and between Blockbuster, Inc. and Angelo Productions LLC |
| Babymakers, The | Babymakers Productions, LLC | Acquisition Agreement, dated as of March 29, 2012, by and between Millennium Entertainment, LLC and Babymakers Productions, LLC. |
| Back in the Day | Back In The Day, Inc. | Agreement, dated as of August 8, 2003, by and between DEJ Productions Inc. and Back in the Day, Inc.<br><br>First Amendment to Acquisition Agreement, dated as of October 1, 2003, by and between DEJ Productions Inc. and Back in the Day, Inc.<br><br>Second Amendment to Acquisition Agreement, dated as of April 2, 2004, by and between DEJ Productions Inc. and Back in the Day, Inc. |
| Back in the Flesh Again | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Back to the Jurassic | Toiion, Inc | Acquisition Agreement, dated as of April 26, 2015, by and between Millenium Entertainment, LLC and Toiion, |
| Bad Company | Nature Productions, Inc. | Letter Agreement, dated as of May 6, 1994, by and between Overseas Filmgroup, Inc. and Nature Productions, Inc. |
| Bandit Hound, The | The Bandit Hound, LLC | Acquisition Agreement, dated as of November 6, 2015, by and among Our Alchemy, LLC and The Bandit Hound, |
| Bark | Dog Pointe Productions LLC | Letter Agreement, dated as of October 16, 2000, by and between Overseas Filmgroup, Inc. and Dog Pointe Productions LLC |
| Beast Beneath | Fairway Film Alliance | Distribution Agreement, dated as of January 1, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Bernard Season 1 | BRB Internacional S.A. | This Distribution Agreement dated as of February 1, 2012 and when fully executed, shall confirm the terms pursuant to which BRB Internacional S.A. hereby grants and assigns to SoPeachi Entertainment, LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Bernie | Bernie Film, LLC | Acquisition Agreement, dated as of July 12, 2011, by and among Millennium Entertainment, LLC,Wind Dancer Bernie, LLC, and Bernie Film, LLC.<br><br>Letter Amendment to Acquisition Agreement, dated as of October 21, 2011, by and among Millennium Entertainment, LLC,Wind Dancer Bernie, LLC, and Bernie Film, LLC. |
| Best Laid Plans | Well Go USA, Inc. | Exclusive Distribution Agreement made as of August 25, 2011 by and between Millennium Media Services, Inc. and Well Go USA, Inc. |
| Between Strangers | Between Strangers Productions Inc. | Letter Agreement, dated as of May 22, 2001, by and between First Look Media, Inc. and Between Strangers Productions Inc. for its own account and on behalf of Jean Vigo Italia S.r.l. and MediaTrade S.p.a. (co-producers).<br><br> Letter Agreement, dated as of October 14, 2002, by and between First Look Media, Inc. and Wladyslaw Bartoszewicz.<br><br>Amendment, dated as of August 18, 2003, by and between First Look Media, Inc. and Between Strangers |
| Beyond Hypothermia | Metropolitan Filmexport c/o Moonstone Entertainment, Inc. | Acquisition Agreement, dated as of July 25, 2003, by and between DEJ Productions Inc. and Metropolitan Filmexport, in care of Moonstone Entertainment, Inc. |
| Big Nothing | Pathe Productions Limited | Acquisition Agreement made as of November 27, 2006 by and between First Look Studios, Inc. and Pathe Productions Limited |
| Big Squeeze, The | Fast Forward Services, Inc. | Distribution Agreement, dated as of March 1, 1995, by and between Overseas Filmgroup, Inc. and Fast Forward Service, Inc. |
| BIG STEAL (THE) | Cascade Films International Pty Ltd. | Distribution Agreement dated as of March 8, 1990 by and between Overseas Filmgroup Inc. and Cascade Films International Pty Ltd. |
| Black Cadillac | Artist View Entertainment agent for Black Cadillac LLC | Acquisition Agreement, dated as of August 23, 2004, by and between DEJ Productions Inc. and Artist View Entertainment as agent for Black Cadillac, LLC. |
| Black Magic Mansion | Golden Pictures Ltd/Filmagic S.L. | Rights Purchase Agreement (Motion Picture), dated as of June 23, 1992, by and among Overseas Filmgroup, Inc.; Golden Pictures Limited; and Filmagic S.L. |
| Black Ops | Celebration Pictures, Inc. | Acquisition Agreement, dated as of November 6, 2007, by and between First Look Studios, Inc. and Celebration Pictures, Inc., a whole-owned subsidiary of Film and Music Entertainment, Inc.<br><br>Settlement Agreement, dated as of November 5, 2008, by and between First Look Studios, Inc. and Celebration Pictures, Inc., a wholly-owned subsidiary of Film and Music Entertainment, Inc. |
| Black Souls | Rialto Distribution Pty Ltd | Acquisition Agreement, dated as of April 23, 2015, by and between Our Alchemy, LLC and Rialto Distribution PTY, Ltd. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Blast | IWP International West Pictures Verwaltung GMBH & CO. Erste Produktions  KG | License Agreement, dated as of August 10, 2004, by and between DEJ Productions Inc. and Motion Picture Corporation of America as agent for IWP International West Pictures GmbH &Co Erst Produktions KG. |
| Blessed | Pueble Film Trading, Ltd. | Agreement, dated as of December 19, 2003, by and between DEJ Productions Inc. and Megalodon 2, Inc.<br><br>First Amendment to Acquisition Agreement, dated as of December 19, 2003, by and between DEJ Productions Inc. and Megalodon 2, Inc.<br><br>Acquisition Agreement, dated as of December 14, 2004, by and between DEJ Productions Inc. and Pueblo Film Trading, Ltd. |
| Blonde and Blonder | Blonde & Blonder Productions Inc. | Agreement, dated as of November 7, 2006, by and between First Look Studios, Inc. and Blonde & Blonder Productions Inc.<br><br>First Amendment, dated as of January 16, 2007, by and between First Look Studios, Inc. and Blonde & Blonder Productions Inc.<br><br>Settlement Agreement, dated as of November 5, 2008, by and between First Look Studios, Inc. and Blonde & Blonder Productions Inc. |
| Blue Demon | Unified Film Organization LLC | Acquisition Agreement, dated as of August 22, 2003, by and between DEJ Productions Inc. and United Film Organization LLC.<br><br>Instrument of Transfer, dated as of May 24, 2005, by and between First Look Media, Inc. and DEJ Productions Inc. |
| Blue Desert | Neo Motion Pictures | Assignment of All Rights (Including Copyright), dated as of January 31, 1990, by and between Overseas Filmgroup, Inc. and Neo Motion Pictures, Inc. |
| Blue Tiger | Gridlock Productions, Inc. | Purchase Agreement, dated as of March 12, 1993, by and between Overseas Filmgroup, Inc. and Gridlock Productions, Inc. |
| Blunt Force Trauma | Blunt Force Trauma LLC | Acquisition Agreement, dated as of April 24, 2015, by and between Our Alchemy, LLC and Blunt Force Trauma |
| Body Count | Racing Pictures s.r.l. | Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup Inc. and Racing Pictures s.r.l. |
| Bone Snatcher, The | Sandmother Distribution Limited | Letter Agreement, dated as of May 31, 2002, by and between First Look Media, Inc. and Sandmother Distribution Limited. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Bookies | IWP International West Pictures Verwaltung GMBH & CO. Erste Produktions  KG | License Agreement, dated as of January 21, 2004, by and between DEJ Productions Inc. and Motion Picture Corporation of America as agent for IWP International West Pictures GmbH & Co Erste Produktions KG.  First Amendment to License Agreement, dated as of December 31, 2004, by and between DEJ Productions Inc. and Motion Picture Corporation of America as agent for IWP InternationalWest Pictures GmbH & Co Erste Produktions KG. |
| Boost | ITN Distribution | Agreement dated December 10, 2007 by and between Vanguard International Cinema and ITN Distribution |
| Born American | Destination Cinema, Inc. | Purchase Agreement, dated as of April 28, 1992, by and between Overseas Filmgroup, Inc. and Destination Cinema, Inc. |
| Bound by Lies | Mainline Releasing, Inc. | Acquisition Agreement, dated as of March 26, 2004, by and between DEJ Productions Inc. and Mainline Releasing, Inc. |
| Boys & Girl from County Clare, The | Kosmic Film Entertainment, Inc. | Distribution Agreement, dated as of March 27, 2007, by and between First Look Studios, Inc. and Kosmic Film Entertainment, Inc. |
| Brahmin Bulls | Barking Cow Media Group | This Agreement dated as of August 23, 2013 and effective as of November 1, 2013 shall confirm the terms pursuatn to which Barking Cow Media Group, LLC grants, assigns and conveys to Anderson Digital, LLC. |
| Bread & Tulips | Monogatari-Rai Cinema-Istituto Luce-AMKA | Distribution Agreement, dated as of October 12, 2000, by and between Overseas Filmgroup, Inc. doing business as First Look Pictures and Adriana Chiesa Enterprises S.R.L. as agent for Monogatari-Rai Cinema-Istituto Luce- |
| Breakout, The | Sam and Tim LLC | Acquisition Agreement, dated as of September 19, 2006, by and between First Look Studios, Inc. and Sam and Tim LLC.  First Amendment to Acquisition Agreement, dated as of March 5, 2007, by and between First Look Studios, Inc. and Sam and Tim LLC. |
| Broken | Broken the Motion Picture, LLC | Acquisition Agreement, dated as of April 6, 2007, by and between First Look Studios, Inc. and Broken the Motion Picture, LLC. |
| Brother's Keeper | Brother's Keeper Feature Film Distribution, LLC | "Brother's Keeper" Term Sheet effective as of June 4, 2014 by and between Millennium Entertainment, LLC and Brother's Keeper Feature Film Distribution, LLC. |
| Brother's Kiss, A | A Brother's Kiss L.P. | Distribution Agreement, dated as of April 8, 1996, by and between Overseas Filmgroup, Inc. and A Brother's Kiss L.P. |
| Brothers..On Holy Ground | Film Kitchen.Com | Agreement dated October 8, 2003 by and between Vanguard International Cinema and Film Kitchen.Com |
| Buck Wild | Buck Wild Film Productions | Acquisition Agreement, dated as of July 2, 2013, by and between Millennium Entertainment, LLC and Buck Wild Film Productions, LLC. |
| Buddy Blue Rey and the Golden Bunr | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Burning Down The House | Film Kitchen.Com | Agreement dated January 8, 2003 by and between Vanguard International Cinema and Film Kitchen.Com |
| BUTTERFLY ROOM | Naedomi Media, LLC | Acquisition Agreement, dated as of May 8, 2014 by and between Naedomi Media, LLC and Archstone Distributions, LLC. |
| By the Gun | God Only Knows, Inc. | "God Only Knows" Term Sheet dated as of April 8, 2014 by and between Millennium Entertainment, LLC and God Only Knows, Inc.<br><br>Acquisition Agreement entered into as of April 8, 2014 by and between Millennium Entertainment, LLC and God Only Knows, Inc. (re: "By the Gun" aka "God Only Knows"). |
| Caffeine | Steaming Hot Coffee LLC | Acquisition Agreement, dated as of September 14, 2006, by and between First Look Studios, Inc. and Steaming Hot Coffee LLC. |
| Californian Indian | Against The WindFilms | Acquisition Agreement, dated as of January 19, 2012, by and between Vanguard International Cinema and Against the WindFilms. |
| Calling, The | Pacifica Film Distribution, LLC | Acquisition Agreement, dated as of December 29, 2000, by and between Blockbuster Inc. and Pacifica Film Distribution LLC |
| Came a Hot Friday | Mirage Entertainment Corporation, Ltd | Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup Inc. and Spectrum Entertainment Group PLC. |
| Carlos Mencia: Not for the Easily Offe | NEDLOS, INC. | Agreement dated May 3, 2005 by and between Vanguard International Cinema and Nedlos, Inc. |
| Carrier, The | Swan Productions, a Michigan limited partnership | Rights Purchase Agreement, dated as of October 1, 1990, by and between Overseas Filmgroup, Inc. and Swan Productions, a Michigan limited partnership. |
| Cassadaga | Archstone North America, LLC | Exclusive Distribution Agreement, dated as of September 26, 2014, by and between Millenium Media Services, Inc. and Archstone North America, LLC.<br><br>First Amendment to the Agreement is entered into agreement on July 1, 2015 by and between Archstone Distribution, LLC and Raging Picturs, Ltd. |
| Cat In The Cage | United Entertainment Incorporated and A&Z Company Limited | Letter Agreement, dated as of October 15, 1995, by and among Overseas Filmgroup, Inc.; United Entertainment, Incorporated; and A & Z Company Limited. |
| Champions | Korea Pictures Co. | Acquisition Agreement, dated as of April 14, 2003, by and between DEJ Productions Inc. and Interclick (Cineclick Asia) as agent for Korea Pictures Co. |
| Charlie Countryman | Countryman Nevada, LLC | Acquisition Agreement, dated as of June 4, 2013 by and between Millennium Entertainment, LLC and Voltage Pictures, LLC sales agent for Countryman Nevada. |
| CHARLIE MIKE | Charlie Mike Productions, LLC | Acquisition Agreement, dated as of May 1, 2015, by and between ANConnect, LLC and Charlie Mike, Productions, LLC. |
| Charlie's Farm | Slaughter FX Pty and WaddaslFX Pty | Acquisition Agreement, dated as of April 24, 2015, by and between Our Alchemy, LLC and Slaughter FX Pty and WaddaslFX Pty. |

**SCHEDULE 1**

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Chase Lays an Egg | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Checkmate | Status Publications LLC | Acquisition Agreement, dated as of March 18, 2015, by and between Millennium Entertainment, LLC and Status Publications, LLC. |
| Cherry Crush | Post Central Entertainment, LLC | Acquisition Agreement, dated as of December 8, 2006, by and between First Look Studios, Inc. and Post Central Entertainment, LLC. |
| Cherrybomb | Generator Entertainment Limited | Acquisition Agreement, dated as of July 28, 2012, by and between Naedomi Media, LLC and Generator Entertainment Limited. |
| Chrystal | Pictures Securities Limited | Acquisition Deal Memo, dated as of November 8, 2004, by and between First Look Studios, Inc. and Picture Securities Limited c/o Cinetic Media.<br><br>Acquisition Deal Memo Addendum, dated as of November 8, 2004, by and between First Look Studios, Inc. (formerly known as First Look Media, Inc.) and Picture Securities Limited c/o The Simkins Partnership. |
| Circuit II, The | Amsell Entertainment Inc. as agent for FilmOne Productions Inc. | Acquisition Agreement, dated as of June 2, 2002, by and between Blockbuster Inc. and Amsell Entertainment, Inc. as agent Filmone Productions Inc. |
| Circuit, The | Amsell Entertainment Inc. as agent for FilmOne Productions Inc. | Acquisition Agreement, dated as of January 7, 2002, by and between Blockbuster Inc. and Amsell Entertainment, Inc. as agent for Filmone Productions. |
| Clawed: The Legend of Sasquatch | Reel Films, LLC and Diversa Films | Acquisition Agreement, dated as of December 1, 2005, by and among First Look Studios, Inc.; Reel Films, LLC; and Diversa Films. |
| Close Your Eyes | Movision 71-82 Film Partnerships, Movision 85-93 Film Partnerships, Movision 95-97 Film Parnerships, Movision 100-102 Film Partnerships | Agreement, dated as of May 18, 2002, by and between First Look Media Incorporated and The Works TSC Limited. |
| Cold & Dark | Beyond Films | Deal Memo, dated as of September 14, 2004, by and between First Look Media, Inc. and Beyond Films Acquisitions Deal Memo.<br><br>Amendment, dated as of October 18, 2004, by and between First Look Media, Inc. and Beyond Entertainment Limited.<br><br>Second Amendment, dated as of March 10, 2005, by and between First Look Media, Inc. and Beyond Entertainment Limited. |
| Coldplay Live 2012 | Warner Music Group | Assumption Agreement entered into and effective as of November 19, 2010 by and among Warner Bros. Digital Distribution and Millennium Entertainment, LLC. |
| Colin Hearts Kay | Colin Hearts Kay, LLC | Acquisition Agreement, dated as of September 8, 2011 by and between Vanguard International Cinema and Colin Hearts Kay, LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Comeback Dad | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Comeback Season | Myriad Pictures, Inc. | Acquisition Agreement, dated as of August 8, 2006, by and between First Look Studios, Inc. and Myriad Pictures, Inc. |
| Coming Home for Christmas | Nasser Group, Inc. | Exclusive Distribution Agreement dated March 8, 2013 by and between Anderson Merchandisers, LLC and Nasser Group Inc. |
| Condition Red | Beyond the LawInc.; Marianna Films Oy; and Oak Island Films | Letter Agreement, dated as of January 4, 1995, by and among Overseas Filmgroup, Inc.; Beyond the Law, Inc.; Marianna Films Oy; and Oak Island Films, Inc.<br><br>Amendment, dated as of January 4, 1995, by and among Overseas Filmgroup, Inc.; Beyond the Law, Inc.; Marianna Films Oy; and Oak Island Films, Inc.<br><br>Amendment, dated as of January 1, 1996, by and among Overseas Filmgroup, Inc.; Beyond the Law, Inc.; Marianna Films Oy; and Oak Island Films, Inc. |
| Conversations with My Mom | Primer Plano Film Group S.A. | Exclusive License & Distribution Agreement, dated as of April 7, 2005, by and between Ventura Entertainment Enterprises, LLC and Primer Plano Film Group S.A. |
| Convicted | Audley Films LLP | Acquisition Agreement, dated as of June 14, 2005, by and between DEJ Productions Inc. and Intandem Pictures, Ltd. as agent for Audley Films LLP. |
| Coronado | Coronado Motion Picture LLC | Acquisition Agreement, dated as of July 31, 2004, by and among DEJ Productions Inc.; Coronado Motion Picture LLC; and ARMS GmbH. |
| Costa Rican Summer | Surf Movie LLC | Letter Agreement, dated as of November 12, 2009, by and between First Look Studios, Inc. and Bleiberg Entertainment LLC as agent for Surf Movie LLC. |
| Countdown | Positive, Inc. | Distribution Agreement, dated as of February 1, 1996, by and between Overseas Filmgroup, Inc. and Positive, Inc. |
| Couple, The | Film and Music Entertainment | Acquisition Agreement, dated as of September 21, 2006, by and between First Look Studios, Inc. and Film and Music Entertainment. |
| Cover Story | Cover Story Films Inc. | Agreement, dated as of May 1, 2001, by and between First Look Media, Inc. and Cover Story Films Inc. |
| Crazy as Hell | Loose Screw, LLC | License Agreement, dated as of April 4, 2002, by and between Blockbuster Inc. and Loose Screw, LLC. |
| Crime Spree | Hannibal Pictures | Acquisition Agreement, dated as of October 21, 2002, by and between DEJ Productions Inc. and Hannibal Pictures, a California corporation.<br><br>Acquisition Agreement, dated as of August 15, 2003, by and between DEJ Productions Inc. and Hannibal Pictures, a California corporation.<br><br>Acquisition Agreement, dated as of October 21, 2002, by and between DEJ Productions Inc. and Hannibal Pictures, a California corporation. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Crush | Stalker Productions, LLC | Acquisition Agreement, dated as of October 11, 2012, by and between Millennium Entertainment, LLC and Stalker Productions, LLC. |
| Culling, The | The Culling LLC | Acquisition Agreement, dated as of June 23, 2014, by and between Naedomi Media, LLC and The Culling LLC. |
| Curse of the Komodo | Royal Oaks Entertainment, Inc. as agent for Buaja Productions, Inc. | Acquisition Agreement, dated as of October 2, 2002, by and between DEJ Productions Inc. and Royal Oaks Entertainment, Inc. as agent for Buaja Productions, Inc. |
| DAHMER | Infinityland Productions, LLC | Acquisition Agreement, dated as of December 26, 2001, by and between Blockbuster Inc. and Infinityland Productions, LLC.

Acquisition Agreement, dated as of August 30, 2002, by and between Blockbuster Inc. and Infinityland Productions, LLC. |
| Danger Zone III | Danger Zone III Film Partnership | Purchase Agreement, dated as of June 24, 1997, by and between Overseas Filmgroup, Inc. and Danger Zone III Film Partnership. |
| Danika | Danika, LLC | Acquisition Agreement, dated as of August 9, 2006, by and between First Look Studios, Inc. and Danika LLC.

First Amendment, dated as of December 7, 2007, by and between First Look Studios, Inc. and Danika, LLC. |
| Dark Descent | Unified Film Organization LLC | Acquisition Agreement, dated as of November 19, 2001, by and between Unified Film Organization LLC. |
| Dark Waters | Unified Film Organization LLC | Acquisition Agreement, dated as of February 14, 2002, by and between Blockbuster Inc. and Unified Film Organization LLC. |
| Darkroom | Weird Chief Pictures | Distribution Agreement, dated as of February 10, 2011, by and between Vanguard International Cinema and Weird Chief Pictures. |
| Day Zero | Indalo DZ, LLC | Acquisition Agreement entered into as of July 10, 2007 between First Look Studios, Inc. and Indalo DZ, LLC |
| Dead Girl, The | Lakeshore Entertainment Group | Short Form Distribution Agreement, dated as of September 12, 2006, by and between First Look Studios, Inc. and Lakeshore Entertainment Group LLC.

Settlement Agreement, dated as of October 5, 2007, by and among First Look Studios, Inc.; First Look Home Entertainment; and Lakeshore Entertainment Group, |
| Dead Heist | Swirl Recordings & Film Inc. | Acquisition Agreement, dated as of January 10, 2007, by and between First Look Studios, Inc. and Swirl Recordings & Film Inc. |
| Dead Within | United Independent Media, LLC | Distribution Agreement entered into as of March 3, 2014 by and between Millennium Entertainment, LLC and United Independent Media, LLC. |
| Deadline | Deadline, LLC | Acquisition Agreement, dated as of July 9, 2009, by and between First Look Studios, Inc. and Deadline, LLC. |
| Deadly Deception | Golden Sun S.A. | Rights Purchase Agreement (Motion Picture), dated as of November 7, 1991, by and between Overseas Film Group, Inc. and Golden Sun S.A. |
| Deathflash | United Entertainment Incorporated and A&Z Company Limited | Letter Agreement, dated as of October 15, 1995, by and among Overseas Filmgroup, Inc.; United Entertainment, Incorporated; and A & Z Company Limited. |

SCHEDULE 1

PICTURES AND DESIGNATED CONTRACTS

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Dedication | Dedicated ProductionsLLC c/o Sloss Law Office | Exclusive License Agreement, dated as of August 20, 2007, by and between First Look Studios, Inc. and Dedicated Productions, LLC. |
| Deep Evil | Unified Film Organization LLC | Acquisition Agreement, dated as of August 22, 2003, by and between DEJ Productions Inc. and Unified Film Organization LLC. |
| Deep Shock | Unified Film Organization LLC | Acquisition Agreement, dated as of February 14, 2002, by and between Blockbuster Inc. and Unified Film Organization. |
| Dempsey Sisters, The | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Deposition, The | Emphatic Films, LLC | Distribution Agreement, dated as of January 6, 2012, by and between Vanguard International Cinema and Emphatic Films, LLC. |
| Desert Saints | TV Pool Enterprises | Acquisition Agreement, dated as of January 24, 2002, by and between Blockbuster Inc. and TV Pool Enterprises, Inc. |
| Devious Beings | Silver Wing Pictures | Acquisition Agreement, dated as of March 18, 2002, by and between Blockbuster Inc. and Bruder Releasing, Inc. as agent for SilverWing Pictures. |
| Diamonds | Cinesun Internationale Filmproduktionsgesellschaft Mbh & Co. Erste Beteilingungs-KG | Distribution Agreement, dated as of October 15, 2000, by and between First LookMedia, Inc. and Cinesun Internationale Filmproduktionsgesellschaft mbH & Co. Erste Beteilingungs-KG. |
| Different for Girls | Changetech Limited | Distribution Agreement, dated as of October 16, 1996, by and between Overseas Filmgroup and Ciby Sales Limited as agent for Changetech Limited. |
| Dinosaur Island | Archlight Films International PTY Ltd. | Acquisition Agreement, dated as of February 2, 2015 by and between Millennium Entertainment, LLC and Archlight Films International PTY Ltd. |
| Dirty Love | D. Love Capital, LLC. | Acquisition Deal Memo, dated as of April 13, 2005, by and between First Look Media, Inc. and D. Love Capital, LLC. |
| Distant Justice | Distant Justice Joint Venture | Purchase Agreement, dated as of September 15, 1996, by and between Overseas Filmgroup, Inc. and Distant Justice Joint Venture. |
| Dog Soldiers | Kismet Entertainment Group | Agreement, dated as of February 14, 2002, by and between Blockbuster Inc. and Kismet Entertainment Group. |
| Donner Party, The | Westward Pictures, LLC | Agreement, dated as of September 1, 2009, by and between First Look Studios, Inc. and Westward Pictures, LLC. |
| DONOVAN'S ECHO | Stealth Media Group Ltd as an agent for Donovan's Echo Productions Inc. | Acquisition Agreement, dated as of October 9, 2012, by and between Naedomi Media, LLC and Donovan's Echo Productions Inc. |
| Dot.Kill | B/M Studios, Inc. as sales agent on behalf of BM Studios UK | License Agreement, dated as of March 15, 2004, by and between DEJ Productions Inc. and B/M Studios, Inc. as agent for BM Studios (UK) Limited. |
| Downhill Willie | C/FP Distribution | Co-Administration Agreement, dated as of December 15, 1994, by and between Overseas Filmgroup, Inc. and C/FP Distribution. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Dragon Fighter | Unified Film Organization LLC | Acquisition Agreement, dated as of February 14, 2002, by and between Blockbuster Inc. and Unified Film Organization. |
| Dragonstorm | Unified Film Organization LLC | Acquisition Agreement, dated as of January 31, 2003, by and between DEJ Productions Inc. and Unified Film Organization LLC.<br><br>First Amendment to Acquisition Agreement, dated as of May 22, 2003, by and between DEJ Productions Inc. and Unified Film Organization LLC. |
| Drawn to be Evil | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Dreams of Home | Mirage Entertainment Corporation, Ltd | Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup Inc. and Spectrum Entertainment Group PLC. |
| Drive | Road to Ruin, Inc. | Distribution Agreement, dated as October 16, 1995, by and between Overseas Filmgroup, Inc. and Road to Ruin, Inc.<br><br>Letter Amendment, dated as of March 26, 1996, by and between Overseas Filmgroup, Inc. and Road to Ruin, Inc. |
| Earthstorm | Reel One Entertainment | Acquisition Agreement, dated as of January 30, 2007, by and between First Look Studios, Inc. and Reel One Entertainment. |
| Earthtastrophe | Earthtastrophe Distribution, LLC | Acquisition Agreement, dated as of July 9, 2014, by and between Millennium Entertainment, LLC and Earthtastrophe Distribution, LLC. |
| EAT YOUR HEART OUT | Leora Films Inc. | Letter Agreement, dated as of July 15, 1996 by and between Overseas Filmgroup Inc. and Leora Films Inc. |
| Echo Drive | Fairway Film Alliance | Exclusive Distribution Agreement, dated as of February 27, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Elsa & Fred | Cuatro Plus Films LLC | Acquisition Agreement entered into as of February 10, 2014 by and between Millennium Entertainment, LLC and Cuatro Plus Films LLC. |
| Emmanuel's Gift | Lookalike Productions II LLC | Acquisition Deal Memo, dated as of June 1, 2005, by and between First Look Media, Inc. and Lookalike Productions II, Inc. c/o William Morris Independent. |
| Emperor's Wife, The | Emperor's Wife C.V. | International Sales Agency Agreement, dated as of October 17, 2002, by and between Overseas Filmgroup and Emperor's Wife, C.V. represented by Stichting Emperor's Wife and Internationale Filmproductie III B.V. |
| Employee of the Month | Lions Gate Films Inc. | Agreement, dated as of February 20, 2004, by and between DEJ Productions Inc. and Lions Gate Films Inc. |
| Empty | Broken Table Productions | Acquisition Agreement, dated as of March 16, 2011 by and between Vanguard International Cinema and Broken Table Productions. |
| Emulation | Fairway Film Alliance | Distribution Agreement, dated as of January 1, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Endure | Endure Pictures, LLC | Acquisition Agreement, dated as of November 30, 2010, by and between Naedomi Media, LLC and Endure Pictures, LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Entity | Brainstorm Media | Exclusive License Agreement, dated as of December 6, 2012, by and between DEJ Productions Inc. and Brainstorm Media. |
| Epoch | Unified Film Organization LLC | Acquisition Agreement, dated as of February 4, 2002, by and between Blockbuster Inc. and Unified Film Organization. |
| Esposito | Michael Vadini Productions | Agreement dated January 25, 2012 by and between Vanguard International Cinema and Michael Vadini Productions |
| Evelyn | Cineevelyn Internationale Filmproduktionsgesellschaft mbH & Co. 1 Beteiligungs-KG | Letter Agreement, dated as of August 27, 2001, by and between First Look Media, Inc. and Cineevelyn Internationale Filmproduktionsgesellschaft mbH & Co. 1 Beteiligungs-KG. |
| Evil Alien Conquerors | Nada Pictures, Inc. | Acquisition Agreement, dated as of July 25, 2003, by and between DEJ Productions Inc. and Nada Pictures, Inc. in care of Traction Media. |
| Exodus | Jinga Films Limited | Distribution Agreement, dated as of March 19, 2011, by and between Vanguard International Cinema and Jinga Films Limited. |
| Eye See You | Universal Pictures | License Agreement, dated as of January 31, 2002, by and between Blockbuster Inc. and Universal Pictures, a division of Universal City Studios, Inc. |
| Eyewitness | Hybrid, LLC | Distribution Agreement is entered into as of September 18, 2014 by and between Our Alchemy, LLC, a Delaware limited liability company and Hybrid, LLC |
| Faces in the Crowd | Voltage Pictures, LLC | Acquisition Agreement, dated as of August 5, 2011, by and between Millennium Entertainment, LLC and Voltage Pictures, LLC as agent for Clandestine Service, |
| Fading Gigolo | Zuzu Licensing, LLC | Acquisition Agreement entered into as of December 9, 2013 by and between Millennium Entertainment, LLC and Zuzu Licensing, LLC. |
| Fair Game (1989) | Eidoscope International | Distribution Agreement, dated as of December 31, 1991, by and between Overseas Filmgroup, Inc. and Eidoscope International.<br><br>Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup Inc. Spectrum Entertainment Group PLC. |
| Fake | Fake, LLC | Acquisition Agreement, dated as of July 21, 2011, by and between Millennium Entertainment, LLC and Fake, LLC. |
| Falling Sky | Unified Film Organization LLC | Acquisiton Agreement made as of January 31, 2003 between DEJ Productions Inc. and Unified Film Organization LLC |
| Family Reunion | Bullseye Entertainment Group | Financing and Distribution Agreement, dated as of March 8, 1988, by and between Spectrum Entertainment Limited and Bullseye Entertainment Group.<br><br>Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup Inc. and Spectrum Entertainment |
| Fanny, Annie and Danny | CB Films | Distribution Agreement, dated as of November 16, 2011, by and between Vanguard International Cinema and CB Films. |

SCHEDULE 1

PICTURES AND DESIGNATED CONTRACTS

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Far Side of Jericho, The | Further Productions, LLC | Acquisition Agreement, dated as of January 10, 2007, by and between First Look Studios, Inc. and Further Productions LLC.<br><br>First Amendment to Acquisition Agreement, dated as of December 5, 2007, by and between First Look Studios, Inc. and Further Productions LLC. |
| Fare, The | B:J Films Pty Ltd. | Letter Agreement, dated as of May 26, 2004, by and between First Look Media, Inc. and B:J Films PTY LTD. |
| Fear of the Darkness | Archlight Films International PTY Ltd. | Acquisition Agreement, dated as of March 31, 2015, by and between Millennium Entertainment, LLC and Archlight Films International PTY Ltd. |
| Ferryman, The | New Zealand Film Commission, TF Productions and Atlantic Film Productions Limited | Letter Agreement, dated as of February 1, 2007, by and among First Look Studios, Inc.; New Zealand Film Commission; TF Productions Limited; and Atlantic Film Productions Limited. |
| Final Round | Final Round Productions, Inc. | Distribution Agreement, dated as of May 27, 1992, by and between Overseas Filmgroup, Inc. and Final Round Productions, Inc.<br><br>Agreement, dated as of May 27, 1992, by and between Overseas Filmgroup, Inc. and Final Round Productions, Inc. |
| Finding Noah | 17K ASL LLC | This Acquisition Agreement is entered into as of June 30, 2015 by and between Our Alchemy, LLC, a Delaware limited liability company and 17K ASL LLC. |
| Fine Gold | Jose antonio de la Loma | Sales Agency Agreement, dated as of August 28, 1987, by and between The Overseas Filmgroup, Inc. and Jose Antiono de la Loma. |
| First Born | IEG VS Distribution LLC | Acquisition Agreement, dated as of July 14, 2006, by and between First Look Studios, Inc. and IEG VS Distribution LLC. |
| Fist 2 Fist 2: Weapon of Choice | Fairway Film Alliance | Exclusive Distribution Agreement, dated as of February 27, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Fly the Dragon (Part III) | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| For Members Only | Cleminternazionale Cinematorgrafica | Short-Form License, executed as of January 9, 1995, by and between Overseas Filmgroup, Inc. and Cleminternazionale Cinematografica. |
| Forecaster, The | Random Media Holdings LLC | Distribution Agreement is entered into as of April 30, 2015 by and between Our Alchemy, LLC, a Delaware limited liability company, and Random Media Holdings, LLC |
| Foreign Land | Random Media Holdings LLC | Distribution Agreement is entered into as of April 30, 2015 by and between Our Alchemy, LLC, a Delaware limited liability company, and Random Media Holdings, LLC |
| Forty Shades of Blue | Capital Entertainment Enterprises, Inc. | Acquisition Agreement is entered into as of April 15, 2005 between Capital Entertainment Enterprises, Inc. and Forty Shades of Blue, LLC. |

PICTURES AND DESIGNATED CONTRACTS

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Four Sheets to the Wind | Four Sheets to the Wind, LLC | Acquisitions Agreement, dated as of February 27, 2007, by and between First Look Studios, Line and Four Sheets to the Wind, LLC. |
| Freeze Frame | Parallel World Production Ltd | Acquisition Deal Memo, dated as of July 21, 2004, by and between First Look Media, Inc. and Parallel World Production, Ltd. c/o The Film Sales Company. |
| Friend Request | Random Media Holdings LLC | Distribution Agreement is entered into as of April 30, 2015 by and between Our Alchemy, LLC, a Delaware limited liability company, and Random Media Holdings, LLC |
| Frightening, The | The Frightening, LLC | Acquisition Agreement, dated as of December 13, 2001, by and between Blockbuster Inc. and The Frightening, LLC. |
| Gacy: The Crawl Space | Rillington Productions, LLC | Acquisition Agreement made as of August 30, 2002 by and between DEJ Productions and Rillington Productions, LLC |
| Gang Of Roses | Roses and Guns, LLC | Agreement, dated as of August 30, 2002, by and between Blockbuster Inc. and Roses and Guns, LLC.<br><br>First Amendment to Acquisition Agreement, dated as of November 7, 2002, by and between Blockbuster Inc. and Roses and Guns, LLC.<br><br>Second Amendment to Agreement, dated as of September 1, 2003, by and between Blockbuster Inc. and Roses and Guns, LLC. |
| George A. Romero Presents Deadtim| Showcase Entertainment, Inc. | Acquisition Agreement, dated as of March 16, 2011, by and between Millennium Entertainment, LLC and Showcase Entertainment, Inc. |
| George A. Romero Presents Deadtim| Showcase Entertainment, Inc. | Acquisition Agreement, dated as of March 16, 2011, by and between Millennium Entertainment, LLC and Showcase Entertainment, Inc. |
| George and the Dragon | Accentures Holding Inc. | Acquisition Agreement, dated as of December 11, 2006, by and between First Look Studios, Inc. and Accentures Holding Inc. |
| Get2gether, A | A Get2Gether, Inc. | Acquisition Agreement, dated as of January 2, 2007, by and between First Look Studios, Inc. and A Get2Gether, Inc. |
| Ginger Snaps | Unapix Enertainment Inc. DIP | Letter Agreement, dated as of July 1, 2002, by and between Blockbuster Inc. and Unapix Entertainment, Inc. DIP. |
| GIRL FROM THE NAKED EYE, THE | Archstone North America, LLC | Exclusive Distribution Agreement, dated as of September 26, 2014, by and between Millenium Media Services, Inc. and Archstone North America, LLC.<br><br>First Amendment to the Agreement is entered into agreement on July 1, 2015 by and between Archstone Distribution, LLC and Raging Picturs, Ltd. |
| Glass Trap | Unified Film Organization LLC | Acquisition Agreement, dated as of August 22, 2003, by and between DEJ Productions Inc. and Unified Film Organization LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Godmoney | Pierson-Doane, Inc. D/B/A Royal Films | Distribution Agreement, dated as of January 15, 1997, by and between Overseas Filmgroup, Inc. and Pierson-Doane, Inc. doing business as Royal Films. |
| Good Night to Die, A | Regent Worldwide Sales, LLC | Acquisition Agreement, dated as of June 18, 2002, by and between Blockbuster Inc. and Regent Worldwide Sales, LLC. |
| Graduation Day | LEGACY ENTERTAINMENT, INC. | Video Distribution Agreement made on May 3, 2004 by and between Legacy Entertainment, Inc. and Ventura Distribution, LLC. |
| Grand Theft Parsons | Swipe Films, LLC | Acquisition Agreement, dated as of January 30, 2004, by and among DEJ Productions Inc.; Swipe Films, LLC; and Morty-Stevie G Productions, LLC. |
| Grind | Kodiak Productions, LLC | Letter Agreement, dated as of February 14, 1996, by and between Overseas Filmgroup and Kodiak Productions, LLC. |
| Guide To Recognizing Your Saints | Steerpike Films Limited/Original Media LLC/CDM Properties LLC ( A Guide TRYS LLC acting as attorney in fact) | Acquisition Agreement, dated as of February 1, 2006, by and between First Look Studios, Inc. and A Guide TRYS LLC as attorney-in-fact for Steerpike Films Limited; Original Media, LLC; and C.D.M. Properties, LLC.

First Amendment, dated as of August 2006, by and between First Look Studios, Inc. and A Guide TRYS LLC. |
| Guncrazy | Laughing Dog, Inc. | Distribution Agreement, dated as of November 7, 1991, by and between Overseas Filmgroup, Inc. and Laughing Dog, Inc.

Purchase Agreement, dated as of January 15, 1997, by and between Overseas Filmgroup, Inc. and Laughing Dog, Inc. |
| Guns And The Fury, The | United Entertainment Incorporated and A&Z Company Limited | Letter Agreement, dated as of October 15, 1995, by and among Overseas Filmgroup, Inc.; United Entertainment, Incorporated; and A & Z Company Limited. |
| Guy X | Movision 71-82 Film Partnerships, Movision 85-93 Film Partnerships, Movision 95-97 Film Parnerships, Movision 100-102 Film Partnerships | Acquisition Agreement, dated as of May 10, 2007, by and between First Look Studios, Inc. and The Works TSC Limited trading as TheWorks International as agent for Movision 71 – 82 Film Partnerships; Movision 85 – 93 Film Partnerships; Movision 95 – 97 Film Partnerships; and Movision 100 – 102 Film Partnerships, acting through their managing partner, Movision Entertainment Limited.

Settlement Agreement, dated as of December 8, 2008, by and between First Look Studios, Inc. and The Works TSC Limited trading as TheWorks International as agent for Movision 71 – 82 Film Partnerships; Movision 85 – 93 Film Partnerships; Movision 95 – 97 Film Partnerships; and Movision 100 – 102 Film Partnerships, acting through their managing partner, Movision Entertainment Limited. |
| Half Light | Half-Light LLC | Agreement, dated as of June 15, 2005, by and between D.E.J. Productions Inc. and Half-Light LLC. |
| Hangman | Hiding in the Attic, LLC | Acquisition Agreement is entered into as of April 23, 2015 by and between Our Alchemy, LLC, and Hiding in the Attic, LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Hardcase & Fist | United Entertainment Incorporated and A&Z Company Limited | Letter Agreement, dated as of October 15, 1995, by among Overseas Filmgroup, Inc.; United Entertainment, Incorporated; and A & Z Company Limited. |
| Harpies | Another Time, Inc. | Distribution Agreement, dated as of May 7, 2013, by and between Millennium Entertainment, LLC and Another Time, Inc.

First Amendment to Acquisition Agreement dated as of November 22, 2013 by and between Millennium Entertainment and Another Time, Inc. |
| Harvard Man | FENB Film Corp. | Acquisition Agreement, dated as of December 13, 2001, by and between Blockbuster Inc. and FENB Film Corp. |
| Heal Me | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Healer, The | Artoko Film GMbH & Co. Filmproduktions KG | Letter Agreement, dated as of June 15, 2001, by and between First Look Media, Inc. and Artoko Film GmbH & Co. Filmproduktions KG. |
| Heaven Can Help | United Entertainment Incorporated and A&Z Company Limited | Letter Agreement, dated as of October 15, 1995, by and among Overseas Film Group, Inc.; United Entertainment, Incorporated; and A & Z Company Limited. |
| Hell Baby | Darko Entertainment LLC | Acquisition Agreement, dated as of April 1, 2013, by and between Millennium Entertainment, LLC and Darko Entertainment LLC. |
| Her Minor Thing | HMT Entertainment, LLC | Acquisition Agreement, dated as of June 19, 2006, by and between First Look Studios, Inc. and HMT Entertainment, LLC. |
| Heroes Three | Bonaire Films Inc. | Letter Agreement, dated as of February 16, 1993, by and among Overseas Filmgroup, Inc., Bonaire Films, Inc., and Roy McAree, an individual. |
| Hey Japanese | Ostrow & Co. | Agreement dated February 15, 2012 by and between Vanguard International Cinema and Ostrow & Company |
| Heylin Within | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| High Road | High Road Productions LLC | Acquisition Agreement, dated as of July 25, 2011, by and between Millennium Entertainment, LLC and High Road Productions LLC.

First Amendment to Acquisition Agreement dated as of March 6, 2014 by and between High Road Productions LLC and Millennium Entertainment, LLC. |
| Hollow, The | The Hollow, LLC | Acquisition Agreement, dated as of January 28, 2004, by and between DEJ Productions Inc. and The Hollow, LLC. |
| Hollywood Dreaming | Smart Alec Productions | Distribution Agreement, dated as of December 13, 1986, by and between Spectrum Entertainment Ltd. and Smart Alec Productions LTD.

Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup, Inc. and Spectrum Entertainment Group PLC. |
| Hollywood Vice Squad | Destination Cinema, Inc. | Purchase Agreement, dated as of April 28, 1992, by and between Overseas Filmgroup, Inc. and Destination Cinema, Inc. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Home Room | Homeroom LLC | Acquisition Agreement, dated as of July 30, 2002, by and between DEJ Productions Inc. and Homeroom LLC. |
| Home Run | Home Run Movie, LLC | Acquisition Agreement, dated as of March 14, 2013, by and between Millennium Entertainment, LLC and Home Run Movie, LLC.<br><br>First Amendment to Acquisition Agreement dated as of September 10, 2013 by and between Millennium Entertainment, LLC and Home Run Movie, LLC. |
| Honey For Oshun | Cinematográfica Macondo, S. A. de C. V | Acquisition Agreement, dated as of April 10, 2003, by and between DEJ Productions Inc. and Cinematográfica Macondo, S. A. de C. V. |
| How to Build A Rapper | Anacost Films LLC | Agreement dated November 30, 2010 by and between Vanguard International Cinema and Anacost Films LLC |
| Howl | Silver Bullet Films Limited | Acquisition Agreement, dated as of April 29, 2015, by and between Our Alchemy, LLC and Silver Bullet Films Limited. |
| Hypersonic | Unified Film Organization LLC | Acquisition Agreement, dated as of August 22, 2003, by and between DEJ Productions Inc. and Unified Film Organization LLC. |
| I Accuse | Cinetel Films, Inc. | Acquisition Agreement, dated as of April 12, 2004, by and between DEJ Productions Inc. and CineTel Films, Inc. |
| ICE Agent | Artist View Entertainment, Inc. | Acquisition Agreement, dated as of December 12, 2013, by and between Naedomi Media, LLC and ArtMedia Ltd. |
| Icetastrophe | Ice Cap Pictures, Inc. | Acquisition Agreement, dated as of July 9, 2014, by and between Millennium Entertainment, LLC and Ice Cap Pictures, Inc. |
| Illegally Yours | DLQ Filmworks, Inc. | Quitclaim, Assumption and Bill of Sale Agreement, dated as of October 17, 1996, by and between Overseas Filmgroup and DLQ Filmworks, Inc. |
| Illuminata | Illuminata, Inc. | Distribution Agreement, dated as of April 28, 1997, by and between Overseas Filmgroup, Inc. and Illuminata, Inc. |
| In A Dark Place | DP Films Limited and Tarantula sarl | Acquisition Agreement, dated as of December 20, 2005, by and between First Look Studios, Inc. and Armada Pictures International, LLC as agent for DP Films Limited and Tarantula sarl.<br><br>Amendment No. 1 to Acquisition Agreement, dated as of 2006, by and between First Look Studios, Inc. and Armada Pictures International, LLC as agent for Tarantula sarl and DP Films Limited.<br><br>Amendment No. 2 to Acquisition Agreement, dated as of 2006, by and between First Look Studios, Inc. and Armada Pictures International, LLC as agent for Tarantula sarl and DP Films Limited. |
| In Search of the Pantanal | The Dreaming Tree | Agreement dated October 28, 2010 by and between Vanguard International Cinema and The Dreaming Tree |

**SCHEDULE 1**

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Infestation | Icon Distribution, LLC | Agreement, dated as of May 8, 2009, by and between First Look Studios, Inc. and Icon Distribution, LLC.<br><br>Assumption and Amendment Agreement effective as of July 1, 2014 by and between Millennium Entertainment, LLC and Icon Distribution LLC. |
| Infinity | Rockaway Productions, Inc. | Distribution Agreement, dated as of June 17, 1994, by and between Overseas Filmgroup, Inc. and Rockaway Productions, Inc. |
| Innocents | Cineinnocent Internationale Filmproduktionsgesellschaft MBH & CO. Erst Beteilungs-KG | Distribution Agreement, dated as of June 30, 2001, by and between First Look Media, Inc. and Cineinnocent Internationale Filmproduktionsgesellschaft mbH & Co. Erste Beteilingungs-KG. |
| INSIDE | Inside Movie, LLC through its agent HIGHLAND FILM GROUP c/o Kilter Films LLC | Acquisition Agreement, dated as of November 12, 2013, by and between Naedomi Media, LLC and Inside Movie, LLC. |
| Into Temptation | Arsenal Pictures Distribution, LLC | Acquisition Agreement, dated as of April 23, 2009, by and between First Look Studios, Inc. and Arsenal Pictures Distribution, LLC. |
| Into the Abyss | MPI MEDIA GROUP | Agreement dated May 7, 2006 by and between Ventura Home Entertainment, Inc. and Malijack Productions, Inc., dba MPI Home Video |
| Intruders | Apaches Entertainment SL | Term Sheet, effective as of September 26, 2011 by and among Millennium Entertainment, LLC, Apaches Entertainment, S.L., and 3 Films, S.L.U. |
| Invisible Maniac | Smoking Gun Pictures | Acquisition Term Sheet, dated as of August 28, 2007, by and between First Look Studios, Inc. and Smoking Gun Pictures. |
| Irresistible | Irresistible UK Limited | Acquisition Deal Memo, dated as of November 8, 2005, by and between First Look Studios, Inc. and Intandem Pictures Limited as agent for Irresistible UK Limited. |
| Island | Nikki Black Films Limited | Indpendent Movie Distirbution Agreement dated December 4, 2012 by and between Anderson Digital LLC and Nikki Black Films Limited |
| Island of the Dead | Unapix Enertainment Inc. DIP | Letter Agreement, dated as of July 1, 2002, by and between Blockbuster Inc. and Unapix Entertainment, Inc. DIP. |
| Isolation | Lions Gate Films International | Acquisition Agreement, dated as of November 17, 2006, by and between First Look Studios, Inc. and Lions Gate Films International. |
| James Cameron's Deepsea Challenge | Disruptive DSC, LLC | Acquisition Agreement, dated as of May 8, 2014, by and between Millennium Entertainment, LLC and Disruptive DSC, LLC. |
| James White | The Film Arcade, LLC | Acquisition Agreement, dated as of November 1, 2015, by and between Our Alchemy, LLC and LThe Film Arcade, LLC. |
| Jimmy Show, The | Conversations Productions; Jimmy Productions, Inc; Stonelock Pictures LLC; Beni Atoori; Echo Lake Productions, LLC | Letter Agreement, dated as of February 9, 2001, by and among First Look Media, Inc.; Jimmy Productions, Inc.; Conversation Productions, Inc.; Stonelock Pictures LLC; Beni Atoori; and Echo Lake Productions, LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Job, The | The Job LLP | License Agreement, dated as of August 18, 2003, by and between DEJ Productions Inc. and Mainline Releasing, Inc. as agent for The Job, LLP. |
| Johnny Was | Was Productions LTD | Acquisition Agreement, dated as of April 18, 2006, by and between First Look Studios, Inc. and Nordisk Film A/S as agent for Was Productions LTD. |
| Jonathan of the Bears | Viva Cinematographica s.r.l. | Letter Agreement, dated as of April 15, 1993, by and between Overseas Filmgroup, Inc. and Viva Cinematographica s.r.l. |
| K-9 Adventures: Legend of the Lost G | HIGHLAND FILM GROUP c/o Kilter Films LLC | Exclusive Distribution Agreement dated July 1, 2015 by and between Our Alchemy, LLC and Kilter Films, LLC. |
| Khumba | Khumba Film Pty | Acquisition Agreement, dated as of October 10, 2012, by and between Millennium Entertainment, LLC and Cinema Management Group LLC as agent for Khumba Film (Pty) Ltd.<br><br>Amendment, dated as of March 19, 2013, by and between Millennium Entertainment, LLC and Cinema Management Group LLC as agent for Khumba Film (Pty) Ltd.<br><br>Second Amendment, dated as of April 30, 2013, by and between Millennium Entertainment, LLC and Cinema Management Group LLC as agent for Khumba Film (Pty) Ltd.<br><br>Amended and Restated Third Amendment, dated as of September 16, 2013 by and between Millennium Entertainment, LLC and Cinema Management Group LLC as agent for Khumba Film (Pty) Ltd. |
| Kidnapping Mr. Heineken | Heineken Finance, LLC | Acquisition Agreement, dated as of August 23, 2013, by and between Millennium Entertainment, LLC and Heineken Finance, LLC. |
| Kill Line | Rocky Group, Inc. | Purchase Agreement, dated as of July 18, 1996, by and between Overseas Filmgroup, Inc. and Rocky Group, Inc. |
| Kill Switch | Learned Productions, Inc. | Distribution Agreement, dated as of July 18, 2007, by and between First Look Studios, Inc. and Learned Productions Inc. |
| King of the Ants | The Global Asylum, Inc. | Acquisition Agreement, dated as of July 25, 2003, by and between DEJ Productions, Inc. and The Global Asylum, Inc. |
| King of The Avenue | Iron Hog Motion Pictures LLC | Acquisition Agreement, dated as of September 1, 2010, by and between First Look Studios, Inc. and Iron Hog Motion Pictures LLC.<br><br>Assumption Agreement, dated as of November 19, 2010, by and between Millennium Entertainment, LLC and Iron Hog Motion Pictures, LLC. |
| Kovak Box, The | Sociedad General de Derechos Audiovisuales S.A. | Acquisition Agreement, dated as of October 27, 2006, by and between First Look Studios, Inc. and Sociedad General de Derechos Audiovisuales, S.A. |
| Krivina | Princ Films | Distribution Agreement, dated as of February 11, 2013, by and between Anderson Digital, LLC, and Princ Films, Inc. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| La Fragilidad de los Segundos (The Fr | Mystic Pictures LLC | Distribution Agreemenet entered into as of May 1, 2010 by and between Vanguard Internations Cinema and Mystic Pictures, LLC |
| La Tigra, Chaco | Primer Plano Film Group S.A. | Distribution Agreement, dated as of December 16, 2011 by and between Vanguard International Cinema, and Primer Plano Film Group S.A. |
| Ladies Book Club | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Land Speed | Unified Film Organization LLC | Acquisition Agreement, dated as of November 19, 2001, by and between Blockbuster Inc. and Unified Film Organization LLC. |
| Last Soul on a Summer Night, The | Rogue Arts, LLC | Exclusive Distribution Agreement, dated March 22, 2012 Vanguard International and Rogue Arts, LLC |
| Last Treasure Hunt, The | Random Media Holdings LLC | Distribution Agreement is entered into as of April 30, 2015 by and between Our Alchemy, LLC, a Delaware limited liability company, and Random Media Holdings, LLC |
| Late Rounders | Suarez Corporation Industries | Distribution Agreement dated November 29, 2011 between Vanguard International Cinema and Suarez Corporation Industries |
| Lavalantula | Valiant Days Distribution, LLC | Acquisition Agreement, dated as of July 9, 2015, by and between Millennium Entertainment and Caliant Days Distribution, LLC. |
| Lawn Boy, The | Mystic Pictures LLC | Distribution Agreemenet entered into as of January 18, 2012 by and between Vanguard Internations Cinema and Mystic Pictures, LLC |
| Laws of Nature | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| LEAVE | Visualeyes Productions, LLC | Acquisition Agreement, dated as of April 27, 2012, by and between Naedomi Media, LLC and Visualeyes Productions LLC. |
| LEGEND OF THE RED REAPER | Reel Heroine! LLC Sales Agent: Event Film Inc. | Acquisition Agreement, dated as of January 18, 2013, by and among Naedomi Media, LLC.and Reel Heroine! LLC, through its agent and authorized signatory Event Film, Inc. |
| Lies & Crimes | Chesler/Perlmutter Productions, Inc. | Acquisition Agreement, dated as of September 15, 2006, by and between First Look Studios, Inc. and Chesler/Perlmutter Production Inc. |
| Life of a King | Life of a King, LLC | Acquisition Agreement entered into as of September 6, 2013 by and between Millennium Entertainment, LLC and Life of a King, LLC. |
| Linkin Park: Frat Party At The Pankak | Warner Music Group | Assumption Agreement entered into and effective as of November 19, 2010 by and among Warner Bros. Digital Distribution and Millennium Entertainment, LLC. |
| Little Birds | Goodnight Moon Film, LLC | Acquisition Agreement, dated as of May 19, 2011, by and between Millennium Entertainment, LLC and Goodnight Moon Film, LLC. |
| Little Bit Of Heaven, A | Earthbound Films, LLC | Acquisition Agreement, dated as of February 2, 2012, by and between Millennium Entertainment, LLC and Earthbound Films, LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Little Fish | Myriad Pictures, Inc. | Acquisition Agreement, dated as of December 5, 2005, by and between First Look Studios, Inc. and Myriad Pictures Inc. |
| Little Red | Loch Raven Films, LLC | Acquisition Agreement, dated as of August 30, 2001, by and between Blockbuster Inc. and Loch Raven Films, LLC. |
| Little Trip To Heaven, A | A Little Trip To Heaven, EHF | Acquisition Agreement, dated as of August 7, 2006, by and between First Look Studios, Inc. and A Little Trip to Heaven, EHF.<br><br>Amendment I, dated as of August 7, 2006, by and between First Look Studios, Inc. and A Little Trip to Heaven, EHF. |
| LIZZIE | Dark Morgue Pictures, LLC c/o Highland Film Group, LLC | Acquisition Agreement, dated as of August 7, 2012, by and between Naedomi Media, LLC and Dark Morgue Pictures, LLC. |
| Local Boys | Runner Productions, Inc. and Local Boys, LLC and Ron Moler | Letter Agreement, dated as of January 1, 2005, by and among First Look Media, Inc.; Runner Productions, Inc.; Local Boys, LLC; Ron Moler. |
| Lockdown | Moon Aire Productions, Inc. | Letter Agreement, dated as of January 20, 2001, by and between First Look Media, Inc. and Moon Aire Productions, Inc. |
| Locksmith, The | Homewrecker Film | Agreement, dated as of June 23, 2010, by and between First Look Studios, Inc. and Homewrecker Film, LLC.<br><br>Assumption Agreement, dated as of Millennium Entertainment, LLC and Homewrecker Film, LLC. |
| LOST AND FOUND IN ARMENIA | Red Tie Films | Acquisition Agreement, dated as of October 29, 2012, by and between Naedomi Media, LLC and Red Tie Films, |
| Lost Voyage | Unified Film Organization LLC | Acquisition Agreement, dated as of November 19, 2001, by and between Blockbuster Inc. and Unified Film Organization. |
| Love | Wild Bunch S.A. | Acquisition Agreement, dated as of April 8, 2015, by and between Our Alchemy, LLC and Wild Bunch S.A. |
| Love Come Down | Unapix Enertainment Inc. DIP | Letter Agreement, dated as of July 1, 2002, by and between Blockbuster Inc. and Unapix Entertainment, Inc. DIP. |
| Love Letter, The | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Love Trap | Love Trap Productions, LLC | Acquisition Agreement, dated as of July 5, 2006, by and between First Look Studios, Inc. and Love Trap Productions, LLC.<br><br>First Amendment, dated as of January 4, 2007, by and between First Look Studios, Inc. and Love Trap Productions, LLC. |
| Love Won't Let Me Wait | Swirl Recording & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Lover's Prayer | Reverge Anselmo | Purchase Agreement, dated as of December 13, 2004, by and between First LookMedia, Inc. (formerly known as Overseas Filmgroup, Inc.) and Reverge Anselmo. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Lower Level | Neo Motion Pictures, Inc. | Distribution Agreement, dated as of August 28, 1990, by and between Overseas Filmgroup, Inc. and Neo Motion Pictures, Inc. |
| Lyfe's Journey | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Madame Bovary | Bovary Distribution Limited | Acquisition Agreement, dated as of July 23, 2013, by and between Millennium Entertainment, LLC and Bovary Distribution Limited. |
| MAFIA | Archstone North America, LLC | Exclusive Distribution Agreement, dated as of September 26, 2014, by and between Millenium Media Services, Inc. and Archstone North America, LLC.<br><br>First Amendment to the Agreement is entered into agreement on July 1, 2015 by and between Archstone Distribution, LLC and Raging Picturs, Ltd. |
| Magic Stallion and the Wild Wild We | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Mama Sweetie | Nimo Mathenge & Beth Turton | Agreement dated December 16, 2009 by and between Vanguard International Cinema and Nimo Mathenge & Beth Turton |
| Maniac Cop II | Medusa Communications and Marketing | Purchase Agreement, dated as of July 31, 1996, by and between Overseas Filmgroup, Inc. and Medusa Communications, Limited.<br><br>Assignment of All Rights (Including Copyright), dated as of November 21, 1996, by and between Overseas Filmgroup, Inc. and The Production Line Sales Company. |
| Maniac Cop III: Badge of Silence | Footstone, Inc. | Distribution Agreement, dated as of January 14, 1992, by and between Overseas Filmgroup, Inc. and Footstone, |
| Map Of The World | Cinemap Internationale Filmproduktionsgesellscaft 1. Beteiligungus KG | Distribution Agreement, dated as of March 24, 1998, by and between Overseas Filmgroup, Inc. and Cinemap Internationale Filmproduktionsgesllschaft 1. Beteilgungus KG. |
| Married People Single Sex: The Retur | New City Releasing, Inc. | Acquisition Agreement, dated as of May 17, 2002, by and between Blockbuster Inc. and New City Releasing, |
| Married People Single Sex: Urban Ad | New City Releasing, Inc. | Acquisition Agreement, dated as of May 17, 2002, by and between Blockbuster Inc. and New City Releasing, |
| Marry Me for Christmas | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Maximum Velocity | Unified Film Organization LLC | Acquisition Agreement, dated as of February 14, 2002, by and between Blockbuster Inc. and Unified Film Organization. |
| Mayor of Sunset Strip | Caldera Productions | Distribution Agreement, dated as of June 24, 2003, by and between First Look Media, Inc. and Caldera Productions. |
| Medium Straight | Adam Friedman Associates, Inc. | Sales Agency Agreement, dated as of March 29, 1989, by and between Overseas Filmgroup, Inc and Adam Friedman Associates, Inc. |
| Meet The Patels | Four In a Billion Pictures, LLC | Acquisition Agreement, dated as of February 20, 2015, by and between Millenium Entertainment, LLC and Four in a Billion Pictures, LCC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Mercy Rule | SONY MUSIC ENTERTAINMENT | Distribution Agreement dated September 23, 2010 by and between Millennium Media Services, Inc. and Sony Network Entertainment International LLC |
| Merry War, A | Aspidistra Productions Limited | Distribution Agreement, dated as of February 27, 1997, by and between Overseas Filmgroup, Inc. and Aspidistra Productions Limited. |
| Messenger of the Truth, The | Messenger of the Truth, LLC | Acquisition Agreement, dated as of November 17, 2014, by and between Mellinnium Entertainment, LLC and Messenger of the Truth, LLC. |
| Method | DEJ PRODUCTIONS INC | Agreement, dated as of September 8, 2004, by and between DEJ Productions Inc. and Megalodon Inc.<br><br>First Amendment to Acquisition Agreement, dated as of November 14, 2003, by and between DEJ Productions Inc. and Megalodon Inc. |
| Mi Temple Mi Casa | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Michael Buble Meets Madison Square | Warner Music Group | Assumption Agreement entered into and effective as of November 19, 2010 by and among Warner Bros. Digital Distribution and Millennium Entertainment, LLC. |
| Midnight Heat | King Productions Inc. | Letter Agreement, dated as of January 31, 1991, by and among First Look Pictures, a division of Overseas Filmgroup, Inc.; King Productions Incorporated; Kandice King; and Lance King.<br><br>First Amendment, dated as of April 8, 1991, by and among First Look Pictures, a division of Overseas Filmgroup, Inc.; King Productions Incorporated; Kandice King; and Lance King.<br><br>Second Amendment, dated as of December 3, 1992, by and among First Look Pictures, a division of Overseas Filmgroup, Inc.; King Productions Incorporated; Kandice King; and Lance King. |
| Mind games | M.T.A. Productions Inc; Persik Productions Inc. | Distribution Agreement, dated as of March 26, 1989, by and between Spectrum Entertainment Group and M.T.A. Productions Inc; Persik Productions Inc. |
| Mindless Behavior: All Around The W | MB Films, LLC | Acquisition Agreement, dated as of March 15, 2013, by and between Millennium Entertainment, LLC and MB Films, LLC. |
| Miner's Massacre | Wanted Entertainment | License Agreement, dated as of April 30, 2003, by and between DEJ Productions Inc. and Wanted Entertainment. |
| Miss Conception | Blue Angel Films Ltd. and Miromar Entertainment | Agreement, dated as of February 19, 2008, by and among First Look Studios, Inc.; Blue Angel Films ltd; and Miromar Entertainment AG. |
| Missing William | Aloris Entertainment, LLC | Acquisition Agreement, dated as of October 30, 2012, by and between Naedomi Miedia, LLC and Aloris Entertainment, LLC. |
| Mission Manila | Primrose Path Limited | Sales Agency Agreement, dated as of December 9, 1986, by and between Overseas Filmgroup, Inc. and Primrose Path Limited. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Molly Moon | Molly Moon | Distribution Agreement, dated as of May 21, 2015, by and between ARC Entertainment, LLC and Molly Moon Films Ltd. |
| Mommy Market, The | Twentieth Century Fox | Term Sheet Acquisition of Distribution and Other Rights, dated as of September 30, 1992, by and among Overseas Filmgroup, Inc.; Mommy Market Productions, Inc.; and Twentieth Century Fox. |
| Mo'Nique: One Night Stand | MO'NIQUE IMES | Artist Agreement dated January 14, 2003 by and between Ventura Distribution Inc. d/b/a UrbanWorks Entertainment and Mo'Nique Imes-Jackson |
| Monster Island | Regent Worldwide Sales, LLC | Acquisition Agreement, dated as of June 1, 2004, by and between DEJ Productions Inc. and Regent Worldwide Sales, LLC. |
| Moo Moo and The Three Sisters | Synkronized US LLC | Exclusive Distribution Agreement dated May 1, 2012 by and between Millennium Media Services, Inc. and Synkronized US LLC |
| Moon 44 | Spectrum Entertainment Group PLC | Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup, Inc. and Spectrum Entertainment Group PLC. |
| More Married People Single Sex | New City Releasing, Inc. | Acquisition Agreement, dated as of May 17, 2002, by and between Blockbuster Inc. and New City Releasing, |
| Mr. Fix It | Chicaray Films, LLC | Acquisition Agreement, dated as of July 26, 2006, by and between First Look Studios, Inc. and Chicaray Films, LLC. |
| Mrs. Dalloway | Elphich Limited | Distribution/Collection Agreement, dated as of 1996, by and among Overseas Filmgroup, Inc.; Elphich Limited c/o Marill Accountancy Services; Newmarket Capital Group, L.P., European Co-Production Fund Limited; British Screen Rights Limited; Film Finances, Inc.; Stichting Bergen; the British Broadcasting Corporation; and Bill Shepherd Productions Limited c/o Harbottle & Lewis. |
| My Chemical Romance Life On the M | Warner Music Group | Assumption Agreement entered into and effective as of November 19, 2010 by and among Warner Bros. Digital Distribution and Millennium Entertainment, LLC. |
| My Dad's a Soccer Mom | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| My Date With Drew | Drew Crew, LLC | Acquisition Agreement, dated as of August 5, 2004, by and between DEJ Productions Inc. and Drew Crew, LLC. |
| My Five Wives | Blue RiderWorldwide Distribution, Inc. | Distribution Agreement, dated as of May 14, 1999, by and between My 5Wives (B.C.) Films Inc. and Blue Rider International, Inc.

Appointment as Sales Agent, dated as of November 2000, by and between Overseas Filmgroup, Inc. and Blue RiderWorldwide Distribution, Inc. |
| My House Is Full Of Mirrors | RAI Radiotelevisione Italiana S.p.A. | Distribution Agreement, dated as of November 29, 2011 by and between Vanguard International Cinema, and RAI Radiotelevisione Italiana S.p.A. |
| My Other Mother | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Naked Betrayal | New City Releasing, Inc. | Acquisition Agreement, dated as of May 2, 2002, by and between Blockbuster Inc. and New City Releasing, Inc. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Necromancer | Bonaire Films Inc. | Distribution Agreement, dated as of May 12, 1988, by and between Spectrum Entertainment Group PLC and Bonaire Films Inc. |
| Neighbor, The | The Neighbor Films | Acquisition Agreement, dated as of February 21, 2008, by and between First Look Studios, Inc. and The Neighbor Films, LLC.<br><br>First Amendment to Agreement, dated as of February 10, 2009, by and between First Look Studios, Inc. and The Neighbor Films, LLC.<br><br>Second Amendment to Agreement, dated as of April 7, 2009, by and between First Look Studios, Inc. and The Neighbor Films, LLC. |
| New York Cop | Distant Justice Joint Venture | Purchase Agreement, dated as of September 15, 1996, by and between Overseas Filmgroup, Inc. and Distant Justice Joint Venture. |
| Night Boats | Princ Films | Distribution Agreement, dated as of February 11, 2013, by and between Anderson Digital, LLC, and Princ Films, Inc. |
| Night of the Templar | Night of the Templar, LLC | Acquisition Agreement, dated as of August 12, 2012, by and between Naedomi Media, LLC and Night of the Templar, LLC. |
| Night Screams | Dill II Productions | Sales Agency Agreement, dated as of December 22, 1986, by and between The Overseas Filmgroup, Inc. and Dill II Productions, a limited partnership (Dill II Productions, Inc., general partner). |
| Ninja Apocalypse | Ninja Productions, LLC | Acquisition Agreement, dated as of May 19, 2014, by and between Naedomi Media, LLC and Ninja |
| Ninja Zombies | Fairway Film Alliance | Exclusive Distribution Agreement, dated as of February 27, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| No Safe Haven | No Safe Haven Limited Partnership | Motion Picture Purchase Agreement, dated as of January 27, 1989, by and between Overseas Filmgroup, Inc. and No Safe Haven Limited Partnership. |
| No Way Back | No Way, Inc. | Distribution Agreement, dated as of September 1, 1994, by and between Overseas Filmgroup, Inc. and No Way, Inc. |
| Nocturna | Industrial Entertainment Releasing, LLC | Acquisition Agreement, dated as of April 28, 2015, by and between Our Alchemy, LLC and Industry Releasing, |
| Now That's Funny | Tricoast Film Partners IV | Letter Agreement, dated as of November 22, 2002, by and between First Look Media, Inc. and Tricoast Production Partners IV. |
| Nugget, The | Nugget Films Pty Limited | Distribution Agreement, dated as of April 4, 2001, by and between First Look Media, Inc. and Nugget Films PTY Limited. |
| Obituary | Chesler/Perlmutter Productions, Inc. | Acquisition Agreement, dated as of September 15, 2006, by and among First Look Studios, Inc.; C/P Obituary Productions Inc.; and Chesler/Perlmutter Productions |
| Occupants, The | Brainstorm Media | Exclusive License Agreement, dated as of September 17, 2013 , by and between Lightening Entertainment Group and Brainstorm Media. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Omi Saves a Holiday | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| On the Edge | Po' Boy Productions, Inc. | Acquisition Agreement, dated as of April 9, 2001, by and between Blockbuster Inc. and Po'Boy Productions Inc. |
| On the Line | Amber Films, Inc. | Purchase Agreement, dated as of December 28, 1996, by and between Overseas Filmgroup, Inc. and Amber Films, Inc. |
| On the Wings of the Monarch | The Dreaming Tree | Agreement dated October 28, 2010 by and between Vanguard International Cinema and The Dreaming Tree |
| Once Fallen | Freedom Films Independent LLC | Acquisition Agreement, dated as of April 12, 2010, by and between First Look Studios, Inc. and Freedom Films Independent, LLC.<br><br>Assumption Agreement, dated as of November 19, 2010, by and between Millennium Entertainment, LLC and Freedom Films Independent, LLC. |
| One Good Turn | 4th Quarter Productions, Inc. | Distribution Agreement, dated as of November 1, 1994, by and between Overseas Filmgroup, Inc. and 4th Quarter Productions, Inc. |
| Operator (2015) | IP2 LLC | Acquisition Agreement, dated as of April 2, 2015, by and between Millennium Entertainment, LLC and IP2, LLC. |
| Out of Ping Pong's Mind | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Pact with the Devil | 9079-1849 Quebec Inc. | Acquisition Agreement, dated as of July 3, 2003, by and between DEJ Productions Inc. and Dream Rock Inc. as agent for 9079-1849 Quebec, Inc. |
| Pallet on the Floor | Mirage Entertainment Corporation, Ltd | Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup, Inc. and Spectrum Entertainment Group PLC. |
| Paranormal Asylum | Meridien Films, LLC | Acquisition Agreement, dated as of March 21, 2013, by and between Naedomi Media, LLC and Meridien Films, LLC. |
| Parasite | Shoreline Etertainment | Distribution Agreement, dated as of December 18, 2003, by and between First Look Media, Inc. and Shoreline Entertainment, Inc. |
| Paris | Paris Digital, LLC | Acquisition Agreement, dated as of September 22, 2003, by and between DEJ Productions Inc. and Paris Digital, LLC. |
| Paris Je T'aime | Victoires International S.A.S | Acquisition Agreement, dated as of August 25, 2006, by and between First Look Studios, Inc. and Victoires International S.A.S.<br><br>First Amendment to Acquisition Agreement, dated as of May 22, 2007, by and between First Look Studios, Inc. and Victoires International S.A.S. |
| Partners in Action | Hannibal Pictures, Inc. (GTF Absolon Films, Inc.) | Acquisition Agreement, dated as of July 25, 2003, by and between DEJ Productions Inc. and Hannibal Pictures Inc.<br><br>First Amendment to Acquisition Agreement, dated as of July 1, 2004, by and between DEJ Productions Inc. and Hannibal Pictures Inc. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Parts Per Billion | Parts Per Billion, LLC | Acquisition Agreement, dated as of November 25, 2012, by and between Millennium Entertainment, LLC and Parts Per Billion LLC.<br><br>First Amendment to Acquisition Agreement, dated as of August 6, 2013, by and between Millennium Entertainment, LLC and Parts Per Billion, LLC. |
| Party Girl | Party Pictures, Inc. | Letter Agreement, dated as of May 16, 1994, by and between Overseas Filmgroup, Inc. and Party Puctures, Inc.. |
| Party Monster | Content Film, Inc. | License Agreement, dated as of July 14, 2003, by and between DEJ Productions Inc. and Content Film, Inc. |
| Passion Crimes | New City Releasing, Inc. | Acquisition Agreement, dated as of May 2, 2002, by and between Blockbuster Inc. and New City Releasing, Inc. |
| Penthouse, The | Penthouse the Movie, LLC | Acquisition Agreement, dated as of August 13, 2009, by and between First Look Studios, Inc. and Penthouse the Movie, LLC. |
| People, Places, Things | The Film Arcade, LLC | Acquisition Agreement, dated as of August 12, 2015, by and between Our Alchemy, LLC and The Film Arcade, |
| Perfect Witness, The | The Ungodly, LLC | Acquisition Agreement, dated as of August 8, 2007, by and between First Look Studios, Inc. The Ungodly, LLC. |
| Pete's Christmas | Eh-Okay Entertainment | Distribution Agreement, dated as of March 7, 2013, by and between Arc Entertainment, LLC and Eh-Okay Entertainment, LLC |
| Picture This | Kino-Eye American | Agreement dated September 22, 2006 by and between Vanguard International Cinema and Kino-Eye American |
| Pinprick | Mystic Pictures LLC | Distribution Agreemeent entered into as of May 1, 2010 by and between Vanguard Internations Cinema and Mystic Pictures, LLC |
| Planet of the Dragons | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Player 5150 | Azurelite Pictures, Inc. | Acquisition Agreement, dated as of January 3, 2008, by and between First Look Studios, Inc. and Azurelite Pictures, Inc. |
| Plush | Plush Productions, LLC | Acquisition Agreement, dated as of June 26, 2013, by and between Millennium Entertainment, LLC and Plush Productions, LLC. |
| Possession | Rogue Arts, LLC | Distribution Agreement, dated as of March 9, 2012, by and between Vanguard International Cinema and Rogue Arts. |
| Post Impact | Unified Film Organization LLC | Acquisition Agreement, dated as of March 31, 2003, by and between DEJ Productions Inc. and Unified Film Organization LLC. |
| Pressure | Pressure, LLC | Acquisition Agreement, dated as of February 20, 2002, by and between Blockbuster Inc. and Pressure, LLC. |
| Prime of Your Life | Prime Of Your Life | Agreement, dated as of November 28, 2010, by and between Vanguard International Cinema and Prime Of Your Life. |
| Prince & Me 2: The Royal Wedding, T | Sobini Films | Agreement, dated as of June 6, 2005, by and between DEJ Productions Inc. and Sobini Films. |
| Princess Kaila of the Thousand Layer | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |

**SCHEDULE 1**

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Project: Human Weapon | Unified Film Organization LLC | Acquisition Agreement, dated as of November 19, 2001, by and between Blockbuster Inc. and Unified Film Organization. |
| Promise Kept, A | Curb Entertainment International Corporation | Distribution Agreement, dated as of December 2, 2003, by and between First Look Media, Inc. and Curb Entertainment. |
| Prophecy, The | Serafilm, Inc. | Purchase Agreement, dated as of August 5, 1993, by and between Overseas Filmgroup, Inc. and Serafilm, Inc. |
| Proposition, The | The Works | Acquisition Deal Memo, dated as of July 26, 2005, by and between First Look Media, Inc. and The Works. |
| Psychocop | Runnymede House Music | Acquisition Term Sheet, dated as of August 28, 2007, by and between First Look Studios, Inc. and RHM Inc. |
| Pumpkin Karver, The | Pumpkin Karver Productions | Acquisition Agreement, dated as of March 1, 2006, by and between First Look Studios, Inc. and Marquee Productions as agent for Pumpkin Karver Productions. |
| Pumpkinhead | DLQ Filmworks, Inc. | Quitclaim, Assumption and Bill of Sale Agreement, dated as of October 17, 1996, by and between Overseas Filmgroup and DLQ Filmworks, Inc. |
| Puncture | Safety Point Productions, LLC | Acquisition Agreement, dated as of June 3, 2011, by and between Millennium Entertainment, LLC and Safety Point Productions, LLC. |
| Purgatory Flats | American Cinema International | Acquisition Agreement, dated as of July 11, 2003, by and between DEJ Productions Inc. and American Cinema International. |
| Pursued | Trademark Entertainment, Inc. | Acquisition Agreement, dated as of December 14, 2004, by and between DEJ Productions Inc. and Trademark Entertainment, Inc. |
| Queen City Rocker | Mirage Entertainment Corporation, Ltd | Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup, Inc. and Spectrum Entertainment Group PLC. |
| Quicksand | Cinesun Internationale Filmproduktionsgesellschaft Mbh & Co. Erste Beteiligungs-KG | Letter Agreement, dated as of October 20, 2000, by and between First Look Media, Inc. and BGB Partnership |
| Ragamuffin | Rich Mullins The Movie, LLC | Acquisition Agreement entered into as of December 9, 2013 by and between Millennium Entertainment, LLC and Rich Mullins The Movie, LLC. |
| Ralphie May: Filthy Animal Tour | Fairway Film Alliance | Exclusive Distribution Agreement, dated as of February 27, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Rampart | End of Watch, LLC | Acquisition Agreement, dated as of November 1, 2011, by and between Millennium Entertainment, LLC and End ofWatch, LLC. |
| Random Acts of Violence | Coma Productions, LLC | Acquisition Agreement, dated as of April 16, 2013, by and between Naedomi Media, LLC and Coma Productions, LLC. |
| Rapid Exchange | Unified Film Organization LLC | Acquisition Agreement, dated as of February 14, 2002, by and between Blockbuster Inc. and Unified Film Organization. |

SCHEDULE 1

PICTURES AND DESIGNATED CONTRACTS

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Reach Me | Seraphim Films Productions, Inc. | Acquisition Agreement, dated as of March 29, 2013, by and between Millennium Entertainment, LLC and Seraphim Films Productions, Inc.<br><br>First Amendment to Acquisition Agreement, dated as of November 15, 2013, by and between Millennium Entertainment, LLC and Seraphim Films Productions, Inc. |
| Red Hot | Film Finances, Inc. | Distribution Agreement, dated as of December 7, 1995, by and between Overseas Filmgroup, Inc. and Film Finances, Inc. |
| Red Lights | VS Entertainment | Acquisition Agreement, dated as of January 24, 2012, by and between Millennium Entertainment, LLC and VS Entertainment.<br><br>Settlement Agreement and Release, dated as of March 13, 2013, by and between Millennium Entertainment, LLC and VS Entertainment, LLC. |
| Redrum | Redrum, LLC | Letter Agreement, dated as of April 27, 2007, by and between First Look Studios, Inc. and Redrum, LLC. |
| Remember the Daze | Beautiful Ordinary, LLC | Acquisition Agreement, dated as of January 4, 2008, by and between First Look Studios, Inc. and Beautiful Ordinary, LLC. |
| Resurrection, A | Archstone North America, LLC | Exclusive Distribution Agreement, dated as of September 26, 2014, by and between Millenium Media Services, Inc. and Archstone North America, LLC.<br><br>First Amendment to the Agreement is entered into agreement on July 1, 2015 by and between Archstone Distribution, LLC and Raging Picturs, Ltd. |
| Retrograde | The Konigsberg Company | Acquisition Agreement, dated as of March 30, 2010, by and between Millennium Entertainment, LLC and The Konigsberg Company. |
| Revelation | Romulus Films Limited | Sales Agency Agreement, dated as of October 24, 2000, by and between First Look Media, Inc. and Romulus Films Limited.<br><br>Amendment, dated as of December 1, 2002, by and between First Look Home Entertainment, a division of First Look Media, Inc. and Romulus Films Ltd. |
| Rhapsody | Bruder Releasing, Inc. as agent for Rhapsody, LLC | Acquisition Agreement, dated as of May 2, 2002, by and between Blockbuster Inc. and Bruder Releasing, Inc. as agent for Rhapsody, LLC.<br><br>First Amendment to Acquisition Agreement, dated as of September 19, 2002, by and between Blockbuster Inc. and Bruder Releasing, Inc as agent for Rhapsody, LLC. |
| Ring of Darkness | Regent Worldwide Sales, LLC | Acquisition Agreement, dated as of June 1, 2004, by and between DEJ Productions Inc. and Regent Worldwide Sales, LLC.<br><br>First Amendment to Agreement, dated as of June 30, 2004, by and between DEJ Productions Inc. and RegentWorldwide Sales. |

**SCHEDULE 1**

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| River King, The | Myriad Pictures, Inc. | Acquisition Agreement, dated as of August 5, 2005, by and between D.E.J. Productions Inc. and Myriad Pictures, Inc. as agent for River King Productions Limited.<br><br>Short Form Assignment of Rights, dated as of November 15, 2005, by and beterrn First Look Studios, Inc. and Myriad Pictures, Inc. |
| Rob the Mob | RTM Film Productions, LLC | Acquisition Agreement, dated as of February 22, 2013, by and between Millennium Entertainment, LLC and RTM Productions, LLC. |
| Rocco | Action Fliks Media Corporation | Agreement is entered into as of January 27, 2015 shall confirm terms pursuant to which ActionFliks Media Corporation hereby lincenses to Anderson Digital, LLC. |
| Rockaway | Rockaway The Movie, LLC | Acquisition Agreement, dated as of October 11, 2007, by and between First Look Studios, Inc. and Rockaway The Movie, LLC. |
| Rolling Papers | Denver Documentary Collective, LLC | Acquisition Agreement, dated as of March 26, 2015, by and between Our Alchemy, LLC and Denver Documentary Collective, LLC. |
| Rose Parade: A Pageant for the Ages | Goal Productions, Inc. | Schedule 1 Short Form License, notarized as of July 29, 2004, by and between First Look Media, Inc. and Goal Productions, Inc. |
| Run | Run The Movie, LLC | Acquisition Agreement, dated as of July 19, 2013, by and between Millennium Entertainment, LLC and Run the Movie, LLC. |
| Runner, The (1999) | Runner Productions, Inc. and Local Boys, LLC and Ron Moler | Letter Agreement, dated as of January 1, 2005, by and among First Look Media, Inc.; Runner Productions, Inc.; Local Boys, LLC; Ron Moler. |
| Runner, The (2015) | The Runner, LLC. | Acquisition Agreement, dated as of April 24, 2015, by and between Our Alchemy, LLC and The Runner, LLC. |
| Sacrifice (2010) | Sacrifice Distribution, Inc. | Acquisition Agreement, dated as of December 1, 2010, by and between Nu Image, Inc. and Sacrifice Distribution, Inc.<br><br>Assignment, dated as of December 15, 2010, by and between Millennium Entertainment, LLC and Nu Image, Inc. |
| Sakura Killer | Bonaire Films Inc. | Distribution Agreement, dated as of May 26, 1986, by and between Spectrum Entertainment Ltd. And Bonaire Films Inc.<br><br>Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup, Inc. and Spectrum Entertainment Group PLC. |
| Samourais | Fidelite Productions | Acquisition Agreement, dated as of July 4, 2003, by and between DEJ Productions Inc. and Pathe International as agent for Fidelite Productions. |
| Sand | Hard Sand Production, Inc. | Acquisition Agreement dated January 18, 2001 by and between Blockbuster, Inc. and Hard Sand Productions, Inc. |
| Savage Messiah | Cinemavault Releasing Inc. | Acquisition Agreement, dated as of June 17, 2002, by and between Blockbuster Inc. and Cinemavault |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Saving Westbrook High | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| Scared Alive | William T. Naud | Agreement, dated as of October 12, 1987, by and among Overseas Filmgroup Inc.; Spectrum Entertainment Limited; and William T. Naud. Assignment, dated as of June 4, 1993, by and between Overseas Filmgroups Inc. and Spectrum Entertainment Group PLC. |
| Scorched | Juniper Productions | License Agreement, dated as of March 25, 2003, by and between DEJ Productions Inc. and Juniper Productions, LLC. |
| Secret of the Cave | Southern Adventist University d/b/a SVAD Productions | Acquisition Agreement, dated as of January 31, 2007, by and between First Look Studios, Inc. and Southern Adventist University dba SVAD Productions. |
| September Tapes | Project Complex LLC | Acquisition Deal Memo, dated as of January 22, 2004, by and between First Look Media, Inc. and Project Complex LLC. |
| Sex and Breakfast | Bleeding Edge Productions | This Acquisition Agreement is entered into as of August 6, 2007 between First Look Studios, Inc. a Delaware corporation and Bleeding Edge Productions, LLC. |
| Shade | Card Mechanic Productions, LLC | License Agreement, dated as of July 2, 2003, by and between DEJ Productions Inc. and Card Mechanics Productions, LLC.

First Amendment to Acquisition Agreement, dated as of September 4, 2003, by and between DEJ Productions Inc. and Card Mechanics Productions, LLC.

Second Amendment to Acquisition Agreement, dated as of November 3, 2003, by and between DEJ Productions Inc. and Card Mechanics Productions, LLC. |
| Shadows and Lies | In Praise of Shadows the film, LLC | Acquisition Agreement, dated as of March 7, 2011, by and between Millennium Entertainment, LLC and In Praise of Shadows the film, LLC. |
| Shameless | Moor Street Films Plc. | Letter Agreement, dated as of June 1, 1994, by and between Overseas Filmgroup, Inc. and Moor Street Films Plc. Amendment, dated as of December 19, 1995, by and between Overseas Filmgroup, Inc. and Moor Street Films Plc. |
| Shark Hunter | Unified Film Organization LLC | Acquisition Agreement, dated as of November 19, 2001, by and between Blockbuster Inc. and Unified Film Organization. |
| Sheryl Underwood: Too Much Inform | Nubian Nights Worldwide, Inc. | Artist Agreement dated November 15, 2004 by and between Urbanworks Entertainment LLC and Sheryl Underwood |
| Shooting Gallery | Pool Hall Productions | Agreement, dated as of November 23, 2004, by and between DEJ Productions Inc. and Pool Hall Productions, LLC. |
| Shortcut To Paradise | Shortcut to Paradise | Letter Agreement, dated as of October 20, 1994, by and between Overseas Filmgroup, Inc. and Shortcut to Paradise, S.E. |

**SCHEDULE 1**

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Shot | Waterline Pictures, Inc. | Acquisition Agreement, dated as of October 15, 2002, by and between DEJ Productions Inc. and Waterline Pictures, Inc. |
| Sight Unseen | Sawmill Entertainment Corp. Inc. | Distribution Agreement, dated as of March 10, 1989, by and between Spectrum Entertainment Group Plc. And Sawmill Entertainment Corporation Inc.<br><br>Assignment, dated as of June 4, 1994, by and between Overseas Filmgroup Inc. and Spectrum Entertainment Group PLC. |
| Six-String Samurai | Blade LLC | Distribution Agreement, dated as of May 28, 1997, by and between Overseas Filmgroup, Inc. and Blade LLC.<br><br>Amendment, dated as of May 28, 1997, by and between Overseas Filmgroup, Inc. and Blade, LLC. |
| Skin Traffik | Archstone North America, LLC | License Agreement, dated as of April 23, 2015, by and between Our Alchemy, LLC and Archstonr Distribution, LLC.<br><br>First Amendment to License Agreement "Skin Traffik", dated as of July 1, 2015, by and between Millennium Entertainment, LLC and Raging Pictures, Ltd. |
| Skins | Skins Productions, Inc | Distribution Agreement, dated as of March 14, 2001, by and between First LookMedia, Inc. and Skins Productions, Inc. |
| Slash | Wild Coast Releasing Ltd. | Distribution Agreement, dated as of May 18, 2002, by and between First Look Media, Inc. and Wild Coast Releasing Limited. |
| Slaves to the Underground | Kristine Peterson and Enough Rope, Inc. | Production/Finance/Distribution Agreement, dated as of November 3, 1995, by and among Overseas Filmgroup, Inc.; Kristine Peterson; and Enough Rope, Inc.<br><br>Amendment, dated as of October 6, 1997, by and among Overseas Filmgroup, Inc.; Kristine Peterson; and Enough Rope, Inc. |
| Sleeper's Wake | Distant Horizon Limited | Acquisition Agreement, dated as of April 23, 2012, by and between Naedomi Media, LLC and Distant Horizon Limited. |
| Snake Island | NGWE Enterprise | Acquisition Agreement, dated as of November 15, 2002, by and between DEJ Productions Inc. and Fusion International Sales Corporation as agent for NGWE Enterprise. |
| Snapshots | Pueblo Film Licensing Limited | Letter Agreement, dated as of March 7, 2001, by and between First Look Media, Inc. and Pueblo Film Licensing Limited.<br><br>Amendment, dated as of November 25, 2002, by and between First Look Media, Inc. and Pueblo Film Licensing Limited. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Snow Walker, The | Walk Well Productions Inc. | Letter Agreement, dated as of February 14, 2001, by and between First Look Media, Inc. and Walk Well Productions Inc.<br><br>Amendment, dated as of May 29, 2002, by and between First Look Media, Inc. and WalkWell Productions Inc.<br><br>Short-Form License, executed as of July 30, 2003, by and among First Look Media, Inc.; WalkWell Productions Inc.; and SnowWalker Productions Inc. |
| So I Wrote A Song About It | Fairway Film Alliance | Distribution Agreement, dated as of January 1, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Soldier's Tale, A | Mirage Entertainment Corporation, Ltd | Assignment, dated as of June 4, 1993, by and between Overseas Filmgroup Inc. and Spectrum Entertainment Group PLC. |
| Soulmates | Smoking Gun Pictures | Acquisition Term Sheet, dated as of August 28, 2007, by and between First Look Studios, Inc. and Smoking Gun Pictures. |
| Southern Comfort | Destination Cinema, Inc. | Purchase Agreement, dated as of April 28, 1992, by and between Overseas Filmgroup, Inc. and Destination Cinema, Inc. |
| Spirit Trap | Spirit Trap Ltd. | Acquisition Agreement, dated as of July 27, 2006, by and between First Look Studios, Inc. and Spirit Trap Ltd. |
| Stand-Ins | Tetragrammaton Films | Distribution Agreement, dated as of January 10, 1997, by and between Overseas Filmgroup, Inc. and Tetragrammaton Films. |
| Stealing Time | Rennie's Landing, LLC | License Agreement, dated as of April 9, 2003, by and between DEJ Productions Inc. and Rennie's Landing LLC.<br><br>First Amendment to Acquisition Agreement, dated as of September 4, 2003, by and between DEJ Productions Inc. and Rennie's Landing, LLC.<br><br>Second Amendment to Acquisition Agreement, dated as of October 10, 2003, by and between DEJ Productions Inc. and Rennie's Landing, LLC. |
| STOCK OPTION | Swirl Recording & Film Inc. | Short Form Agreement, dated March 30, 2015, by and between The Swirl Girl, LLC, and Our Alchemy, LLC |
| Stolen Child | Hybrid, LLC | Distribution Agreement is entered into as of September 18, 2014 by and between Our Alchemy, LLC, a Delaware limited liability company and Hybrid, LLC |
| Stormageddon | Stormageddon Distribution, LLC | Acquisition Agreement, dated as of July 9, 2014, by and between Millennium Entertainment, LLC, and Stormageddon Distribution LLC, through its agent and authorized signatory Cintel Films, LLC. |
| Stranded | Dolores Pictures, Pza. | Acquisition Agreement, dated as of December 22, 2002, by and between DEJ Productions Inc. and Dolores Pictures. |
| Strangerland | Parker Pictures Holdings Pty Ltd | Acquisition Agreement, dated as of April 27, 2015, by and between Our Alchemy, LLC, and Parker Pictures Holdings, Pty Ltd. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Strays | Strays Productions LLC | Acquisition Agreement dated as of October 31, 2006 by and between First Look Studios Inc. and Strays Productions LLC |
| Stuck in Love | Writers the Movie, LLC | Acquisition Agreement, dated as of September 13, 2012, by and between Millennium Entertainment, LLC andWriters the Movie, LLC. |
| Subject Two | S2 Productions, LLC | Acquisition Agreement, dated as of February 1, 2006, by and between First Look Studios, Inc. and Lantern Lane as agent for S2 Productions, LLC. |
| Subterano | Brainstorm Media | Exclusive License Agreement, dated as of May 9, 2002, by and between DEJ Productions Inc. and Brainstorm |
| SuicideGirls: Must Die! | SG Services Inc. and Beige Lion Productions | Letter Agreement, dated as of June 15, 2009, by and among First Look Studios, Inc.; SG Services Inc.; and Beige Lion Productions, LLC.<br><br>First Amendment to Agreement, dated as of January 20, 2010, by and among First Look Studios, Inc.; SG Services Inc.; and Beige Lion Productions, LLC. |
| Sukiyaki Western Django | Celluliod Dreams Sales | Acquisition Agreement, dated as of November 26, 2007, by and between First Look Studios, Inc. and Celluloid Dreams Sales. |
| Sunstorm | Runner Productions, Inc and Local Boys | Letter Agreement, dated as of January 1, 2005, by and among First Look Media, Inc.; Runner Productions, Inc.; Local Boys, LLC; Ron Moler. |
| Survival | Frank Raffel d/b/a Creative Movie Creations | Acquisition Agreement is entered into as of May 15, 2014 by and between Naedomi Media, LLC and Frank Raffel d/b/a Creative Movie Creations. |
| SWAT: Unit 887 | Status Publications LLC | Acquisition Agreement, dated as of March 18, 2015, by and between Millennium Entertainment, LLC, and Status Publications LLC. |
| Swindle | Export Development Canada | Acquisition Agreement, dated as of November 20, 2002, by and between DEJ Productions Inc. and Fusion International Sales Corporation as agent for Export Development Canada. |
| System Within, The | The System Within Film Production, LLC | Acquisition Agreement, dated as of August 22, 2006, by and between First Look Studios, Inc. and The System Within Film Production, LLC. |
| Target | Westfilm L.P. | Distribution Agreement, dated as of May 3, 2004, by and between First Look Media, Inc. and American Cinema International as agent for Westfilm L.P. |
| Ted Bundy | Incessant Barking Productions, Inc. | Co-Investment Agreement, dated as of May 3, 2001, by and among First Look Media, Inc (formerly known as Overseas Filmgroup, Inc.; Teddy Films Limited; Crowbar and Hammer Productions, Inc.; and Incessant Barking Productions, Inc. |
| Tell-Tale Heart | Archlight Films International PTY Ltd. | Acquisition Agreement, dated as of June 23, 2015, by and between Our Alchemy, LLC and Archlight Films International PTY Ltd. |
| The Perfect Student | Hybrid, LLC | Distribution Agreement is entered into as of September 18, 2014 by and between Our Alchemy, LLC, a Delaware limited liability company and Hybrid, LLC |
| Thing Below, The | Unified Film Organization LLC | Acquisition Agreement, dated as of August 22, 2003, by and between DEJ Productions Inc. and Unified Film Organization LLC. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Thirst | MarkoPoloFilms Library, LLC | Acquisition Agreement, dated as of January 4, 2010, by and between First Look Studios, Inc. and MarkoPoloFilms Library, LLC. |
| Thirteen Conversations About One Th | Conversations Productions; Jimmy Productions, Inc; Stonelock Pictures LLC; Beni Atoori; Echo Lake Productions, LLC | Deed of Transfer, notarized as of August 28, 2001, by and among First Look Media, Inc; Stonelock Pictures, LLC; Jimmy Productions, Inc.; Conversation Productions, Inc.; Beni Atoori; and Echo Lake Productions, LLC. |
| This Is The Sea | Pembridge Pictures | Letter Agreement, dated as of May 10, 1995, by and between Overseas Filmgroup, Inc. and Pembridge Pictures, Ltd. |
| Through The Fire | Charles C. Cunningham | Letter Agreement, dated as of January 30, 1989, by and between Overseas Filmgroup, Inc. and Charles C. Cunningham. |
| Ticks | Ticks United, Inc. | Purchase Agreement, dated as of May 8, 1992, by and between Overseas Filmgroup, Inc. and Ticks United, Inc. |
| Titus | Clear Blue Sky Productions, Inc. | Production/Financing/Distribution Agreement, dated as of December 24, 1997, by and among Overseas Filmgroup, Inc.; Clear Blue Sky Productions, Inc; and N.D.F. International Ltd. |
| Touched | Touched The Movie, LLC | Acquisition Agreement, dated as of February 21, 2006, by and between First Look Studios, Inc. and Touched the Movie, LLC. |
| Tough Luck | Curb Entertainment International Corporation | License Agreement, dated as of July 25, 2003, by and between DEJ Productions Inc. and Curb Entertainment International Corporation. |
| Tracks | Two Dog Productions, Inc. | Acquisition Agreement, dated as of January 2, 2007, by and between First Look Studios, Inc. and Two Dog Productions, Inc. |
| Trade Routes | Mystic Pictures LLC | Distribution Agreemenet entered into as of January 8, 2010 by and between Vanguard Internations Cinema and Mystic Pictures, LLC |
| Trained To Kill | Starvision, Inc. | Purchase Agreement, dated as of March 19, 1997, by and between Overseas Filmgroup, Inc. and Starvision, |
| Transsiberian | Sociedad General de Derechos Audiovisuales S.A. | Agreement, dated as of February 28, 2008, by and between First Look Studios, Inc. and Sociedad General de Derechos Audiovisuales S.A. |
| Trauma | Myriad Pictures, Inc. | Acquisition Agreement, dated as of October 1, 2004, by and between DEJ Productions Inc. and Myriad Pictures, Inc. as agent for Trauma Productions Limited. |
| Trauma (Dario Argento's Trauma) | ADC s.r.l. | Distribution Agreement, dated as of March 31, 1992, by and between Overseas Filmgroup, Inc. and ADC s.r.l.  Distribution Agreement Amendment, dated as of July 29, 1992, by and between Overseas Filmgroup, Inc. and ADC s.r.l. |
| Treasure Of The Lost Desert | United Entertainment Incorporated and A&Z Company Limited | Letter Agreement, dated as of October 15, 1995, by and among Overseas Filmgroup, Inc.; United Entertainment, Incorporated; and A & Z Company Limited. |
| Triangle | Icon Entertainment International | Agreement, dated as of June 29, 2009, by and between First Look Studios, Inc. and Icon Entertainment International. |

SCHEDULE 1

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| Turkles | Fairway Film Alliance | Distribution Agreement, dated as of January 1, 2014, by and between Anderson Digital, LLC and Fairway Film Alliance. |
| Unbelievable Truth | Action Features, Inc. | Sales Agency Agreement, dated as of April 26, 1989, by and between Overseas Filmgroup, Inc. and Action Features, Inc. |
| Uncorked | Unapix Enertainment Inc. DIP | Letter Agreement, dated as of July 1, 2002, by and between Blockbuster Inc. and Unapix Entertainment, Inc. DIP. |
| Unexpected | The Film Arcade, LLC | Acquisition Agreement, dated as of May 15, 2015, by and between Our Alchemy, LLC and The Film Arcade, |
| Unmoved Mover, The | Mystic Pictures LLC | Distribution Agreemenet entered into as of January 18, 2012 by and between Vanguard Internations Cinema and Mystic Pictures, LLC |
| Upside Down | Over the GW | Acquisition Agreement, dated as of October 10, 2012, by and between Millennium Entertainment, LLC and Studio 37 SA. |
| Virgin of Juarez, The | Las Mujeres LLC | Acquisition Agreement, dated as of April 25, 2006, by and between First Look Studios, Inc. and Las Mujeres |
| Visit: An Alien Encounter, The | Random Media Holdings LLC | Distribution Agreement is entered into as of April 30, 2015 by and between Our Alchemy, LLC, a Delaware limited liability company, and Random Media Holdings, LLC |
| Voyage Of The Heart | Maddalena Z Ltd. Partnership | Distribution Agreement, dated as of February 22, 1990, by and between Overseas Filmgroup, Inc. and Madelena Z Limited Partnership. |
| Wake Of Death | B/M Studios, Inc. as sales agent on behalf of BM Studios UK | License Agreement, dated as of December 8, 2003, by and between DEJ Productions Inc. and B/M Studios, Inc. as agent for BM Studios [UK] Limited. |
| Wan Chai Baby | Dragon Horse Films Limited | Agreement, dated as of February 27, 2012, by and between Vanguard International Cinema, and Dragon Horse Films Limited. |
| Wassup Rockers | Dual Films Productions, Inc. | Acquisition Agreement, dated as of June 1, 2006, by and between First Look Studios, Inc. and Dual Films Productions, Inc.<br><br>Buyout/Assignment of Rights Agreement, effective as of December 22, 2006, by and between First Look Studios, Inc. and Dual Films Productions, Inc. |
| Wedding Weekend, The | Shut Up and Sing LLC | Agreement, dated as of August 1, 2008, by and between First Look Studios, Inc. and Shut up and Sing LLC. |
| Welcome to Inspiration | CAPITAL CHRISTIAN DIST | Agreement dated as of April 30, 2015 shall confirm the terms pursuant to which Capital Chrisitan Music Group, Inc. hereby grants, assigns and conveys to Anderson Digital, LLC. |
| Welcome to Me | Welcome to Me, LLC | Agreement, dated as of September 7, 2014, by and between Our Alchemy, inc. and Welcome to Me, LLC. |
| Welcome To Paradise | Welcome to Paradise, LLC | License Agreement, dated as of March 8, 2007, by and between First Look Studios, Inc. andWelcome to Paradise, LLC. |
| What Maisie Knew | Maisie Knew, LLC | Acquisition Agreement, dated as of September 11, 2012, by and between Millennium Entertainment, LLC and Maisie Knew, LLC. |

**SCHEDULE 1**

**PICTURES AND DESIGNATED CONTRACTS**

| Schedule of Titles | Content Licensor | Designated Contract |
|---|---|---|
| When Will I Be Loved | Signet Ring Productions, Inc. | Distribution Agreement, dated as of September 8, 2004, by and between First Look Media, Inc. and Signet Ring Productions, Inc. |
| Where's the Love? | Swirl Recordings & Film Inc. | Acquisition Agreement entered into as of August 21, 2014 by and between Millinnum Entertainment, LLC and Swirl Recoding Film, Inc. |
| White Coats | Tintagle Productions Inc. | Acquisition Agreement, dated as of March 2, 2006, by and between First Look Studios, Inc. and Tintagel Productions Inc. |
| White Phantom | Bonaire Films Inc. | Distribution Agreement, dated as of May 16, 1987, by and between Spectrum Entertainment Ltd. And Bonaire Films Inc. |
| Wilderness | AV Pictures LTD | Acquisition Agreement, dated as of July 28, 2006, by and between First Look Studios, Inc. and AV Pictures Ltd as agent for Wilderness Film.<br><br>First Amendment, dated as of January 16, 2007, by and between First Look Studios Inc. and AV Pictures Ltd as agent for Wilderness Film. |
| Woman, Her Men And A Futon, A | Interpersonal Films, Inc. | Distribution Agreement, dated as of November 1, 1990, by and between Overseas Filmgroup, Inc. and Interpersonal Films, Inc.<br><br>Short Form Quitclaim, executed as of December 6, 2001, by and between First Look Media, Inc. and Dale Rosenbloom. |
| World Made Straight, The | TWMS, LLC | Proposed Summary Term Sheet; Distribution fee Deal effective as of July 10, 2014 by and between Millennium Entertainment, LLC and TWMS, LLC. |
| XII | The Skinner Movie, LLC | Acquisition Agreement, dated as of May 5, 2011, by and between Naedomi, Meida, LLC and The Skinner Movie, LLC. |
| Zipper | Hush Productions, LLC | Acquisition Agreement, dated as of May 5, 2015, by and between Pacific Northwest Pictures, Inc. and Our Alchemy, LLC |

## Schedule II

Guild Secured Pictures

**Schedule II - Guild Secured Pictures**

**Picture Title**

10 Items or Less
2001 Maniacs: Field of Screams
Accidental Love
Aftershock
Amateurs, The
American Crime, An
American Yakuza
American Yakuza 2: Back to Back
Animal
Are You Here
Arizona Heat
Art of Travel, The
Ash Wednesday
Assasin's Bullet
Attic Expeditions, The
Avenging Angelo
Babymakers, The
Back in the Day
Bad Company (aka Nature of The Beast)
Bandit Hound, The
Bark
Bernie
Big Nothing
Big Squeeze, The a.k.a. Body of a Woman
Black Cadillac
Blue Demon
Blue Desert
Blue Tiger
Bookies
Bound by Lies a.k.a. Long Dark Kiss
Broken
Brother's Keeper
Brother's Kiss, A
Butterfly Room, The
By The Gun
Caffeine
Cassadaga
Charlie Countryman (aka Necessary Death of Charlie Countryman)
Cherry Crush
Chrystal
Clawed: The Legend of Sasquatch
Comeback Season
Coronado
Costa Rican Summer

**Schedule II - Guild Secured Pictures**

| Picture Title |
| --- |
| Countdown (aka Summer Bomber aka Serial Bomber) |
| Cover Story |
| Crazy as Hell |
| Crush |
| Culling, The (a/k/a Children of the Devil) |
| Dahmer a.k.a The Mind is a Place of its Own |
| Danika |
| Darkroom |
| Dead Girl, The |
| Dedication |
| Desert Saints |
| Devious Beings |
| Dirty Love |
| Distant Justice |
| Donner Party, The |
| Dragonstorm aka Dragon Storm a.k.a. Dragon Quest |
| Drive |
| Elsa & Fred |
| Employee of the Month |
| Endure |
| Epoch |
| Epoch: Evolution |
| Evil Alien Conquerors |
| Fading Gigolo |
| Falling Sky a.k.a. Crocodile Tears |
| Far Side of Jericho, The |
| Final Round |
| First Born |
| Gacy |
| Gang of Roses a.k.a. Guns and Roses |
| Glass Trap |
| Grand Theft Parsons |
| Guide To Recognizing Your Saints |
| Guncrazy |
| Harvard Man |
| Hell Baby |
| Her Minor Thing |
| High Road |
| Hollow, The |
| Hollywood Dreaming |
| Hollywood Vice Squad |
| Home Room |
| Howl |
| Illuminata |

**Schedule II - Guild Secured Pictures**

| Picture Title |
| --- |
| Infestation |
| Infinity |
| Into Temptation |
| James White |
| Jimmy Show, The |
| Job, The |
| Jonathan of the Bears |
| Khumba |
| Kidnapping Mr. Heineken |
| King of the Avenue |
| Lavalantula |
| Little Birds |
| Little Bit of Heaven, A |
| Local Boys |
| Lost and Found in Armenia |
| Lost Voyage |
| Lower Level |
| Maniac Cop II |
| Maniac Cop III: Badge of Silence |
| Map of the World |
| Maximum Velocity |
| Midnight Heat (aka Sunset Heat) |
| Mindgames |
| Missing William |
| Molly Moon and the Incredible |
| Mommy Market, The (aka Trading Mom) |
| Monster Island |
| Mr. Fix It |
| Necromancer aka Aftershock |
| Neighbor, The |
| Night Screams |
| No Safe Haven |
| No Way Back |
| On the Line |
| Once Fallen |
| One Good Turn |
| Parasite |
| Parts Per Billion |
| Party Girl |
| Party Monster |
| People Place Things |
| Perfect Witness, The (aka Ungodly, The) |
| Player 5150 |
| Plush |

**Schedule II - Guild Secured Pictures**

| Picture Title |
| --- |
| Post Impact (aka P.I.: Post Impact) |
| Pressure |
| Prophecy, The |
| Puncture |
| Purgatory Flats |
| Quicksand (2002) |
| Ragamuffin |
| Rampart |
| Reach Me |
| Red Lights |
| Remember the Daze |
| Resurrection, A |
| Ring of Darkness a.k.a Boys II Death |
| Rob the Mob |
| Rockaway |
| Run |
| Sand |
| Scorched |
| Sex and Breakfast |
| Shade |
| Shadows and Lies (aka Shadows & Lies) |
| Shooting Gallery a.k.a Pool Hall Prophets |
| Shot (aka Shutter aka Focus) |
| Sight Unseen (aka Out of Sight, Out of Mind) |
| Skins |
| Stand-Ins |
| Stormageddon |
| Stuck in Love |
| Sunstorm |
| Target |
| Ted Bundy |
| The Runner |
| Thirst (1998) |
| Thirteen Conversations About One Thing |
| Ticks |
| Touched |
| Tracks |
| Trauma |
| Trauma (1993) |
| Uncorked |
| Virgin of Juarez, The |
| Wassup Rockers |
| Wedding Weekend, The |
| Welcome to Me |

**Schedule II - Guild Secured Pictures**

| Picture Title |
| --- |
| What Maisie Knew |
| When Will I Be Loved |
| Woman, Her Men And A Futon, A |
| World Made Straight, The |
| Zipper |

**Schedule III**

Litigation

**NONE**

**Amendment No. 1**

"Excluded Assets" as defined in this Agreement is amended to include the following:

(k)     The right of Our Alchemy LLC as Distributor under section 4.1 of the Acquisition Agreement entered into May 1, 2015, effective as of September 7, 2014 by and between Our Alchemy LLC ("Distributor") and Welcome to Me LLC the ("WTM Agreement") to match the terms of any offer (the "Right of First Refusal") received by Welcome to Me LLC ("WTM") to exploit Derivative Production Rights (as defined in the WTM Agreement).  However, WTM has agreed in lieu of the Right of First Refusal to instead notify the Purchaser as successor distributor under the WTM Agreement in writing of the receipt of offers to exploit such Derivative Production Rights and provide the Purchaser as successor distributor with two (2) business days in which to submit a competing offer for consideration by WTM ("Right to Notice") which offer WTM may or may not agree to accept in its sole and absolute discretion.  Notwithstanding anything in this Agreement to the contrary, the aforesaid Right to Notice shall be included as an Acquired Asset under this Agreement.

**Agreed to by SELLER:**

GEORGE L. MILLER, AS TRUSTEE FOR THE ESTATES

By: _____ 7/25/18
Name:     George L. Miller     Date
Title:     Trustee

**Agreed to by PURCHASER:**

OA ACQUISITIONS LLC

By: _____ 7/25/18
Name: Craig Brumberg     Date
Title: VP finance

**Agreed to by GUARANTOR:**

FILMRISE ACQUISITIONS LLC

By: _____ 7/25/18
Name: Craig Brumberg     Date
Title: VP finance